**STATE OF MICHIGAN**
**IN THE BUSINESS COURT FOR THE COUNTY OF OAKLAND**

FILED   Received for Filing   Oakland County Clerk   1/25/2021 8:14 AM

**AXLE OF DEARBORN, INC., D.B.A.**
**DETROIT AXLE**, a Michigan corporation;
**DETROIT AXLE, INC.**, a Michigan corporation;
and **DETROIT AXLE QSSS, INC.**, a Michigan
corporation,

        Plaintiffs,

v.

**DETROIT IT, LLC**, a Michigan limited
liability company and **ERIC GRUNDLEHNER**,
an individual,

        Defendants.

Case No. 21-185911-CB
Hon. Michael Warren

---

Jonathan H. Schwartz (P70819)
Mark L. Kowalsky (P35573)
Jonathan E. Sriro (P52100)
Benjamin M. Low (P82834)
Jaffe Raitt Heuer & Weiss, PC
Attorneys for Defendants
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
jschwartz@jaffelaw.com
mkowalsky@jaffelaw.com
jsririo@jaffelaw.com
benlow@jaffelaw.com

---

**<u>SUPPLEMENT TO PLAINTIFFS' EMERGENCY MOTION FOR ENTRY OF A
TEMPORARY RESTRAINING ORDER TO MAINTAIN THE STATUS QUO AND TO
SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED</u>**

      Plaintiffs Axle of Dearborn, Inc. d.b.a. Detroit Axle, Detroit Axle, Inc., and Detroit Axle

QSSS, Inc. (collectively, "Detroit Axle" or "Plaintiffs"), through their attorneys, Jaffe, Raitt, Heuer

& Weiss, P.C., submits this Supplement to their Emergency Motion for Entry of a Temporary

Restraining Order to Maintain the Status Quo and to Show Cause Why a Preliminary Injunction

1

5112644

Should Not Be Entered (the "Motion") against Defendants Detroit IT, LLC ("Detroit IT") and Eric Grundlehner ("Grundlehner," together with Detroit IT, the "Defendants"), and states:

1. Since the afternoon of Friday, January 22, 2021, when Detroit Axle filed its Verified Complaint and Motion, new information has come to light that establishes that: (i) Defendants have acted consistently in the same illicit and extortive manner as described in Detroit Axle's Verified Complaint with other companies which have utilized, and then attempted to disengage from, Defendants' services; and (ii) <u>Oakland County Business Court Judge Martha D. Anderson (in an ongoing case) and Ret. Oakland County Business Court Judge James Alexander have both previously issued Temporary Restraining Orders against Detroit IT in similar situations where it tried to hold a former client's IT infrastructure hostage, compelling Detroit IT to immediately return control of the IT infrastructure, without requiring the posting of a bond.</u>

2. Detroit Axle has learned that Detroit IT is currently engaged in litigation in twelve other cases in the Oakland County Circuit Court. Detroit IT is the defendant in six of those cases and has had counter-claims asserted against it in three more of those cases.[1]

3. Defendants, individually or collectively, have had claims similar to Detroit Axle's claims asserted against them in many of these previously filed lawsuits – that Detroit IT and its owner Eric Grundlehner, upon having the client terminate serves, engage in a repeated pattern of hijacking their former clients' networks, computers and servers in order to extort them for monies that they are not entitled to receive as ransom to regain control of their IT infrastructure.[2]

---

[1] Of the three cases that Detroit IT is a plaintiff, two of them (2020-181902-CB 2019-174882-CB) and have been dismissed before an answer could even be filed, and one of them, 2019-178465-CB, only had an answer filed in the last two weeks.

[2] The cases where Defendants have claims or counterclaims asserted against them are 2015-148388-CB, 2019-178289-CB, 2020-18970-CB, 2020-180046, 2019-174634-CB, 2018-169904-CB, 2018-170280-CB, 2020-182419-CB, and 2019-175739-CZ.

5112644

4.     In *Custom Home Health, Inc v Detroit IT, LLC*, 20-181970-CB, an ongoing case that appears headed to trial, the Honorable Martha D. Anderson found that "it appears that Defendant Detroit IT, LLC may be improperly withholding the requested login access credentials and interfering with Plaintiff's relationships with its patients and new IT service provider." *See* Order Granting Plaintiff's Emergency Motion for a Temporary Restraining Order and Requiring Defendant to Show Cause, attached as **Exhibit A**.

5.     In issuing a Temporary Restraining Order against Detroit IT, without notice to Detroit IT, Judge Anderson found that "Plaintiff will suffer irreparable harm if this order is not entered because Plaintiff and its new IT service Provider will be unable to access and use Plaintiff's own computers, network servers, and devices, compromising Plaintiff's ability to provide service to its patients. . . ." *Id*.

6.     Thus, Judge Anderson issued the same injunctive relief that Detroit Axle is asking for in this case, and issued a TRO against Detroit IT, which required it to return all of its former customer's login credentials and passwords without bond, for conduct which is exactly the same as what Detroit IT has done to Detroit Axle in this case. *See* Custom Home Health, Inc. Emergency Motion, attached as **Exhibit B**.

7.     Moreover, now retired Judge James Alexander issued Temporary Restraining Orders against Detroit IT for similar conduct, which required Detroit IT to "provide all passwords, access information and other information to allow Plaintiff to access it's business information contained on Defendant's servers or at Defendant's premises within 48 hours of this Order." **Exhibit C**.

8.     Similarly, a TRO should issue in this matter to allow Plaintiffs to regain control of their IT infrastructure, so that Defendants' extortion will end, and then this matter can fairly proceed without the threat of Plaintiffs' business, and its hundreds of employees, and the essential

3

services they provide, being under constant jeopardy. The opinions of Judges Anderson and Alexander on this exact issue of returning control of the IT Infrastructure to former clients who are being extorted by Detroit IT constitute compelling persuasive authority.

9.     To make matters worse, upon learning of the filing of the Complaint and Motion on Friday, January 22, 2021, Defendants' counsel, Jason Yertz, has continued to engage in harassing and unprofessional behavior toward counsel for Plaintiffs, including, but not limited to, baselessly threatening to: (i) file frivolous lawsuits against Plaintiffs' counsel, Jonathan H. Schwartz and Jonathan E. Sriro, personally; and (ii) move to have Plaintiffs' law firm disqualified or get them fired by Plaintiffs.

10.    Mr. Yertz's behavior – including the deeply disturbing telephone call with Plaintiffs' counsel last Thursday evening referenced in the Motion, where Mr. Yertz threatened to trespass on Plaintiffs' premises over the objection of Plaintiffs' counsel – appears to be intentionally calculated to: (i) gain an unfair litigation advantage through improper means; (ii) prejudice these proceedings; (iii) terrorize Plaintiffs and their counsel; and (iv) directly help Defendants in their effort to pressure Plaintiffs into paying a ransom to regain control of their business which had thrived for over 60 years before Detroit IT's involvement. Unfortunately, the Plaintiffs and their attorneys in this case are not the only current victims of this sort of misconduct by Defendants and their counsel.[3]

11.    After the filing of the Complaint, Plaintiffs' counsel received information that Mr. Yertz is engaged in similar bullying and increasingly disturbing behavior against opposing attorneys and another former client of Detroit IT in the ongoing case before Judge Anderson.

_____

[3] In a telephone conversation on Thursday, January 21, 2021, Defendants' counsel Jason Yertz not only threatened to enter Plaintiffs' premises without permission, but lewd comments to Plaintiffs' counsel, including demanding that Mr. Schwartz "pull down your pants." This conversation was also witnessed by Plaintiffs' co-counsel Jon Sriro who was also on the telephone call.

5112644

12.     Plaintiffs request that the court pay particular attention to Defendants' and their counsel's actions during these proceedings, and strictly enforce the rules of civility and professionalism so that they are not flouted, and so that Mr. Yertz's repeated pattern of harassment against opposing counsel and parties does not continue in the Oakland County Business Court.[4]

13.     Because Mr. Yertz is allegedly engaged in similar misbehavior (including conduct even worse than described here) in a nearly identical ongoing case for the same clients, Judge Anderson should similarly be notified so that appropriate oversight, disciplinary and corrective actions is taken.

14.     Additionally, Detroit Axle has additional substantial reason to believe that Detroit IT has and continues to read as well as intercept the emails of clients – all of which places all of Plaintiffs' attorney/client privileged emails and work/product protected documents at risk.[5]

15.     For the sake of the integrity of these proceedings and in the interest of justice, Detroit IT and Mr. Grundlehner should be ordered to turn over all login credentials and remove themselves completely from Detroit Axle's network and computer systems immediately due to the substantial risk that Detroit IT is intentionally intercepting Detroit Axle's privileged and confidential communications, as it has believed to have done to other customers, especially given the troubling behavior exhibited by their attorney in at least two cases before the Oakland County Business Court on behalf of Detroit IT.

16.     Plaintiffs' counsel's ability to interact and advise their clients, especially during an

---

[4] Plaintiffs respectfully requests that the Court reminds all counsel to adhere to the Professionalism Principles for Lawyers and Judges in Administrative Order 2020-23, attached as **Exhibit D**, and the requirements of the Michigan Rules of Professional Conduct.
[5] Due to the information that Detroit Axle has discovered about Detroit IT's intrusion onto its network and computer systems, Detroit Axle has in the interim been forced to disconnect and/or otherwise make some of its computers inoperable, due to the serious security threat it faces as a result of Detroit IT's hacking of its systems.

5112644

ongoing pandemic, has and continues to be detrimentally impacted by the risk and likelihood of spying and further sabotage by these Defendants.

17.     In light of this new information, and for the reasons previously stated, Detroit Axle respectfully requests that the Court issues a temporary restraining order against Defendants that requires them to immediately turn over all login credentials to any and all of Detroit Axle's network or computer systems, along with the credentials for all Detroit Axle's local and/or cloud based accounts. A new proposed order is attached as **Exhibit E**.

WHEREFORE, Detroit Axle respectfully requests that this Court issue a temporary restraining order and order to show cause why a preliminary injunction pursuant to MCR 3.310 should not be entered temporarily retraining and enjoining Defendants, and anyone acting in concert with them, from: (1) removing the Detroit Axle Equipment; (2) removing any other network and/or computer systems that are already installed at Detroit Axle's locations; (3) restricting Detroit Axle's use and/or access to the Detroit Axle Equipment and/or other equipment installed at Detroit Axle's locations in any way; (4) changing the passwords to the Accounts; (5) modifying the Accounts in any way; (6) restricting Detroit Axle's use and/or access to the Accounts in any way; (7) restoring Detroit Axle's full access to its entire IT infrastructure, and (8) delivering all passwords, access information, and other information required to facilitate Detroit Axle's transition to its new IT service provider, together with such other and further relief as the Court deems just and proper. A copy of the proposed temporary restraining order is attached as **Exhibit E**.

Respectfully submitted,

JAFFE, RAITT, HEUER, & WEISS, P.C.

By:     /s/ Jonathan H. Schwartz
        Jonathan H. Schwartz (P70819)
        Mark L. Kowalsky (P35573)

5112644

Jonathan E. Sriro (P52100)
Benjamin M. Low (P82834)
Jaffe Raitt Heuer & Weiss, PC
*Attorneys for Detroit Axle*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
jschwartz@jaffelaw.com
mkowalsky@jaffelaw.com
jsririo@jaffelaw.com
Dated: January 25, 2021                  benlow@jaffelaw.com

7

## INDEX OF EXHIBITS

Exhibit A          Custom Homes Order Granting Plaintiff's Emergency Motion for a
                   Temporary Restraining Order and Requiring Defendant to Show Cause

Exhibit B          Custom Home Health, Inc. Emergency Motion

Exhibit C          Search Plus International Order

Exhibit D          Administrative Order 2020-23

Exhibit E          Proposed Temporary Restraining Order

# EXHIBIT A

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS DIVISION**

Custom Home Health, Inc.,

        Plaintiff,

v.

Detroit IT, LLC ,

        Defendant.

Case No. 20-181970-CB

Hon. Martha D. Anderson

_____/

MILLER, CANFIELD, PADDOCK
  and STONE, P.L.C.
Joseph G. Vernon (P68951)
Jeffrey A. Crapko (P78487)
Anita C. Marinelli (P81986)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420

_____/

Proposed **ORDER GRANTING PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY**
**RESTRAINING ORDER AND REQUIRING DEFENDANT TO SHOW CAUSE**

At a session of said Court, held in the City of Pontiac, County
of Oakland, State of Michigan, on ___6/26/2020___

PRESENT: ___HON. MARTHA D ANDERSON___
          Honorable Martha D. Anderson

This matter having come before the Court on Plaintiff Custom Home Health, Inc.'s

Emergency Motion for a Temporary Restraining Order and Order to Show Cause Why a

Preliminary Injunction Should Not Issue, the Court finds as follows:

Upon review of Plaintiff Custom Home Health, Inc.'s Verified Complaint, Emergency

Motion, and Brief in Support, and being otherwise advised in the premises, it appears that

Defendant Detroit IT, LLC may be improperly withholding the requested login access

credentials and interfering with Plaintiff's relationships with its patients and new IT service

provider.

FILED   Received for Filing   Oakland County Clerk   6/26/2020 4:25 PM

It further appears that Plaintiff will suffer irreparable harm if this order is not entered because Plaintiff and its new IT service provider will be unable to access and use Plaintiff's own computers, network servers, and devices, compromising Plaintiff's ability to provide services to its patients, and putting patient well-being and the security of patient data at risk.

It further appears necessary to enter this order without notice to Defendant given the above-described irreparable harm that will occur if Plaintiff's information technology is in any way breached or compromised, either before or during Plaintiff's transition to its new IT service provider.

IT IS HEREBY ORDERED THAT Defendant Detroit IT SHALL DELIVER TO CUSTOM by ~~Monday June 29~~, **Tuesday, June 30th** 2020 at 5:00 p.m., all passwords, access information, and other information required to facilitate Custom's transition to its new IT service provider, including but not limited to:

(i)     domain administrator login credentials and passwords for Custom's Windows domain;

(ii)    Global Administrator login credentials and passwords for Custom's Microsoft 365 tenant;

(iii)   administrator login credentials and passwords to Custom's Meraki console;

(iv)   administrator login credentials and passwords for Custom's switches, firewalls, routers, and any other network devices;

(v)    Custom's current backup solution, including onsite and offsite storage locations;

(vi)   Custom's antivirus and remote machine management products; and

(vii)   administrator access to Microsoft VLSC portal (and any copies of Custom's Microsoft server licensing);

IT IS FURTHER ORDERED that Detroit IT is HEREBY RESTRAINED AND ENJOINED from altering the status quo or otherwise imperiling Custom's information technology during its transition to a new IT service provider, which is expected to take 10-14 days;

IT IS FURTHER ORDERED that Detroit IT shall appear before this Court to show cause **on July 29, 2020 at 10:00 a.m. to be conducted via Zoom video conference. Plaintiff shall file a NOH & Praecipe.** why a preliminary injunction should not be entered by ~~Wednesday, July 1, 2020;~~

IT IS FURTHER ORDERED that a copy of this Order shall be served upon Detroit IT's **& all pleadings and papers filed in this case** resident agent and president, Eric Grundlehner, and its prior designated counsel, Jason Yert, by email and via Federal Express (or similar service) overnight delivery, **on or before 12:00 p.m. on Monday, June 29, 2020.**

IT IS FURTHER ORDERED, that, given the nature of this controversy, bond is deemed unnecessary; and

IT IS FURTHER ORDERED, that this order shall **continue until further Order of this Court.** ~~expire within fourteen days of entry, unless continued by a subsequent order of the Court.~~

This is not a Final Order and does not close the case.

/s/ Martha Anderson
Honorable Martha D. Anderson
Circuit Court Judge

36096930.1\158296-00002

# EXHIBIT B

FILED   Received for Filing   Oakland County Clerk   6/24/2020 12:32 PM

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

**BUSINESS DIVISION**

Custom Home Health, Inc.,

        Plaintiff,                     Case No. 20-181970-CB

v.                                    Hon. Martha D. Anderson

Detroit IT, LLC ,

        Defendant.                 JURY TRIAL DEMANDED

_____/

MILLER, CANFIELD, PADDOCK
   and STONE, P.L.C.
Joseph G. Vernon (P68951)
Jeffrey A. Crapko (P78487)
Anita C. Marinelli (P81986)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420

_____/

**PLAINTIFF'S EMERGENCY MOTION**
**FOR A TEMPORARY RESTRAINING ORDER AND ORDER**
**TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

      NOW COMES Plaintiff Custom Home Health, Inc. ("Custom"), by and through its attorneys, Miller, Canfield, Paddock and Stone, P.L.C., and hereby moves for the entry of a temporary restraining order and order to show cause why a preliminary injunction should not be issued for the reasons more fully stated in the attached brief.

                             Respectfully submitted

                             MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

                             By:  /s/Joseph G. Vernon
                                      Joseph G. Vernon (P68951)
                                      Jeffrey A. Crapko (P78487)
                                      Anita C. Marinelli (P81986)
                                      150 West Jefferson, Suite 2500
                                      Detroit, MI  48226
                                      (313) 963-6420
                                      vernon@millercanfield.com
                                      crapko@millercanfield.com
                                      marinelli@millercanfield.com

FEE                                 Attorneys for Plaintiff

Date:  June 24, 2020

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

**BUSINESS DIVISION**

Custom Home Health, Inc.,

                 Plaintiff,

v.

Detroit IT, LLC ,

                 Defendant.

_____/

Case No. 20-181970-CB

Hon. Martha D. Anderson

JURY TRIAL DEMANDED

MILLER, CANFIELD, PADDOCK
   and STONE, P.L.C.
Joseph G. Vernon (P68951)
Jeffrey A. Crapko (P78487)
Anita C. Marinelli (P81986)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420

_____/

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

**OVERVIEW**

With the pandemic as a backdrop and the well-being of hundreds of Custom's patients at risk, Detroit IT has resorted to mob-style strong-arm tactics and is holding Custom's entire computer infrastructure hostage, threatening Custom's supply of life-improving and life-sustaining services.

Custom provides critical home health services—including palliative and hospice care—to over 700 patients here in Southeastern Michigan. Custom hired Detroit IT to manage its information technology infrastructure—its computers, network servers, and devices—pursuant to a Managed IT Services Agreement ("Agreement").

Custom gave notice on February 7, 2020 that it was terminating the Agreement effective May 1, 2020. This was two months' more notice than the Agreement required. Custom gave

this additional notice to ensure that its patients' services were not interrupted during the process of transitioning to a new IT manager.  And Custom asked right away for the administrative login and password credentials for **Custom's own network and software** so that it could prepare for and ensure a seamless transition to the new provider.

To be clear, Custom is asking for login and password information for **its own property**. This is information that Detroit IT was supposed to have provided long ago pursuant to the terms of the Agreement.

But for the past five months, Detroit IT has failed to provide the requested information despite repeated requests.  Its president Eric Grundlehner said in February that he would provide the credentials, but since then has either ignored the follow up requests or said "talk to my lawyer."  Detroit IT's counsel has either claimed not to understand the requests—which have been articulated several times—or said "talk to my client."  They've both claimed at times to be "too busy" and at other times—shockingly—demanded a ransom and threatened to leak confidential and sensitive information if their demand was not met.

On May 19, Detroit IT finally promised to provide the information and claimed that it was still "trying to compile" it.  Its counsel complained that Custom was being "insensitive to the hardships of Covid-19" by repeatedly asking for its own password and login information for five months.  **But he said he would provide the very information at issue in this motion**.

It is now June 24 and they still have not provided the information.  Custom needs its administrator login credentials immediately so that it can facilitate and complete its transfer to a new provider.  Given Detroit IT's conduct and threats, Custom also needs assurances that Detroit IT will not sabotage its information technology during the transition process.

Custom has fulfilled its obligations under the Agreement and even paid for an additional two months of Detroit IT's services (May and June 2020), services that were only necessitated by Detroit IT's failure to provide the needed information in a timely manner. **Custom does not owe Detroit IT for any outstanding services and Detroit IT has promised that it would provide the requested information.** Detroit IT has simply failed to fulfill that promise.

Custom, its employees, and its staff will be irreparably harmed if this Court does not enter an injunction mandating the delivery of the login information and passwords to Custom's own computer system and otherwise preserving the status quo through the transition. Custom will be unable to access and use its own computers, network servers, and devices, it risks losing vital patient medical data, the security of this data could be compromised, Custom's employees will be unable to work remotely, its current contracts and business relationships—both with its patients and its new IT manager—will be significantly disrupted, and the well-being of hundreds of Custom's patients will be jeopardized.

Detroit IT faces no harm at all. It does not cost Detroit IT anything to provide Custom's own passwords for its own network and software. These are things that were supposed to be provided to Custom already, and that Detroit IT's counsel has already promised to produce. And Detroit IT has already been paid for its services through June.

Sadly, these delay tactics and threats appear to be Detroit IT's modus operandi. Just two weeks ago—in similar circumstances—Judge Alexander ordered Detroit IT to "provide all passwords, access information, and other information to allow Plaintiff to access it's business information" within 48 hours, or be subject to "sanctions, including entry of default and/or a contempt citation."

For the reasons set forth more fully below and in the Complaint, Custom asks this Court for an order:

(a)     requiring Detroit IT to deliver to Custom within two days all passwords, access information, and other information required to facilitate the transition process, including but not limited to:

      (i)     domain administrator login credentials and passwords for Custom's Windows domain;

      (ii)     Global Administrator login credentials and passwords for Custom's Microsoft 365 tenant;

      (iii)     administrator login credentials and passwords to Custom's Meraki console;

      (iv)     administrator login credentials and passwords for Custom's switches, firewalls, routers, and any other network devices;

      (v)     Custom's current backup solution, including onsite and offsite storage locations;

      (vi)     Custom's antivirus and remote machine management products; and

      (vii)     administrator access to Microsoft VLSC portal (and any copies of Custom's Microsoft server licensing); and

(b) otherwise preserving the status quo through the transition process, which is expected to take 10-14 days, and requiring Detroit IT to refrain from imperiling Custom's information technology during this process.

## STATEMENT OF FACTS

Custom provides a variety of home health care services to over 700 patients here in Southeastern Michigan.  These services including critical nursing services, physical therapy, joint replacement therapy, cardiac care, palliative care, and hospice care.  Verified Compl at ¶ 15.

In order to provide these services, Custom relies heavily on its technology infrastructure, which includes desktop and laptop computers, network servers, devices, and other related programs and technologies ("Information Technology").  *Id.* at ¶ 16.

Custom owns all of its Information Technology.  Custom uses its Information Technology to maintain and protect patient medical data, and to provide seamless home health care services to its patients.  Custom cannot maintain or secure medical data or billing records, monitor patient wellbeing, or coordinate and implement life-improving or life-sustaining treatment plans without the use of its Information Technology, and the protection and security of this Information Technology is of paramount importance.  *Id.* at ¶ 17.

### A.      The Managed IT Services Agreement

On June 30, 2017, Custom and Detroit IT entered into a Managed IT Service Agreement ("Agreement"), pursuant to which Detroit IT agreed to manage Custom's Information Technology and provide remote and onsite support and maintenance for its servers, workstations, and devices.  **Ex. A**.  More specifically, Detroit IT agreed to provide a variety of services, including application support, third-party application support, consulting, hardware support, 24/7 remote and onsite support, and antivirus, monitoring, and maintenance for a monthly fee of $2,348.00.  This fee would increase as Custom added additional workstations.  Verified Compl at ¶ 18.

The Agreement was to "remain in effect until May 1st, 2018," but would "automatically renew for successive one (1) year terms unless notice to terminate [was] provided thirty (30) days prior to the end of the current term." **Ex. A, § 11;** Verified Compl at ¶ 19.

Upon notice of termination, the Agreement required Custom to "continue to pay the monthly service fees during [the] notice period." Or, Custom could instead "pay a lump sum termination fee equal to two (2) months of monthly service fees on the effective date of termination." **Ex. A, § 11;** Verified Compl at ¶ 20.

The Agreement also required Detroit IT to ensure that Custom's information technology manager had administrative access to all of the Information Technology.  **Ex. A, § 5;** Verified Compl at ¶ 21.

B.    **Problems Arise with Detroit IT**

By late 2019, Custom began to experience extreme unresponsiveness from Detroit IT.  At times, Detroit IT would take weeks or even months to respond to routine information requests. *Id.* at ¶ 22.

If Custom was fortunate enough to receive an initial response to a request for help—and a "ticket" was generated—Detroit IT would often fail to follow up on its own ticketing process, or inexplicably cancel some tickets, leaving Custom uninformed and its problems unresolved. *Id.* at ¶ 23.

C.    **Custom Terminates the Managed Services Agreement**

By February 2020, Custom decided to move in another direction.  The Agreement enabled either party to terminate at will thirty days or more before the end of an annual term. **Ex. A, § 11.**  This meant that Custom could terminate the Agreement at will so long as it sent notice prior to April 1, 2020.  Verified Compl at ¶ 24.

On February 7, 2020 Custom notified Detroit IT that it was terminating the Agreement effective May 1, 2020. **Ex. B.** Custom also told Detroit IT that it needed to start working on a successful transition of services to a new vendor. Verified Compl at ¶ 25.

One of the reasons Custom gave 84 days' notice—instead of the required thirty—was to ensure the uninterrupted provision of critical home health services to its patients. In the termination notice Custom asked Detroit IT's President, Mr. Grundlehner, to coordinate with Custom's Chief Financial Officer JC Tibbitts and its Head of Human Resources Matthew Bejin "to successfully start the transition process." Verified Compl at ¶ 26.

D.    **Detroit IT Gives Custom the Run-Around for Three Months**

Mr. Tibbitts contacted Mr. Grundlehner and explained that Custom needed its administrator login information and passwords to begin the transition process. Mr. Grundlehner initially said that he would provide these credentials, but then inexplicably cancelled the "ticket" for the request. Then he said that he would have to speak to his counsel before providing the information. This hesitation made no sense, because Custom needed the login credentials to access Custom's own Information Technology, Custom was entitled to access its own Information Technology, and the credentials were something that Detroit IT was contractually obligated to provide anyway. Verified Compl at ¶ 27.

Detroit IT's counsel Jason Yert followed up with Custom on March 4, 2020. Mr. Yert acknowledged receipt of the termination notice but suggested that in addition to paying the monthly fees through May 1—which Custom already said it would do and in fact has done— Custom should also pay monthly fees **for the next three years**, along with unspecified off-boarding and termination fees. Mr. Yert argued that any time Custom purchased a "new or independent" product or service—for which there were separate contracts, invoices, and

payments—it somehow also agreed to extend the Agreement for three years. By his logic, the parties' relationship was never-ending. Verified Compl at ¶ 28.

This, of course, is not the case. Custom explained why in a response letter dated March 17. **Ex. C**. Custom also expressed concern that Mr. Grundlehner had yet to provide the administrator login credentials. Custom explained that Detroit IT's conduct had already jeopardized its timely transition to a new vendor and threatened irreparable harm to Custom, its staff, and its customers. Verified Compl at ¶ 29.

Mr. Yert responded by telephone, suggesting again that the parties had unwittingly extended the Agreement for three years. He also warned that Custom "better be nice" to Detroit IT given its access and control over sensitive and privileged information. He also cautioned that Custom "should want to be friendly" with Detroit IT given Custom's increased reliance on its Information Technology during the then-burgeoning pandemic and Custom's looming trial in an unrelated case. *Id.* at ¶ 30.

Custom's counsel expressed its concerns about these extortive threats and cautioned against them. He also requested again the administrator login credentials. Mr. Yert committed to provide the login information and to working with Custom through May 1 given the uncertainties brought about by the pandemic and his client's conduct. He also asked for a "more specific" description of the administrative logins being requested so that he could follow up with his client. *Id.* at ¶ 31.

Putting aside that Mr. Grundlehner knew full well which login credentials were being requested, Custom articulated the specific information again in a letter to Mr. Yert dated March 31, 2020:

> In the meantime, Custom needs access to certain information to begin the transition process, including its domain administrator

login, its Office 365 Global Administrator logins, and its Administrator login to the Meraki console for the firewall.

**Ex. D;** Verified Compl at ¶ 32.

Given the passage of time since the initial request and Mr. Yert's comments, Custom also expressed its concern that Detroit IT was trying to "withhold this information in an effort to force new contractual terms," and it reminded Detroit IT that such conduct "would of course be inconsistent with the parties' contractual obligations and ownership rights, constitute conversion, and raise a number of other HIPAA and HIPAA HITECH concerns, among others." **Ex. D**. Custom thereby demanded again that the administrative login credentials be provided immediately. Verified Compl at ¶ 33.

Detroit IT did not respond. Custom followed up with Mr. Grundlehner several times. He did not return emails or calls. So Custom's counsel followed up with Mr. Yert again on April 21, asking again for the administrator login credentials and asking for a confirmation that Detroit IT would continue to provide services after May 1, given that Detroit IT's conduct had thus far prevented the transition:

> In my letter I asked you to confirm that your client will continue to provide services on a month-to-month basis beyond May 1. Custom simply can't complete the transition—in part because of the positions your client has taken—by May 1. We of course discussed the continued services and our continued efforts to resolve the larger dispute, but we do need a confirmation that you will continue to provide services beyond May 1.
>
> When I last checked, Custom had not yet received the logins it needs to transition. Please also advise when we can expect to receive those.

**Ex E;** Verified Compl at ¶ 34.

Detroit IT did not respond. Custom followed up again on April 24. **Ex. F**; Verified Compl at ¶ 35.

When Detroit IT finally responded, Mr. Yert inexplicably claimed ignorance of Custom's request for login information: "I am not certain what logins [you] are referring to, but please feel free to have your client call mine to discuss." **Ex. G**; Verified Compl at ¶ 36.

Of course, Custom had already been calling and emailing Mr. Grundlehner and receiving no response.  And Custom had made several requests for very specific login information to Mr. Yert.  But—in light of Mr. Yert's direction—Custom tried again to reach Mr. Grundlehner, making another request for the administrative login information.  Mr. Grundlehner said this was "news" to him, and he said he would follow up with his counsel and get back to Custom.  *Id.* at ¶ 37.

Mr. Grundlehner did not get back to Custom.  Custom's counsel followed up with Mr. Yert again on May 12:

> It looks like your client continued to provide services beyond May 1, which is good. Mine have had some difficulty getting a hold of Erik about an invoice for May, which they have not yet received. I hope he's ok. Let us know if there should be another contact point.
>
> I know they asked for but have not yet received the administrator logins needed for the transition. Let us know if there is another contact point for those as well.

**Ex. H;** Verified Compl at ¶ 38.

Exasperatingly, and despite that Custom's counsel had detailed the request as recently as March 31 and made two follow-up requests, Mr. Yert **again** claimed ignorance of Custom's transition to a new provider and its request for the administrator login information.  Mr. Yert again asked Custom to follow up with Mr. Grundlehner.  *Id.* at ¶ 39.

Custom responded to Mr. Yert on May 18, referencing the series of communications and demanding again the administrator login information:

> You'll recall that my client sent a termination letter on February 7. I explained on March 17 why your client's refusal to acknowledge

the letter was improper. While you disagreed, we agreed in our March 26 discussion to work together in the short term while reserving our rights. This included your client providing the administrative login information my client needs for its transition to a new provider, information your client improperly withheld. I confirmed all of this in my March 31 letter. I also identified the specific login information being requested.

On April 24 you weren't certain which login information we needed and you encouraged my client to reach out to yours directly to get what it needs. Unfortunately, your client has not responded to those requests and your email suggests that they were never made.

I ask again for your client to provide the domain administrator login, Office 365 Global Administrator logins, and Administrator login to the Meraki console.  He can contact Mr. Bejin directly with this information.

**Ex. I**; Verified Compl at ¶ 40.

### E.     Detroit IT Finally Confirms that it Will Produce the Requested Login Credentials

Mr. Yert's May 19 response finally acknowledged that he understood the request and would be producing the information, but—nearly twelve weeks after Custom's initial request for simple login credentials—Mr. Yert complained that Custom was being unreasonably impatient:

On another note, my client is trying to compile the information requested, but as you know the COVID-19 crisis has caused significant labor intensive work for my client given his customers have and continue to totally change their method of conducting business.  Why are you so insensitive to the hardships of Covid-19?

**Ex. J;** Verified Compl at ¶ 41.

Custom thanked Mr. Yert for confirming that his client would be providing the administrator login and password information. **Ex. K**; Verified Compl at ¶ 42.

Perhaps for comedic effect, Mr. Yert asked again "for specifics, what business records does your client not have access to?"  **Ex. L;** Verified Compl at ¶ 43.

To put an end to the seemingly endless cycle, Custom responded on May 21:

Jason, I'm not sure where the disconnect is here.

I've already laid out the information we need and are entitled to (see e.g. my 3/31 letter and 5/18 email). And you've said you're going to provide it.

Thanks

**Ex. M;** Verified Compl at ¶ 44.

## F.   Detroit IT Has Still Failed to Provide the Requested (and Promised) Information

It is now June 24. It has been twentyweeks since Custom first asked for its administrative login credentials. It has been five weeks since Detroit IT confirmed that this information was immediately forthcoming. Detroit IT has produced nothing and gone silent once again. *Id.* at ¶ 45.

## G.   Custom Will Suffer Irreparable Harm if the Requested Injunction Does Not Issue

Custom needs the administrator login credentials immediately so that it can facilitate and complete its transfer to a new provider. It also needs assurances that Detroit IT will not sabotage its Information Technology during the transition process, which is expected to take 10-14 days. *Id.* at ¶ 46.

Custom, its employees, and its staff will be irreparably harmed if this Court does not enter an injunction mandating the delivery of the login information and passwords to Custom's own computer system and otherwise preserving the status quo through the transition. Custom will be unable to access and use its own computers, network servers, and devices, it risks losing vital patient medical data, the security of this data could be compromised, Custom's employees will be unable to work remotely, its current contracts and business relationships—both with its patients and its new IT manager—will be significantly disrupted, and the well-being of hundreds of Custom's patients will be jeopardized. *Id.* at ¶ 49.

## **ARGUMENT**

### I.     **Injunction Standard**

For a preliminary injunction to issue, Custom must prove "that the traditional four elements favor the issuance of a preliminary injunction."  *Hammel v. Speaker of House of Representatives*, 297 Mich App 641, 648, 825 NW2d 616, 620 (2012).  This requires Custom to show that: (1) Custom is likely to prevail on the merits, (2) Custom will suffer irreparable harm if an injunction is not issued, (3) Custom will be harmed more by the absence of an injunction than Detroit IT would by granting the injunction, and (4) public interest supports granting the injunction.  *Mich AFSCME Council 25 v Woodhaven-Brownstown School Dist,* 293 Mich App 143, 148, 809 NW2d 444, 448 (2011).

### II.     **Custom is Likely to Prevail on the Merits**

Custom owns its own Information Technology.  Detroit IT cannot refuse to surrender the passwords to it.  Verified Compl at ¶ 17.  That's conversion.  *See e.g. Dunn v. Bennett*, 303 Mich. App. 767, 778; 846 NW2d 75 (2014) ("Conversion may be committed by the refusal to surrender property in demand."); *Hard Luck Distributors, L.L.C. v. Temperance Distilling Co.*, No. 319392, 2015 WL 2448516, at *3 (Mich. App. May 21, 2015) (agreeing that "a person who is otherwise lawfully in possession of property may commit a conversion by refusing to surrender the property after a demand by another who has the right of possession.")

Similarly, to establish tortious interference with a business expectancy, Custom must show the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice for the purpose of invading plaintiff's contractual rights or business relationship.  *See Feldman v Green*, 138 Mich App 360, 369, 360 NW2d 881, 886 (1984).  Here, Detroit IT has ignored and obstructed Custom's repeated requests to access its own Information Technology for the past five months.  Verified Compl at ¶¶ 27-44.  And when confronted with this conduct by

Custom's counsel, Detroit IT has warned Custom that it "better be nice" and made reference to both the sensitive information Detroit IT holds in trust for Custom as well as an unrelated upcoming trial involving Custom. *Id.* at ¶ 30. Such strong-arm tactics have no place in legitimate business relationships, and Detroit IT's attempted extortion certainly qualifies as a malicious and unlawful act.

The U.S. District Court for the Western District of Michigan entered an injunction in similar circumstances in *H.S. Die & Engineering, Inc. v. GBI Cincinnati*, No. 12-cv-148, 2012 WL 13027492 (WD Mich Feb 21, 2012) (attached as **Ex. N**). In that case, the plaintiff sought emergency injunctive relief requiring the defendants to turn over the software passcodes necessary to access and use the plaintiff's machines, which were located at its facility and necessary for its manufacturing operations. In discussing the "likelihood of success" prong of the test, the Court noted that the defendants had "no ownership interest" in the subject property which was "wholly owned by Plaintiff. *Id.* at *2.

That same logic holds true here. And in addition to its possessory rights, the Agreement clearly required Detroit IT to provide Custom's "internal IT personnel" with "administrative access to all systems." **Ex. A, § 5.**

This Court recently admonished Detroit IT for similar behavior in *Search Plus International, Inc. v. Detroit, IT, LLC*, No. 2020-180046-CB, noting that Detroit IT "may be intentionally interfering with" the plaintiff's business relationships, ordering Detroit IT to "provide all passwords, access information, and other information" to enable the plaintiff to access its own system, and threatening sanctions and a contempt citation if Detroit IT failed to comply. *See Search Plus International, Inc. v Detroit IT*, No. 2020-180046-CB, Order Granting Preliminary Injunction (May 14, 2020) (Alexander, J.), attached hereto as **Ex. P.** In other words,

Detroit IT's tactics with Custom appear to be nothing new and this Court has seen them before. An injunction preventing such extortive tactics is appropriate here as well.

Detroit IT has no right to hold Custom's login credentials hostage.  It certainly has no right to threaten Custom that it "better be nice" or else. Custom is highly likely to prevail on the merits.

## III.    Custom will be Irreparably Harmed if the Injunctive Relief is Not Granted

Custom must show a particularized risk of irreparable harm if an injunction is not issued. *Michigan AFSCME*, 293 Mich App at 149.  "The injury is evaluated in light of the totality of the circumstances affecting, and the alternatives available to, the party seeking injunctive relief." *Id.* at 149.  "In order to establish irreparable injury, the moving party must demonstrate a noncompensable injury for which there is no legal measurement of damages or for which damages cannot be determined with a sufficient degree of certainty. The injury must be both certain and great, and it must be actual rather than theoretical. *Thermatool Corp. v. Borzym*, 227 Mich. App. 366, 377, 575 N.W.2d 334, 338–39 (1998).

Custom, its employees, and its staff will be irreparably harmed if this Court does not enter an injunction mandating the delivery of the login information and passwords to Custom's own computer system and otherwise preserving the status quo through the transition.  Custom will be unable to access and use its own computers, network servers, and devices, it risks losing vital patient medical data, the security of this data could be compromised, Custom's employees will be unable to work remotely, its current contracts and business relationships—both with its patients and its new IT manager—will be significantly disrupted, and the well-being of hundreds of Custom's patients will be jeopardized. Verified Compl at ¶ 49.

In *HS Die*, the Court entered an injunction in less dire circumstances. The Court found that "grave harm [was] threatened" and that the plaintiff was "likely to suffer immediate and irreparable injury" if an injunction did not enter. That injury included "significant damages," being prevented from servicing "existing and prospective customers" because of the "lack of full access to manufacturing capabilities," and the "significant business disruption" that would "interfere[..] with current contracts and business relationships." **Ex. N**, 2012 WL 13027492 at *2.

The damages here would be far greater. In addition to the shutdown of operations, the inability to use the Information Technology, and the significant business disruption that would interfere with Custom's relationships with its patients and new IT provider, the privacy, safety, and well-being of hundreds of Custom's patients will be jeopardized. *See Volunteer Energy Servs, Inc v Option Energy, LLC*, No. 11-CV-554, 2011 WL 3268653, at *7 (WD Mich July 29, 2011) (threat of loss of customers, damage to business reputation, and loss of trust sufficient to demonstrate irreparable harm) (attached as **Ex. O**).

## IV.   Detroit IT Faces No Harm Whatsoever if the Injunctive Relief is Granted

This Court must also balance the probable harms that will be caused to the parties and ascertain whether the harm to the moving party absent the injunction outweighs the harm it would cause to the nonmoving party. *Detroit Fire Fighters Ass'n, IAFF Local 344 v City of Detroit*, 482 Mich 18, 34 (2008). The balance of harms here is not even close and weighs decidedly in favor of granting an injunction.

The grave harm Custom will face if an injunction is not granted is detailed above and in the Verified Complaint.

On the other hand, if the injunction is granted, Detroit IT loses nothing and is not harmed in the slightest.  It costs Detroit IT nothing to deliver Custom's login credentials, to which Custom has an absolute entitlement under the Agreement and as the owner of its own Information Technology.  *See* **Ex. A, § 5.**  And **Detroit IT has already been paid through June** for the services it is being asked to refrain from imperiling and maintain as status quo.  So it faces no economic loss from the entry of the injunction either.

As was the case in *HS Die, supra*, any harm Detroit IT suffers will be insubstantial.  The Court noted there that it appeared the defendants were "likely to suffer little, if any, irreparable harm if activation of Plaintiff's machines is required, which Plaintiff asserts involves only a numerical code and will not cost the defendant any time, money or effort."  **Ex. N**, 2012 WL 13027492 at *2.  Here, Custom asks for similar basic information — login credentials and passwords that will allow it to access its own technology.  Such information should be able to be provided in hours or at the very least, days.  Certainly not five months.

V.      **The Public Interest Weighs in Favor of Injunctive Relief**

By requesting an injunction, Custom is seeking to access its own property which another party is trying to hold hostage.  The public interest is certainly served there.

Custom is also seeking the ability contract freely with a new IT service provider, a freedom that is the "bedrock principle of American law."  *Wilkie v Auto-Owners Ins Co*, 469 Mich. 41, 51 (2003) (referring to "the bedrock principle of American contract law that parties are free to contract as they see fit[.]").

Custom is also seeking to protect hundreds of patients during the transition of IT services, which is clearly in the public's best interest.  *Dept. of Environmental Quality v. Worth Twp*, 491

Mich. 227, 250 (2012) (concluding that an injunction was proper to protect public health and safety).

Here, after becoming dissatisfied with lackluster service, Custom sought to exercise the at-will termination provisions in the parties' agreement and provided Detroit IT with more than double the required notice for termination.   Detroit IT has responded by dilly-dallying, threatening, promising (but not delivering) for five months, effectively preventing Custom from transitioning to a new service provider, and putting two extra months of service fees into Detroit IT's coffers.   In effect, Detroit IT seeks to create a de facto perpetual contractual relationship with Custom, whereby it prevents and obstructs Custom from ever exercising its choice to change service providers.

This is not how American free enterprise works.   Although parties must live up to the plain language of the contracts they sign, they are not permitted to unilaterally impose terms on their counterparts and prevent those counterparts from ever leaving the relationship through obstruction and blackmail.   Custom is entitled to contract with whomever it choses, and Detroit IT cannot hold Custom's own property and data hostage to avoid losing a customer.

Moreover, the public interest favors termination of this relationship based on Detroit IT's threats to Custom.   As described above, Custom is a home healthcare service provider, which provides services to over 700 patients in Southeastern Michigan.   These services including critical nursing services, physical therapy, joint replacement therapy, cardiac care, palliative care, and hospice care.   In order to provide its valuable services to the public, Custom must carefully maintain patient information, much of which is protected and confidential.

Detroit IT has lost Custom's trust.   By threatening that Custom "better be nice" to Detroit IT given Detroit IT's access and control over Custom's sensitive patient information, Detroit IT

has made clear that it is willing to use sensitive and protected patient information to leverage its own economic gain. This cannot be allowed to happen — Custom's patients and their data are not bargaining tools for Detroit IT to crassly leverage a renewal of its contract. And a service provider willing to threaten the confidentiality and treatment of such protected data is not a service provider who can be trusted to possess the data in the first place. The public interest therefore strongly favors the requested injunction.

## CONCLUSION

For the foregoing reasons, Custom respectfully requests that this Court enter a preliminary injunction:

(a)    requiring Detroit IT to deliver to Custom within two days all passwords, access information, and other information required to facilitate the transition process, including but not limited to:

(i)    domain administrator login credentials and passwords for Custom's Windows domain;

(ii)    Global Administrator login credentials and passwords for Custom's Microsoft 365 tenant;

(iii)    administrator login credentials and passwords to Custom's Meraki console;

(iv)    administrator login credentials and passwords for Custom's switches, firewalls, routers, and any other network devices;

(v)    Custom's current backup solution, including onsite and offsite storage locations;

(vi)    Custom's antivirus and remote machine management products; and

(vii)   administrator access to Microsoft VLSC portal (and any copies of Custom's Microsoft server licensing); and

(b)   otherwise preserving the status quo through the transition process, which will be completed within 10-14 days, and requiring Detroit IT to refrain from imperiling Custom's information technology during this process.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By:   /s/Joseph G. Vernon
       Joseph G. Vernon (P68951)
       Jeffrey A. Crapko (P78487)
       Anita C. Marinelli (P81986)
       150 West Jefferson, Suite 2500
       Detroit, MI  48226
       (313) 963-6420
       vernon@millercanfield.com
       crapko@millercanfield.com
       marinelli@millercanfield.com

       Attorneys for Plaintiff

Dated:  June 24, 2020

# EXHIBIT C

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

SEARCH PLUS INTERNATIONAL INC

_____
                          **Plaintiff,**

**V**

DETROIT IT

_____
                          **Defendant,**

NO:    **2020-180046-CB**

**HON. JAMES M. ALEXANDER**

**<u>ORDER</u>**

**At a session of Court**
**held in Oakland County, Michigan**
**on  05/14/2020**

In view of the Covid 19 crisis, the Court has reviewed the Motion and Response, from which it appears that Defendant may be intentionally interfering with Plaintiff's ability to prepare and file tax returns required by governmental authorities.  In light of the State of Emergency, and pursuant to MCR 2.119 (e) (3), Oral Argument is waived.

Defendant DTI must provide all of Plaintiff's tax information contained on Defendant's servers, and/or provide all passwords, access information and other information to allow Plaintiff to access it's business information contained on Defendant's servers or at Defendant's premises within 48 hours of this Order.

Failure to comply with the terms of this Order will subject Defendant to sanctions including entry of Default and/or a contempt citation.

/s/ James M. Alexander
_____
**HON. JAMES M. ALEXANDER**       JD
**Circuit Court Judge**

FILED    Received for Filing    Oakland County Clerk    5/15/2020 9:22 AM

# EXHIBIT D

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

December 16, 2020

ADM File No. 2019-32

Administrative Order No. 2020-23

Administrative Order
Regarding Professionalism
Principles for Lawyers and
Judges

_____

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

Administrative Order No. 2020-23 – Professionalism Principles for Lawyers and Judges

## PREFACE

Rule 1 of the Rules Concerning the State Bar provides, in part, that the "State Bar of Michigan shall . . . aid in promoting improvements in the administration of justice and advancements in jurisprudence, in improving relations between the legal profession and the public, and in promoting the interests of the legal profession in this State."  To achieve these goals, the State Bar of Michigan, acting in accord with the Michigan Supreme Court, has established twelve principles of professionalism ("Principles") as guidance to attorneys and judges concerning appropriate standards of personal conduct in the practice of law. These Principles are not intended to form the basis for discipline, professional negligence, or sanctions; or to alter the Michigan Rules of Professional Conduct, the Michigan Code of Judicial Conduct, or the Michigan Court Rules; or to recast the Lawyer's Oath, although many of the Principles are derived from these sources.  Rather, the Principles are meant only to be remindful that members of our profession must never lose sight of the foundational principles of personal conduct that have always guided us in even our most ordinary and routine professional dealings.  Together and individually, we must exhibit the highest levels of professional conduct in order to maintain and preserve, and to advance, our profession and to ensure that we each become exemplars of all that is best in this profession.  If by the statement of these Principles the Michigan Supreme Court or the State Bar of Michigan runs the risk of being viewed as repetitive of existing strictures and standards, we view our obligation as the superintending authorities of the legal profession in our state to accept that risk rather than allowing these Principles ever to wither or to be treated as mere cant.

## PRINCIPLES OF PROFESSIONALISM

In fulfilling our professional responsibilities, we as attorneys, officers of the court, and custodians of our legal system, must remain ever-mindful of our obligations of civility in pursuit of justice, the rule of law, and the fair and peaceable resolution of disputes and

controversies.  In this regard, we adhere to the following principles adopted by the State Bar of Michigan and authorized by the Michigan Supreme Court.

* We show civility in our interactions with people involved in the justice system by treating them with courtesy and respect.

* We are cooperative with people involved in the justice system within the bounds of our obligations to clients.

* We do not engage in, or tolerate, conduct that may be viewed as rude, threatening or obstructive toward people involved in the justice system.

* We do not disparage or attack people involved in the justice system, or employ gratuitously hostile or demeaning words in our written and oral legal communications and pleadings.

* We do not act upon, or exhibit, invidious bias toward people involved in the justice system and we seek reasonably to accommodate the needs of others, including lawyers, litigants, judges, jurors, court staff, and members of the public, who may require such accommodation.

* We treat people involved in the justice system fairly and respectfully notwithstanding their differing perspectives, viewpoints, or politics.

* We act with honesty and integrity in our relations with people involved in the justice system and fully honor promises and commitments.

* We act in good faith to advance only those positions in our legal arguments that are reasonable and just under the circumstances.

* We accord professional courtesy, wherever reasonably possible, to other members of our profession.

* We act conscientiously and responsibly in taking care of the financial interests of our clients and others involved in the justice system.

* We recognize ours as a profession with its own practices and traditions, many of which have taken root over the passing of many years, and seek to accord respect and regard to these practices and traditions.

* We seek to exemplify the best of our profession in our interactions with people who are not involved in the justice system.

# <u>COMMENTARY</u>

The Principles are intertwined and part of a whole, but each Principle deserves to be specifically identified because of its importance to the overall goal of professionalism. That these rules are both longstanding and matters of commonsense does not gainsay that even the most experienced members of our profession must occasionally pause and step back from the fray to assess their own comportment.  It is precisely because ours is a distinctive and ancient profession that it is incumbent on each of us from time to time to reflect upon first principles of conduct.  Underscoring and reemphasizing as these Principles do, such virtues as respect, cooperation, courtesy, fairness, honesty, good faith, and integrity in our everyday dealings, is hardly to define our professional obligations in a novel or remarkable manner, but it is necessary nonetheless that we occasionally remind ourselves of these fundamental obligations as we each engage in a profession in which these virtues are so ordinarily and regularly implicated.

While a lawyer is responsible for determinedly carrying out the representation of his or her clients, such representation should never be confused with what is unprofessional conduct.  Unprofessional conduct increases the cost of litigation, consumes judicial resources with little concomitant benefit for the client, and undermines not only the legal profession and its reputation among those whom it serves, but erodes public respect for what are perhaps the greatest and most enduring aspects of our civilizational heritage, a justice system in which all stand equally before the law and in which the rule of law is determinative of rights and responsibilities.

These Principles are intended to afford general guidance in the practice of law for lawyers and judges, inside and outside the courtroom, including within alternative dispute resolution processes, for we are each the custodians of our law in whatever forum it is being resolved.  The following simple and straightforward propositions are intended only to give further detail and illustration to the Principles of Professionalism:

## 1. <u>Lawyers</u>

• We allow opposing counsel to make their arguments without distraction or interruption.

• We promptly respond to communications from clients and attorneys.

• We confer early and in good faith to discuss the possibility of settlement, although never for dilatory purposes.

• We accurately represent and characterize matters in our written and oral communications.

• We draft documents that accurately reflect parties' understandings, court's rulings, and pertinent circumstances.

• We do not engage in ex parte communications unless authorized by law.

• We only make objections reasonably grounded in rules of evidence and procedure.

• We are punctual in our professional interactions and are considerate of the schedules of judges, lawyers, parties, and witnesses.

• We act reasonably and in good faith in scheduling hearings, conferences,  depositions, and other legal proceedings.

• We are respectful and considerate of personal emergencies and exigencies that may arise in the course of the scheduling process and attempt reasonably to accommodate such difficulties.

• We attempt to verify the availability of necessary participants and witnesses before court dates are set and give notice of scheduling changes and cancellations at the earliest practicable time.

• We only make good faith and reasonable requests for time extensions and we also agree to such requests if they are not prejudicial to the interests of our clients.

• We act in good faith in deciding when to file or to serve motions and pleadings.

• We only make discovery requests that are reasonable and relevant in their breadth, substance, and character.

• We respond promptly to reasonable discovery requests from opposing parties.

• We only engage in conduct during a deposition that is compatible with court rules and would be proper in the presence of a judicial officer.

• We readily stipulate to undisputed facts.

• We take care to thoroughly inform ourselves of the law that is relevant to a particular matter.

## 2. **Judges**

    • We are patient and respectful of a party's right to be heard and fully and fairly afford such opportunities as are within our reasonable discretion.

    • We fully and fairly consider each party's arguments.

    • We do not condone incivility by one lawyer to another or to another's clients and we call such conduct to the attention of the offending lawyer on our own initiative and in appropriate ways.

    • We see as paramount our obligations to the administration of justice and the rule of law and seek to facilitate the resolution of cases and controversies before us consistent with these objectives.

    • We endeavor to work with other judges to foster cooperation in our shared goal of enhancing the administration of justice and the rule of law.

    • We are courteous, respectful, and civil in our opinions, mindful that we contribute in substantial ways to the public's faith in our system of justice and our rule of law.

    • We are punctual in convening the business of the court and considerate of the schedules of lawyers, parties, jurors, and witnesses.

    • We are respectful of the personal emergencies and exigencies that may arise in the course of litigation and attempt reasonably to accommodate such difficulties in our scheduling determinations.

    • We are committed to ensuring that judicial proceedings are conducted with the dignity and decorum deserving of the administration of the law and the application of the rule of law.

    • We maintain control and direction of judicial proceedings, recognizing that we have both the obligation and the authority to ensure that such proceedings are conducted in a civil and fair-minded manner.

    • We do not engage in practices and procedures that unnecessarily increase litigation expenses or contribute to litigative delays.

6

• We recognize that a lawyer has the right and duty to present a cause fully and fairly, and to make a full and accurate record, and that a litigant has the right to a full and fair hearing.

• We undertake all reasonable efforts to decide in a prompt manner all questions presented for decision.

• We assure that reasonable accommodations are afforded to people with disabilities, including lawyers, parties, witnesses and jurors.

• We ensure that self-represented litigants have equal access to the legal system while also reasonably holding them to equivalent legal standards as litigants represented by counsel.

• We ensure that our court staff treats litigants, attorneys, and other persons interacting with the justice system with dignity, respect, and helpfulness.

• We do not conflate our own personal perspectives and attitudes with the rule of law but view ourselves as the custodians and superintendents of the rule of law.

• We are patient in our response to human foible and we are impatient in allowing uncivil behavior to take place in the legal processes over which we serve as custodians.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

December 16, 2020



Clerk

# EXHIBIT E

## STATE OF MICHIGAN
## IN THE BUSINESS COURT FOR THE COUNTY OF OAKLAND

**AXLE OF DEARBORN, INC., D.B.A. DETROIT AXLE**, a Michigan corporation; **DETROIT AXLE, INC.**, a Michigan corporation; and **DETROIT AXLE QSSS, INC.**, a Michigan corporation,

        Plaintiffs,

v.

**DETROIT IT, LLC**, a Michigan limited liability company and **ERIC GRUNDLEHNER**, an individual,

        Defendants.

Case No. 21-185911-CB
Hon. Michael Warren

---

Jonathan H. Schwartz (P70819)
Jonathan E. Sriro (P52100)
Benjamin M. Low (P82834)
Jaffe Raitt Heuer & Weiss,PC
Attorneys for Defendants
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
jschwartz@jaffelaw.com
jsririo@jaffelaw.com
benlow@jaffelaw.com

---

## <u>TEMPORARY RESTRAINING ORDER</u>

At a session of said Court
held in the Oakland County Circuit Court
in the City of Pontiac, County of Oakland, State of Michigan
on _____

PRESENT: _____
CIRCUIT COURT JUDGE

This matter having come before the Court on Plaintiffs Axle of Dearborn, Inc. d.b.a. Detroit

Axle, Detroit Axle, Inc., and Detroit Axle QSSS, Inc.'s (collectively, "Detroit Axle") Emergency

Motion for Entry of a Temporary Restraining Order To Maintain The Status Quo and to Show Cause Why a Preliminary Injunction Should Not Be Entered, which was heard on an ex-parte basis, and the Court being fully advised:

Detroit Axle having established the elements required to obtain injunctive relief and Detroit Axle having shown that it will suffer irreparable harm if injunctive relief is not granted,

**IT IS HEREBY ORDERED** that Defendants Detroit IT, LLC ("Detroit IT") and Eric Grundlehner ("Grundlehner," together with Detroit IT, the "Defendants"), its subsidiaries, affiliated, or anyone acting in concert with them, are preliminary enjoined from:

1. Entering and/or accessing Detroit Axle's network and/or computer systems;

2. Removing any networking and/or computer equipment from any Detroit Axle location;

3. Restricting Detroit Axle's use and/or access to any networking and/or computer equipment in any way;

4. Changing the passwords to and/or modifying any local or cloud-based accounts used by Detroit Axle;

5. Restricting Detroit Axle's access to any local or cloud-based accounts in any way;

6. Engaging in any self-help remedies in relation to Detroit Axle; and

7. Engaging in any activities that may disrupt Detroit Axle's operations,

unless or until ordered otherwise by this Court.

**IT IS FURTHER ORDERED** that Defendants shall deliver to Detroit Axle all passwords, access information, and/or other information required to facilitate Detroit Axle's transition to its new IT services provider by Wednesday, January 27, 2021, at 5:00 p.m.

**IT IS FURTHER ORDERED** that Defendants shall immediately take steps to safeguard all network and/or computer logs related to any way to Detroit Axle on any and all of their electronic devices, to assure no damages occurs to said logs which would thwart a forensic

5112622

examination of said logs or devices, and that Defendants shall preserve all communications and information related to Detroit Axle.

**IT IS FURTHER ORDERED** that no security is required at this time.

**IT IS FURTHER ORDERED** that the Court will conduct a hearing on Plaintiff's Motion for Preliminary Injunction and Brief in Support Thereof, including determining whether Detroit Axle is entitled to an order requiring Defendants to restore Detroit Axle's full access to its entire IT infrastructure, including, but not limited to disclosing all passwords used on Detroit Axle's local and cloud based accounts, on _____, 2021, at _____ am/pm.

**IT IS FURTHER ORDERED** that failure to comply with the terms of this Order will subject Defendants to sanctions including entry of Default and/or a contempt citation.

**IT IS SO ORDERED**.

_____
CIRCUIT COURT JUDGE

5112622