UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

AXLE OF DEARBORN, INC., d/b/a
DETROIT AXLE, a Michigan corporation;
DETROIT AXLE, INC., a Michigan corporation;
and DETROIT AXLE QSSS, INC., a Michigan
corporation,

           Plaintiffs,

v.

DETROIT IT, LLC, and ERIC
GRUNDLEHNER.,

           Defendants.

Case No. 21-cv-10163
Hon. Stephanie Dawkins Davis
Magistrate Anthony P. Patti

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY
MOTION FOR ENTRY OF A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

Defendants Detroit IT, LLC ("Detroit IT"), and Eric Grundlehner

("Grundlehner") (together "Defendants"), by and through their attorneys, oppose the

Emergency Motion for Entry of a Temporary Restraining Order and Preliminary

Injunction filed by Plaintiffs Axle of Dearborn, Inc., d/b/a Detroit Axle, Detroit

Axle, Inc., and Detroit Axle, QSSS, Inc., (together "Plaintiffs") because Plaintiffs

failed to meet the standard for a temporary restraining order or preliminary

injunction under Fed. R. Civ. P. 65.  Plaintiffs' complaint (ECF No. 8-2, PageID

410-474) is deficient, most of their claims are subject to dismissal under Fed. R. Civ.

P. 12(b)(6), and Plaintiffs failed to provide any credible support for their conclusory

1

allegations of "irreparable injury."  Furthermore, Plaintiffs' proposed temporary restraining order (ECF No. 8-10, PageID 680-684) is ripe for abuse and serves Plaintiffs' poorly concealed goal of enlisting this Court to force Defendants to perform transition IT services without payment.  For the reasons stated herein and in the attached brief in support, this Court should DENY Plaintiffs' motion (ECF No. 8, PageID 378-408), order Plaintiffs to immediately deposit into the Court's escrow account the $25,000.00 transition services fee required under the parties' contract as a condition for proceeding with this case, and award Defendants such other and further relief as is consistent with equity and good conscience.

Respectfully submitted,

**JOELSON ROSENBERG, PLC**

By:*/s/ Emily R. Warren*
Emily R. Warren (P76675)
Attorneys for Defendants
30665 Northwestern Hwy., Suite 200
Farmington Hills, Michigan 48334
(248) 855-2233
Dated:  January 27, 2021          (248) 855-2388 (Fax)
ewarren@jrlawplc.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

AXLE OF DEARBORN, INC., d/b/a
DETROIT AXLE, a Michigan corporation;
DETROIT AXLE, INC., a Michigan corporation;
and DETROIT AXLE QSSS, INC., a Michigan
corporation,

         Plaintiffs,

v.

DETROIT IT, LLC, and ERIC
GRUNDLEHNER.,

         Defendants.

Case No. 21-cv-10163
Hon. Stephanie Dawkins Davis
Magistrate Anthony P. Patti

---

**BRIEF IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS'
EMERGENCY MOTION FOR ENTRY OF A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

Statement of Issues Presented ........................................................................ i

Controlling or Most Appropriate Authorities ............................................. ii

Cited Authorities .......................................................................................... iii

I.      Introduction ........................................................................................ 1

II.     Statement of Facts .............................................................................. 1

III.    Legal Standards ................................................................................. 4

IV.     Analysis .............................................................................................. 5

        A.      Defendants Did Not "Improperly" Remove this Case ........................ 6

        B.      Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims ... 8

                1.      Plaintiffs' Claims for Breach of Contract, Declaratory Relief,
                        and Unjust Enrichment (Counts I, II, IX, and X) Are Based
                        on False Statements and Undermined by Plaintiffs'
                        Admission to Owing $100,000.00 to Detroit IT ........................ 8

                2.      Plaintiffs' Fraud Claim (Count III) is Improperly Pled ............. 9

                3.      Defendants Were Authorized to Access Plaintiffs'
                        Computers and Could Not Have Violated the Computer
                        Fraud and Abuse Act (Count IV) or the Stored
                        Communications Act (Count VI) ............................................. 10

                4.      Plaintiffs' Cannot Maintain its Claim for Violation of the
                        Federal Wiretap Act (Count V) ................................................ 12

                5.      Plaintiffs Are Not Entitled to Injunctive Relief (Counts VII
                        and VIII) ..................................................................................... 14

                6.      Plaintiffs Cannot Maintain Their Conversion Claims
                        As Pled ........................................................................................ 15

7.    Plaintiffs' Claim for Civil Conspiracy (Count X) is
      Precluded by the Intracorporate Conspiracy Doctrine..............16

C.    Plaintiffs Are Not in Danger of Suffering Irreparable Harm..............17

D.    Detroit IT Will be Harmed by Issuing a Temporary Restraining
      Order Under These Circumstances ......................................................19

E.    Public Interest Does Not Weigh in Plaintiffs' Favor .........................22

IV.   Conclusion and Request for Relief..................................................................22

## STATEMENT OF ISSUES PRESENTED

I.     Whether Plaintiffs' motion for temporary restraining order or preliminary injunction should be denied where Plaintiffs' claims are insufficiently pled and are subject to dismissal under Fed. R. Civ. P. 12(b)(6)?

Defendants Answer:        Yes.

II.    Whether Plaintiffs' motion for temporary restraining order or preliminary injunction should be denied where Plaintiffs failed to allege anything more than theoretical risk of harm and the "risk" as alleged by Plaintiffs has existed since December 7, 2020?

Defendants Answer:        Yes.

III.   Whether Plaintiffs' motion for temporary restraining order or preliminary injunction should be denied where Plaintiffs' proposed order is deliberately designed to require Defendants to perform extensive, time-consuming, and costly transition services for Plaintiffs without payment?

Defendants Answer:        Yes.

IV.    Whether Plaintiffs should be ordered to deposit into a Court escrow account at least $25,000 as required by the parties' contracts and as security for the transition services it is demanding Defendants perform and as a condition for proceeding with this case?

Defendants Answer:        Yes.

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*,
32 F. Supp. 3d 824 (E.D. Mich. 2014)........................................................................9

*Brown v. Countrywide Home Loans*,
2009 WL 1798069 (E.D. Mich. June 19, 2009) ......................................................14

*Konop v. Hawaii Airlines*,
302 F.3d 868 (9th Cir. 2002) ...................................................................................13

*Luis v. Zang*,
833 F.3d 619 (6th Cir. 2016) ...................................................................................13

*Nieves v. Bell Industries*,
204 Mich. App 459, 517 N.W.2d 235 (1994)..........................................................10

*Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*,
974 F.3d 756 (6th Cir. 2020) ...................................................................................11

# CITED AUTHORITIES

Fed. R. Civ. P. 12(b)(6) ............................................................23

18 U.S.C. §1030 ......................................................................10

18 U.S.C. § 2701 .....................................................................12

18 U.S.C. § 2510 .....................................................................12

28 U.S.C. § 1446 ....................................................................6, 7

*Anderson v. Bank of Am., N.A.*,
2013 WL 4670825 (E.D. Mich. Aug. 30, 2013) ......................7

*Bailey v. Bailey*,
2008 WL 324156 (E.D. Mich. Feb. 6, 2008) ..........................12

*Blair v. Checker Cab Co.*,
219 Mich. App. 667, 558 N.W.2d 439 (1996) ........................16

*Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, 110 F. 3d 318 (6th Cir. 1997) ...................5

*Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*,
32 F. Supp. 3d 824 (E.D. Mich. 2014) .....................................9

*Brown v. Countrywide Home Loans*,
2009 WL 1798069 (E.D. Mich. June 19, 2009) ......................14

*Cablevision of Bos., Inc. v. Shamatta*,
63 Mass. App. Ct. 523, 827 N.E.2d 246 (2005) ......................18

*DiLuzio v. Vill. of Yorkville, Ohio*,
796 F.3d 604 (6th Cir. 2015) ...................................................16

*Facebook, Inc. v. Power Ventures, Inc.*,
252 F. Supp. 3d 765 (N.D. Cal. 2017) ................................18, 22

*Gottlieb v. Arrow Door Co.*,
364 Mich. 450, 110 N.W.2d 767 (1961)....................................................17

*H & H Ind., Inc. v. Miller*,
2013 WL 6858760 (S.D. Ohio Dec. 27, 2013).........................................5

*Hi-Way Motor Co. v. Int'l Harvester Co.*,
59 Mich. App. 366, 229 N.W.2d 456 (1975)...........................................9

*Konop v. Hawaii Airlines*,
302 F.3d 868 (9th Cir. 2002) ...................................................................13

*Luis v. Zang*,
833 F.3d 619 (6th Cir. 2016) ...................................................................13

*Nieves v. Bell Industries*,
204 Mich. App 459, 517 N.W.2d 235 (1994)..........................................10

*Qualite Sports Lighting, LLC v. Ortega*,
2019 WL 7582823 (W.D. Mich. Sept. 10, 2019) ....................................15

*Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*,
974 F.3d 756 (6th Cir. 2020) ...................................................................11

*Sarver v. Detroit Edison Co.*,
225 Mich. App. 580, 571 N.W.2d 759 (1997)..........................................16

*Thermatool Corp. v. Borzym*,
227 Mich. App. 366, 575 N.W.2d 334 (1998)..........................................14

*TracFone Wireless, Inc. v. Adams*,
98 F. Supp. 3d 1243 (S.D. Fla. 2015) ......................................................19

*United States v. Steiger*,
318 F.3d 1039 (11th Cir. 2003) ...............................................................13

*Verma v. Giancarlo*,
2000 WL 33395243 (Mich. Ct. App. Dec. 12, 2000).............................16

iv

## I.      Introduction

Plaintiffs Axle of Dearborn, Inc., d/b/a Detroit Axle, Detroit Axle, Inc., and

Detroit Axle, QSSS, Inc., (together "Plaintiffs") contracted with Defendant Detroit

IT, LLC ("Detroit IT") for information technology ("IT") services in April of 2020.

After months of making late and partial payments, it became clear that Plaintiffs

could not afford Detroit IT's services.  Plaintiffs owe Detroit IT $496,771.55 to

Plaintiffs in services, equipment, labor, and fees.  As of the date herein, Plaintiffs

have only paid Detroit IT less than half of what is owed.  On December 7, 2020,

Plaintiffs "terminated" their contract with Detroit IT and stated they were

transitioning to a new IT service provider, Auxiom.   Rather than paying their

outstanding balance and committing to pay the transition service fees and costs

contractually required for Detroit IT's assistance with the transition, Plaintiffs filed

this lawsuit and moved for a temporary restraining order, hoping to manipulate the

Court into forcing Defendants under threat of contempt or default to continue to

provide services to Plaintiffs without any prospect of payment.

## II.      Statement of Facts

Plaintiffs hired Detroit IT to perform IT services in April 2020.  On April 28,

2020, Plaintiffs' principal, Michael McCauley, signed a Price Quote for various

equipment, materials, and one-time and monthly services.  Below the signature line

appears the following provision:

1

This quote is subject to the Terms and Conditions found on our website (www.detroitit.com/terms). These terms are considered to be the most recent and take precedent over any other previously written or implied terms and conditions. Thank you for the opportunity to earn your business. The information contained in this communication is confidential, is intended only for the use of the recipient named above, and maybe legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message or any copy of it from your computer system.

The terms and conditions provide that if a customer requests Detroit IT's assistance with transitioning services, such services will be billed at Detroit IT's current rate and the customer is required to make an advance payment for transition services of $25,000.00. (Exhibit 1, April 28, 2020 Price Quote and Terms and Conditions). Plaintiffs signed eleven additional Price Quotes for *a la carte* services or equipment on May 19, June 11, July 7, July 9, July 15, July 28, July 30, July 31, August 12, September 28, and November 16, each time affirming the Terms and Conditions (Exhibit 2, Price Quotes May-November 2020).

Detroit IT performed a variety of services for Plaintiffs, including selecting and ordering equipment, installing the equipment, creating and maintaining cloud-based storage, administering employee accounts, managing Plaintiffs' domain, and other services as they became necessary in the course of Plaintiffs' business. Plaintiffs completed "satisfaction surveys" at various points. Plaintiffs rated the

2

service calls on October 2, October 9, and December 9 as "Good, I'm satisfied." (Exhibit 3, Satisfaction Surveys).

By October 2020, Plaintiffs were extremely behind in payment and Detroit IT had to begin pursuing payment of its invoices through numerous "follow up" emails. Plaintiffs responded that payment had been "authorized" and promised to come up with a "plan" for payment. (Exhibit 4, Email Exchange RE: Open Invoices). Plaintiffs were unable to pay Detroit IT's invoices and instead chose to terminate Detroit IT's services on December 7, 2020. (Exhibit 5, Termination Letter, December 7, 2020). On December 7, 2020, at 5:46pm and 5:47pm, Detroit IT received notification that Auxiom had made changes to components of Plaintiffs' computer system, including to equipment that Detroit IT owned. (Exhibit 6, Notification of Changes by Auxiom).

In the evening on December 7, 2020, Plaintiffs contacted Defendants and advised that Plaintiffs were *not* transitioning to Auxiom and wanted Detroit IT to continue to provide services on a per-project, "COD" basis to avoid any large invoices. On December 7, 2020, Defendants confirmed Plaintiffs' request and asked that Detroit IT's access be restored from Auxiom. (Exhibit 7, Text Messages December 7-9, 2020). Plaintiffs confirmed that Detroit IT's access would be restored. (Exhibit 7). On December 7, 2020 at 7:46pm, Plaintiffs requested that an employee be "whitelisted" for a certain computer. (Exhibit 8, Post-December 7,

2020 Help Tickets, p. 1).   On December 8, 2020, Defendants advised Plaintiffs that they could not log into the servers and did not have domain administration.  (Exhibit 7).   On December 9, 2020, Plaintiffs confirmed that they owed Defendants $100,000.00 and that Detroit IT would perform work in the future on a "COD" basis.  (Exhibit 9, December 9, 2020 Email).  Plaintiffs confirmed this arrangement again in an email on December 17, 2020 (Exhibit 10, December 17, 2020 Email; see also Exhibit 11, Declaration of Eric Grundlehner).

Almost immediately after sending their termination letter, Plaintiffs made numerous requests to fix printers, help employees with their login credentials, and other demands.  (Exhibit 8).  Detroit IT responded to and resolved Plaintiffs' "Help Ticket" requests dutifully, even when Plaintiffs' principal swore at or insulted Defendants.  (Exhibit 7).

The parties were in the process of negotiating to resolve Plaintiffs' outstanding invoices owed to Detroit IT and the terms under which Detroit IT would continue to provide services to Plaintiffs when Plaintiffs filed this lawsuit on January 22, 2021.

## III.   Legal Standards.

Four factors are relevant in considering a motion for temporary restraining order and for preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury

without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, 110 F. 3d 318, 322 (6th Cir. 1997). The movant must show that irreparable harm is likely, not merely possible. *H & H Ind., Inc. v. Miller*, 2013 WL 6858760 (S.D. Ohio Dec. 27, 2013).

## IV. Analysis.

Plaintiffs took a garden-variety contract dispute over payment for IT services and dressed it up into a ten-count complaint comprised largely of conclusory allegations and hyperbole. No matter how many times Plaintiffs make the allegations, Defendants are not holding Plaintiffs' information technology "hostage," nor have Defendants "hijacked" Plaintiffs' "infrastructure" or attempted "extortion" (see, e.g., ECF No. 8, PageID 379, 387, 389, 393, 398, 400). Plaintiffs' grumbles about "gamesmanship" (ECF No. 8, PageID 380) are baseless, and their mischaracterization of the parties' contractual relationship and circumstances of this case alone warrant denial of Plaintiffs' motion.

Plaintiffs waited over a month after settlement discussions broke down to seek "emergency relief," clearly as a tactic to pressure Detroit IT to cede to Plaintiffs' demands. The circuit court recognized this delay in its opinion denying Plaintiffs' motion, other than prohibiting Defendants from entering Plaintiffs' facilities without

permission (ECF No. 9-1, PageID 960-961). Plaintiffs recently filed a "declaration" by someone named Bartnowak (ECF No. 11, PageID 693-696), which merely repeats Plaintiffs' conclusory and generally unsupported assertions calculated to make this run-of-the-mill contract dispute into something other than what it really is. In addition to its contents having no evidentiary value, Bartnowak's "declaration" is not notarized and does not comply with 28 U.S.C. § 1746.

### A. Defendants Did Not "Improperly" Remove this Case.

Plaintiffs accused Defendants of "improperly" removing this case from the Oakland County Circuit Court to this Court on January 25, 2021 "before they were even served" and failing to "provide this Court with the entire record." (ECF No. 8, PageID 380, 389). Defendants filed the Notice of Removal on January 25, 2021, at 11:10 AM (Exhibit 11, ECF Notification Email). Defendants filed a separate notice in circuit court at 11:23 AM identifying this case number and corrected the circuit court notice at 2:40 PM (Exhibit 12, Notice Entered with Circuit Court).

28 U.S.C. § 1446(b)(1) requires the notice of removal to be filed within 30 days "after the receipt by the defendant, through service or otherwise, a copy of the initial pleading . . ." There is no requirement that a defendant wait until it is served with process before filing a notice of removal. Plaintiffs provided a "courtesy copy" of the complaint on January 22, 2021, but it was not time-stamped or filed with the circuit court. Defendants ordered the time-stamped copies of the summons,

complaint, and notice of assignment to business court—the entire record available to the public when Defendants requested copies of the documents and filed the Notice of Removal (ECF No. 1) on January 25, 2021, after receiving the time-stamped documents from the circuit court clerk's office.  28 U.S.C. § 1446(a) requires the removing party to file with the notice of removal "all process, pleadings, and orders served upon such defendant or defendants in such action."  The only "process" were the summons and the only "pleading" was the complaint, both of which were filed with the Notice of Removal.  No orders had been entered.  As of January 25, 2021, nothing had been served on Defendants and Defendants submitted to this Court all of the available documents filed with the circuit court at the time the Notice of Removal was filed.  In *Anderson v. Bank of Am., N.A.*, 2013 WL 4670825, at *1 (E.D. Mich. Aug. 30, 2013), this Court rejected Plaintiffs' argument that Defendants were required to include the entire record in its Notice of Removal. "Plaintiff misinterprets § 1446(a).  'Defendants [are] not required to file all of the pleadings from the state court proceeding, only those that were served on them.'" Defendants filed all of the pleadings, process, and orders that existed and were available to Defendants at the time the Notice of Removal was filed.

On January 26, 2021, the circuit court entered an order denying in part and granting in part Plaintiffs' motion for temporary restraining order.  This order was filed by Plaintiffs (ECF No. 9-1, PageID 690-691).

7

**B.      Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims.**

**1.      Plaintiffs' Claims for Breach of Contract, Declaratory Relief, and Unjust Enrichment (Counts I, II, IX, and X) Are Based on False Statements and Undermined by Plaintiffs' Admission to Owing $100,000.00 to Detroit IT.**

Defendants agree that there is a contract dispute between the parties.  What Plaintiffs conveniently omitted from their filings is that Detroit IT provided $496,771.55 to Plaintiffs in services, equipment, and labor, and Plaintiffs have only paid Detroit IT $173,271.25—less than half of what they owe.  The $185,000.00 settlement proposal that Plaintiffs call an "extortion fee" (ECF No. 8, PageID 387) and "ransom" (ECF No. 8, PageID 388) is still $138,500.30 short of what Plaintiffs owe Defendants according to the express, plain language of the parties' contracts.  It is only slightly more than what Plaintiffs admit they owe.  (Exhibit 10).  Plaintiffs' allegations that they terminated Detroit IT due to poor performance (ECF No. 8-2, PageID 420, ¶ 65) is contradicted by the satisfaction surveys Plaintiffs completed, including one on December 9, 2021, when Detroit IT was performing services for Plaintiffs *after* Plaintiffs claim to have terminated Detroit IT.  (Exhibit 3, Satisfaction Surveys).

Plaintiffs' claim for declaratory relief is nothing more than their breach of contract claims re-framed to convey false entitlement.  Plaintiffs want the Court to adjudicate the "rights" they have to compel "Detroit IT's help and cooperation to transition to a new IT service provider."  (ECF No. 8-2, PageID 431, ¶ 143-144).

These "rights" are stated in the parties' contracts and the terms and conditions governing those contracts. (Exhibit 1). Plaintiffs made no mention of *paying* Detroit IT for "transition services" and clearly has no intention of doing so, much less paying the balance owed to Detroit IT for services already rendered. Furthermore, Plaintiffs omit the fact that the parties have a written contract for services (Exhibit 1) that governs transition services and Detroit IT's liability for said services. Plaintiffs' unjust enrichment claim is likewise deficient because there is a written contract for the same subject matter. "[T]he law operates to imply a contract in order to prevent unjust enrichment, and ... this will not occur if there is already an express contract on the same subject matter." *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 824, 833 (E.D. Mich. 2014) (internal quotation omitted).

### 2. Plaintiffs' Failed to Plead a Prima Facie Claim for Fraud (Count III).

Plaintiffs' fraud claim is deficient. (ECF No. 8-2, PageID 422, ¶ 78-86). It is unclear whether the fraud claim is based on alleged representations of then-existing material facts or promises of future conduct. "Statements promissory in their character that one will do a particular thing in the future are not misrepresentations, but are contractual in their nature and do not constitute fraud." *Hi-Way Motor Co. v. Int'l Harvester Co.*, 59 Mich. App. 366, 371-72, 229 N.W.2d 456, 459 (1975) (internal citations omitted). The general basis of the fraud claim appears to be that Detroit IT attempted to invoice Plaintiffs for equipment that was not installed in

9

Plaintiffs' facilities.  Defendants deny this allegation, however, Plaintiffs would be able to see which equipment was installed in their facilities and easily verify whether the items listed in the invoice were installed.  "There can be no fraud where a person has the means to determine that a representation is not true."  *Nieves v. Bell Industries,* 204 Mich. App 459, 464, 517 N.W.2d 235 (1994).

### 3. Defendants Were Authorized to Access Plaintiffs' Computers and Could Not Have Violated the Computer Fraud and Abuse Act (Count IV) or the Stored Communications Act (Count VI).

Plaintiffs' claim under the Computer Fraud and Abuse Act, 18 U.S.C. §1030, alleges that Defendants "were not authorized to and/or exceeded their authorization to access Detroit Axle's computes" during the "relevant period."  (ECF No. 8-2, PageID 423, ¶ 89).  Presumably, the "relevant period" is after December 7, 2020, when Plaintiffs claim to have terminated Detroit IT's services.  However, Plaintiffs repeatedly demanded that Detroit IT continue to perform services after December 7, 2020. (Exhibit 8).  Detroit IT's ability to perform any services required continued access to Detroit Axle's computers and systems.  Detroit Axle gave Detroit IT such authorization by demanding that Detroit IT address various issues and provide services after December 7, 2020.  Plaintiffs allege that Detroit IT continued to access its computers "after Detroit Axle outright revoked Defendants' access" (ECF No. 8-2, PageID 424, ¶ 92).  Plaintiffs did not revoke Detroit IT's access in its December 7, 2020 termination letter—in fact, Plaintiffs referenced Detroit IT's "offboarding

services" in the letter (Exhibit 5) and then continued to request that Detroit IT provide services that required Detroit IT's access of Plaintiffs' computers and systems. At no point did Plaintiffs revoke Detroit IT's access and Plaintiffs' continuing requests for services gave Detroit IT authorization to continue to access all aspects of Plaintiffs' computers and systems required for Detroit IT to continue to perform services.

Accessing a computer "without authorization" or "exceeding authorization" is a key element of a claim under the Computer Fraud and Abuse Act ("CFAA"). Plaintiff recited the element and concluded that Defendants "were not authorized to and/or exceeded their authorization to access Detroit Axle's computers…" (ECF No. 8-2, PageID 425, ¶ 104), but did not support this conclusion with any facts showing that Plaintiffs revoked Detroit IT's authorization. Instead, Plaintiffs concealed the fact that Detroit IT continued to service Plaintiffs *at Plaintiffs' repeated request* and were therefore authorized to access Plaintiffs' computers and systems. "[O]ne who is authorized to access a computer does not exceed her authorized access by violating an employer's restrictions on the *use* of information once it is validly accessed." *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 761 (6th Cir. 2020). Plaintiffs and Defendants did not have an employee-employer relationship, however, the same principle applies in this context. Plaintiffs gave Defendants authorization to access all aspects of Plaintiffs' computers, networks, and systems, as is necessary

11

for Detroit IT to perform services.  Plaintiffs did not revoke Detroit IT's access and continued to request services.  Plaintiffs' claim for violation of the Computer Fraud and Abuse Act fails because Detroit IT had authorization to access Plaintiffs' systems.

The Stored Communications Act, 18 U.S.C. § 2701, *et seq.*, prohibits *unauthorized* access of communication stored in "temporary, intermediate storage . . . incidental to electronic transmission thereof," and communications in "backup" storage.  The Stored Communications Act "does not extend to emails and messages stored only on Plaintiff's personal computer."  *Bailey v. Bailey*, 2008 WL 324156, at *6 (E.D. Mich. Feb. 6, 2008).  Plaintiffs' claim under the Stored Communications Act also fails to acknowledge that Plaintiffs provided Defendants with authorization to access its networks, computers, and systems.  Plaintiffs cannot satisfy the "unauthorized access" element of this claim.

### 4.   Plaintiffs' Cannot Maintain its Claim for Violation of the Federal Wiretap Act (Count V).

Plaintiffs made the conclusory allegation that Defendants "intercepted Plaintiff's electronic communications via remote desktop software and/or other software and used those communications for their own benefit and gain."  (ECF No. 8-2, PageID 425, ¶ 105).  "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).  For an "intercept" to

occur, "the electronic communication at issue must be acquired contemporaneously with the transmission of that communication." *Luis v. Zang*, 833 F.3d 619, 629 (6th Cir. 2016). In *Luis*, the Sixth Circuit cited with approval to *Konop v. Hawaii Airlines*, 302 F.3d 868 (9th Cir. 2002), where the Ninth Circuit held that for a communication to be intercepted it must be acquired during transmission. Plaintiffs alleged that Detroit IT was accessing and monitoring Plaintiffs' computers and thereby contemporaneously intercepted Plaintiffs' emails. Detroit IT categorically denies accessing or monitoring Plaintiffs' computers beyond which is necessary to provide IT services as requested by Plaintiffs, but even improper "monitoring" of a computer would only allow the offender to access what was on Plaintiffs' computer. When an email appears in Plaintiffs' inbox, it is not in transmission, it is stored.

> [T]here is only a narrow window during which an E-mail interception may occur—the seconds or mili-seconds before which a newly composed message is saved to any temporary location following a send command. Therefore, unless some type of automatic routing software is used (for example, a duplicate of all of an employee's messages are automatically sent to the employee's boss), interception of E-mail within the prohibition of [the Wiretap Act] is virtually impossible.

*United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003) (citing Jarrod J. White, *E–Mail @Work.com: Employer Monitoring of Employee E–Mail,* 48 Ala. L.Rev. 1079, 1083 (1997)). There is no allegation that Defendants halted or diverted the transmission of messages to or from their intended recipients. Plaintiffs have failed to state a claim for violation of the Federal Wiretap Act.

### 5. Injunctive Relief (Counts VII and VIII).

Plaintiffs' claims for injunctive relief fail for the same reasons this Court should deny Plaintiffs' motion and decline to issue a temporary restraining order just as the circuit court did. As the circuit court noted, Plaintiffs failed to allege anything other than speculative, potential injuries, and did not set forth in an affidavit or verified pleading that irreparable injury, loss, or damage is likely to result. The circuit court noted that Plaintiffs alleged that Defendants were engaged in the alleged "harm" since December 2020 and "reflects a situation that pre-exists this lawsuit and Motion and speculation as to what might occur." (ECF No. 9-1, PageID 690). Plaintiffs have not cured these defects in their filing with this Court.

> A temporary restraining order is an extraordinary remedy that generally is reserved for emergent situations in which a party may suffer irreparable harm during the time required to give notice to the opposite party or where notice itself may precipitate the harm.

*Brown v. Countrywide Home Loans*, 2009 WL 1798069, at *1 (E.D. Mich. June 19, 2009). According to Plaintiffs, the circumstances under which some unspecified irreparable harm "may" come to Plaintiffs have existed for over six weeks. Plaintiffs have not credibly alleged that they already suffered any irreparable harm. In Michigan, irreparable harm is "a non-compensable injury for which there is no legal measurement of damages or for which damages cannot be determined with a sufficient degree of certainty. The injury must be both certain and great, and it must be actual rather than theoretical." *Thermatool Corp. v. Borzym,* 227 Mich. App. 366,

14

377, 575 N.W.2d 334, 338–39 (1998).  The dispute over the cost or installation of equipment is compensable and alleged damages can easily be calculated.  The balance of Plaintiffs' allegations of irreparable harm are conclusory and "theoretical."

### 6.    Plaintiffs Cannot Maintain Their Conversion Claims as Pled.

Plaintiffs' claim that Defendants "converted" Plaintiffs' network and computer systems and accounts is tenuous.  Plaintiffs failed to allege whether the network, systems, and accounts are personal property capable of being converted or intangible personal property that falls within one of the exceptions to the general rule that intangible personal property cannot be converted.

> Although other jurisdictions have liberalized the bar to actions for conversion of intangible property, Michigan jurisprudence has long held that intangible property cannot be converted.

*Qualite Sports Lighting, LLC v. Ortega*, 2019 WL 7582823, at *7 (W.D. Mich. Sept. 10, 2019) (quoting Anthony P. Patti, *Intentional Torts, in* Torts: Michigan Law & Practice § 3.104 (Linda Miler Atkinson, Hon. Helene N. White & Noreen L. Slank ed., Sept. 2014)).  In fact, "[m]ost states ... have rejected or at least qualified intangible conversion, as do most states in the Sixth Circuit." *Id.*  Plaintiffs have not alleged the nature of the property supposedly converted or whether it is consistent with the general rule in Michigan or the recognized exceptions.  See

*Sarver v. Detroit Edison Co.,* 225 Mich. App. 580, 586, 571 N.W.2d 759, 762 (1997).

### 7. Plaintiffs' Claim for Civil Conspiracy (Count X) is Precluded by the Intracorporate Conspiracy Doctrine.

Plaintiffs allege that Defendants, being Detroit IT, LLC, and its member and owner, Defendant Eric Grundlehner, "entered into an agreement" or "acted in concert" to harm Plaintiffs. Plaintiffs' claim ignores the intracorporate conspiracy doctrine. "[T]here can be no conspiracy between a corporation and its directors if the directors are acting on behalf of the corporation." *Blair v. Checker Cab Co.,* 219 Mich. App. 667, 674, 558 N.W.2d 439, 442 (1996); see also *Verma v. Giancarlo*, No. 208534, 2000 WL 33395243, at *8 (Mich. Ct. App. Dec. 12, 2000) ("[A] corporation cannot ordinarily conspire with its agents or employees. These rules have been collectively referred to as the 'intracorporate conspiracy doctrine.'") The Sixth Circuit held that the doctrine provides that "members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment." *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 615 (6th Cir. 2015). Plaintiffs did not allege that Defendant Grundlehner was acting beyond the scope of his employment or conspiring with anyone other than his entity, Detroit IT.

Plaintiffs chose to name Defendant Grundlehner individually but failed to allege any facts justifying this decision. There are no allegations that Detroit IT is a

mere instrumentality of Grundlehner.   Absent proofs of fraud, sham, or other improper use of the corporate form, there is no justification for disregarding the separate existence of an entity.   See *Gottlieb v. Arrow Door Co.,* 364 Mich. 450, 452, 110 N.W.2d 767 (1961).

### C.    Plaintiffs Are Not in Danger of Suffering Irreparable Harm.

As Plaintiffs alleged and the circuit court noted in its January 26, 2021 ruling, the situation between the parties has been the same since December 7, 2020, and Plaintiffs did not allege that they suffered any *actual* harm.   Plaintiffs concealed the fact that they have been demanding additional services from Defendants constantly from December 7 until recently and that the written contract contains express provisions regarding Plaintiffs' rights and Detroit IT's responsibilities following termination of the contract and transition to a new IT service provider.   As part of their settlement discussions, Defendants, through counsel, suggested that the parties and counsel meet at Plaintiffs' facilities to walk through and inventory the equipment because Plaintiffs claim that Detroit IT is charging for equipment that was never provided or installed.   Plaintiffs declined to allow an inventory and instead filed a lawsuit falsely accusing Defendants' counsel of threatening to "barge into Detroit Axle's facility."   (ECF No. 8, PageID 392)[1].   With any IT service provider there is

---

[1] Defendants' counsel denies the allegations of wrongdoing contained in Plaintiffs' various filings but believes that those issues are irrelevant to the questions presented in this case.

an inherent risk that, by virtue of performing IT services the provider has access to its customer's systems and information and can, theoretically, disrupt those systems. The fact that no disruption occurred before December 7 and has not occurred since, even after Plaintiffs demanded additional services, disputed invoices, and refused to pay outstanding balances, is evidence that there is nothing more than this theoretical risk that would exist with Detroit IT or any other service provider.  The cases Plaintiffs cite are highly distinguishable from this case.  In *Cablevision of Bos., Inc. v. Shamatta*, 63 Mass. App. Ct. 523, 526, 827 N.E.2d 246, 249 (2005), the defendant's revoked their prior consent to allow the plaintiff to install its wires and cable boxes on the defendant's apartment building and told the plaintiff to remove the wires and cables within seven days or the defendants would do it themselves. The trial court intervened to issue a temporary restraining order prohibiting the defendants from yanking down wires and boxes and interrupting service to hundreds of rental units.  Plaintiffs here are demanding to keep equipment they have not paid for under circumstances where Defendants have not threatened to remove the equipment.  In fact, Plaintiffs should be enjoined from moving, altering, damaging, or otherwise disposing of any equipment provided to it by Detroit IT.

*Facebook, Inc. v. Power Ventures, Inc.,* 252 F. Supp. 3d 765, 772 (N.D. Cal. 2017), *aff'd,* 749 F. App'x 557 (9th Cir. 2019) is highly distinguishable because the cited opinion was issued nine years after the case was filed and after the Ninth Circuit

made a finding that the defendants violated the Computer Fraud and Abuse Act.  In *TracFone Wireless, Inc. v. Adams*, 98 F. Supp. 3d 1243, 1256 (S.D. Fla. 2015), the defendant *admitted*[2] that he "was bypassing TracFone's security measures and misleading potential customers about the origins of the airtime."  As explained above, Plaintiffs have not even sufficiently *alleged* that Defendants violated the CFAA and are certainly not entitled to relief provided to litigants who has successfully proven their claims or where the defendant admitted to the violation.

### D. Detroit IT Will be Harmed by Issuing a Temporary Restraining Order Under These Circumstances.

Detroit IT has not and has no intention of wrongfully removing equipment from Plaintiffs' facilities, intercepting Plaintiffs' communications (privileged and otherwise) or interfering with Plaintiffs' business.  Plaintiffs' feigned concern over speculative, but "grave" harm, is belied by their repeated reference to their "right" to force Defendants to perform transition services, apparently at no cost to Plaintiffs.  Defendants' obligations to a terminating customer are outlined in the parties' contract.  Plaintiffs ask this Court to declare their "rights to Detroit IT's help and cooperation to transition to a new IT service provider," and that Detroit IT is "violating the terms of the Parties' agreement by failing to help and cooperate with Detroit Axle's transition to a new IT service provider (ECF No. 8-2, PageID 142, ¶

---

[2] Defendants vehemently deny Plaintiffs' allegations of wrongdoing and have made no such admissions in this case.

143-144).  Plaintiffs further argued that Defendants would not be harmed by an injunction because they would "simply be in the position of having to abide by the agreement it made—that it would help transition Detroit Axle to a new IT services provider." (ECF No. 8, PageID 406).  Detroit IT appropriately charges its customers for transition services, as do most IT service providers, because the services can be cumbersome and time-consuming.  Plaintiffs' true motive in filing this lawsuit and motion for temporary restraining order is to enlist the Court to force Defendants to perform costly services without payment.  Plaintiffs dismiss this as merely forcing Defendants' "compliance with the law," (ECF No. 8, PageID 406).  There is no "law" requiring Defendants to perform services without payment and the parties' contract expressly provides for payment.

The proposed temporary restraining order is intentionally written to require Detroit IT to continue to perform services for Plaintiffs without any prospect of payment.  Plaintiffs propose that Defendants be enjoined from "engaging in any activities that may disrupt Detroit Axle's operations." (ECF No. 8-10, PageID 683).  Plaintiffs will inevitably abuse any such order to force Detroit IT to perform additional services because Detroit IT's declination to perform services without pay may "disrupt Detroit Axle's operations."  Ordering Defendants to deliver "all passwords, access information, and/or other information required to facilitate Detroit Axle's transition to its new IT services provider" will be interpreted by Plaintiffs as

20

requiring Detroit IT to respond to all inquiries by Plaintiffs or their new IT service provider, no matter how complex, and will be shamelessly exploited by Plaintiffs and their new IT service provider. The same will result from the next section of the proposed order:

> [T]o immediately take steps to safeguard all network and/or computer logs related to any way to Detroit Axle on any and all of their electronic devices, to assure no damages occurs to said logs which would thwart a forensic examination of said logs or devices, and that Defendants shall preserve all communications and information related to Detroit Axle

This provision goes way beyond a typical discovery or litigation hold and makes Detroit IT the guardian of information and data to which it does not have access. Plaintiffs do not reconcile how Detroit IT can safeguard data without having access to it or how Detroit IT can reasonably be held responsible for such data when Plaintiffs' new IT service provider also has access to their systems.

Plaintiffs' proposed temporary restraining order is intentionally drafted to require Defendants to provide transition and other services not required under the parties' contracts and without any expectation of payment, under the threat of contempt or default. This is fundamentally unreasonable and the certain harm to Defendants far outweighs any risk of harm to Plaintiffs in having to arrange and pay for their transition to a new IT service provider.

### E.      Public Interest Does Not Weigh in Plaintiffs' Favor.

Plaintiffs' brief is replete with exaggerations and hyperbolic imagery of "hostages" and "hijacking" and "extortion," so it is only fitting that they conclude by claiming that, without an injunction, Plaintiffs will be forced to lay-off all of their employees and the emergency services and police departments will collapse. Plaintiffs did not explain how Detroit IT could possibly be responsible for this imaginary disaster. Plaintiffs cited again to *Facebook* for the notion that the public interest is served by ensuring that computers "are not accessed without authorization." Plaintiffs' claim for CFAA violations fail precisely because Detroit IT's access to Plaintiffs' computers was authorized. Defendants agree that the public interest is served by enforcement of valid contracts, but Plaintiffs are seeking to have this Court force Defendants to perform transition services without payment. The parties' contract requires advance payment of $25,000 and Plaintiffs must be ordered to either pay or deposit at least $25,000 with the Court to ensure that Detroit IT will be paid for its services.

### V.      Conclusion and Request for Relief.

Other than prohibiting Defendants from entering Plaintiffs' premises without permission, the circuit court denied Plaintiffs' motion for temporary restraining order without the opportunity to review Defendants' response. Plaintiffs' arguments are even more specious in light of the facts and evidence outlined herein. Plaintiffs

do not have a likelihood of success on the merits; it is far more likely that Plaintiffs'

claims will be dismissed under Fed. R. Civ. P. 12(b)(6).  Hysterical ramblings about

"grave danger" aside, Plaintiffs do not have a risk of irreparable harm.  In contrast,

Defendants are at great risk of harm if Plaintiffs' proposed temporary restraining if

Plaintiffs' proposed temporary restraining order is entered, Plaintiffs plan to and will

abuse the order to force Detroit IT to perform even more services without payment

and will inevitably conspire with Auxiom to coerce Detroit IT to perform for free

services that Auxiom would normally perform at Plaintiffs' cost.  There is no "public

interest" in forcing Detroit IT to perform services that are not required under the

parties' contract without payment.   The public interest is served by enforcing

contracts as written, and in this case requires that Plaintiffs be ordered to make the

advance payment of $25,000 for transition services as stated in the contract (Exhibit

1).  For the foregoing reasons, this Court should DENY Plaintiffs' motion (ECF No.

8, PageID 378-408), order Plaintiffs to immediately deposit into the Court's escrow

account the $25,000.00 transition services fee required under the parties' contract as

a condition for proceeding with this case, and award Defendants such other and

further relief as is consistent with equity and good conscience.

Respectfully submitted,

**JOELSON ROSENBERG, PLC**

By:*/s/ Emily R. Warren*
Emily R. Warren (P76675)

23

Attorneys for Defendants
30665 Northwestern Hwy., Suite 200
Farmington Hills, Michigan 48334
(248) 855-2233
Dated:  January 27, 2021     (248) 855-2388 (Fax)
ewarren@jrlawplc.com

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document along with a Certificate of Service was electronically filed on January 27, 2021, with the Court's e-filing system, which will send notification of such filing to all attorneys of record.

*/s/ Emily R. Warren*
Emily R. Warren