# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**AXLE OF DEARBORN, INC., D.B.A. DETROIT AXLE**, a Michigan corporation; **DETROIT AXLE, INC.**, a Michigan corporation; and **DETROIT AXLE QSSS, INC.**, a Michigan corporation,

       Plaintiffs

v.

**DETROIT IT, LLC**, a Michigan limited liability company and **ERIC GRUNDLEHNER**, an individual, and **STEPHANIE MILLER**, an individual,

       Defendants.

and

**DETROIT IT, LLC**, a Michigan limited liability company,

       Counter-Plaintiff

v.

**AXLE OF DEARBORN, INC., D.B.A. DETROIT AXLE**, a Michigan corporation; **DETROIT AXLE, INC.**, a Michigan corporation; and **DETROIT AXLE QSSS, INC.**, a Michigan corporation,

       Counter-Defendants.

Case No. 21-cv-10163
Hon. Stephanie Dawkins Davis

---

## PLAINTIFFS/COUNTER-DEFENDANTS'
## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs Axle of Dearborn, Inc., d.b.a. Detroit Axle, Detroit Axle, Inc., and Detroit Axle QSSS, Inc. (collectively, "Detroit Axle" or "Plaintiffs"), through their counsel, Jaffe, Raitt, Heuer & Weiss, P.C., submits this Amended Complaint against Defendants Detroit IT, LLC ("Detroit IT"), Eric Grundlehner ("Grundlehner"), and Stephanie Miller ("Miller," together with Detroit IT and Grundlehner, the "Defendants"), and states as:

## Introduction

1.     This action alleging racketeering, fraud and/or misrepresentation, violation of the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030, conversion, tortious interference with business expectancy, breach of contract, unjust enrichment, and civil conspiracy arises as a direct and proximate result of misconduct committed by Defendants, including, but not limited to:

(i)     Illegal attempt to obtain payment from Detroit Axle based upon fraudulent invoices, which included fabricated and/or backdated charges, sent by Miller via electronic communication to Detroit Axle on at least (2) separate occasions;

(ii)    Hacking into Detroit Axle's network and computer systems after being terminated as the IT provider, against the express wishes of Detroit Axle, and then taking control of and obstructing Detroit Axle from

2

utilizing its own IT Infrastructure;

(iii)   Extortion of Detroit Axle through Grundlehner's threats to shut down the business, and demands for an increasing amount of money (first $100,000.00, and then $185,000.00), if Detroit Axle wanted the return of passwords to its own IT Infrastructure, which led to Detroit Axle wiring $25,271.20 to Defendants on December 8, 2020;

(iv)   Intentional interference with Detroit Axle's ability to operate its business and service its customers, thereby obstructing, delaying and affecting commerce and the movement of goods sold by Detroit Axle, including by: (i) intentionally withholding passwords from and refusing to relinquish control over Detroit Axle's IT Infrastructure; while at the same time, (ii) neglecting to resolve IT issues or provide services, but refusing to let Detroit Axle bring in a new IT provider, and (iii) engaging in corporate sabotage by depriving Detroit Axle of access to and control of its IT Infrastructure, which was necessary to operate the business, and as a result detrimentally impacted Detroit Axle's customer service and fulfillment, onboarding of new employees, logistics, revenue generation, and communications; and

(v)   Refusing to turn over access and/or control to Detroit Axle's IT Infrastructure (including computers, network hardware, servers, cloud

accounts, and security cameras) from December 8, 2020, until the day of the hearing on Detroit Axle's Motion for Preliminary Injunction on February 8, 2021.

2.      As a direct and proximate result of their actions, Defendants impaired the ability of Detroit Axle to operate, causing substantial damages, in excess of $1,000,000.00.

3.      Detroit IT, under the direction of Grendlehner and Miller, have engaged in the same pattern and practice of racketeering activity against many other customers, evidenced, in part, by multiple prior and ongoing lawsuits, and scathing judicial injunctions issued against Detroit IT.

4.      While Defendants finally turned over control and access to Detroit Axle's IT Infrastructure during the course of this litigation, Detroit Axle is entitled to a substantial monetary judgment against Defendants to compensate for the extensive damages caused, plus treble damages and attorneys' fees.

## **Parties, Jurisdiction, and Venue**

5.      Detroit Axle is a Michigan corporation headquartered in Ferndale, Michigan, that manufactures and sells automotive parts.

6.      Defendant Detroit IT is a Michigan limited liability company whose principal place of business is in Oakland County, Michigan.

7.      Defendant Eric Grundlehner is an individual who conducts business in

Oakland County, Michigan.

8.     Grundlehner is the founder of Detroit IT, is its President and Chief Technology Officer.

9.     Defendant Stephanie Miller is an individual who conducts business in Oakland County, Michigan.

10.     Miller, who is employed as Operations Coordinator for Detroit IT, is also Grundlehner's romantic partner.

11.     This Court has original subject-matter jurisdiction pursuant to 18 U.S.C. §1964(c) and 28 U.S.C. §1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO").

12.     This Court also has jurisdiction over this action pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391, because Defendants are subject to personal jurisdiction in this judicial district, reside in this district, and the amount in controversy exceeds $25,000, exclusive of interest, costs, and attorneys' fees.

13.     Venue is proper before this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district.

## **General Allegations**

### A.     **Detroit Axle's Business**

14.     Formed in 1990, Detroit Axle is a manufacturer, distributor and retailer

of automotive parts.

15.    Detroit Axle is a family run business, which is headed by Mouhamed Musheinish ("Mr. Musheinish"), the Chief Executive Officer and co-owner. Attached as **Exhibit 1**, and incorporated herein, is the Affidavit of Mr. Musheinish.

16.    In addition to a physical sales location at its Ferndale, Michigan headquarters, Detroit Axle has been engaged in online commerce, selling and distributing to customers across the country, for approximately ten (10) years.

17.    The vast majority of Detroit Axle's sales are now through e-commerce efforts, including its website, www.detroitaxle.com, and various online retailers, including eBay and Amazon.

18.    As part of Detroit Axle's business, it supplies crucial automotive parts across the country for ambulances, police, and other first responders, in addition to repair shops, mechanics and individual consumers.

19.    In order to facilitate its business, and its online presence, Detroit Axle relies upon its networking, computer, and IT Infrastructure and technology.

20.    Detroit Axle's business requires it to have a robust networking, computer, and IT infrastructure, as any disruption to its computers and/or networks would cause a great deal of harm, including interfering with order fulfillment and customer service, in addition to causing a variety of operational and revenue generation problems.

21.    Detroit Axle has invested heavily in its computer and networking hardware, software, and its entire IT infrastructure to ensure that its business can run properly and that it can service customers across the United States.

**B.    Relationship with Detroit IT**

22.    In or about April 2020, Detroit Axle decided to hire Detroit IT, an IT management and consulting company, after Grundlehner represented at an in-person meeting that Detroit IT could service a company of Detroit Axle's size, and provide its services in a professional manner.

23.    Grundlehner, the President and Chief Technology Officer for Detroit IT, runs and directs Detroit IT, including performing IT work, supervising staff, participating in billing, and handling customers complaints.

24.    Miller, who began as an employee at Detroit IT, and is now Operations Coordinator, in addition to Grundlehner's partner, participates in billing and invoicing clients, among other actions to facilitate the operation of Detroit IT.

25.    The parties did not enter into any written contract, but rather, agreed that Detroit IT would bill Detroit Axle for services authorized by Detroit Axle, with payment to be made after receipt of invoices.

26.    Defendants also agreed that they would assist Detroit Axle if it wanted to change to a new IT services provider in the future.

27.    At no time did Defendants inform Detroit Axle that any written Terms

and Conditions would vary this basic "handshake agreement," and at no time did Detroit Axle agree to be bound by any Terms & Conditions prepared by Detroit IT.

28. Unbeknownst to Detroit Axle at the time, Defendants had a longstanding and ongoing plan and common purpose to intentionally and willfully defraud and extort customers similarly situated to Detroit Axle.

29. Detroit Axle began utilizing Detroit IT's services (the "Services"), specifically: (i) to purchase and install computer and networking equipment for Detroit Axle; and (ii) provide certain IT managed services for: (a) two of Detroit Axle's facilities in Michigan, where Detroit Axle employs hundreds of local workers and sells products to clients across the United States; and (b) one facility in Juarez, Mexico.

30. The Services included, but were not limited to, the maintenance of: (i) server and domain administrative accounts; (ii) Detroit Axle's network infrastructure; (iii) cloud management administrative accounts; (iv) cloud application administrative accounts; (v) on premise administrative accounts; and (vi) external DNS administrative accounts.

31. Detroit Axle trusted and relied upon Defendants to provide the Services in a professional manner, and to refrain from taking any actions which would harm Detroit Axle and its business.

32. Correspondingly, to allow Detroit IT to perform the Services, Detroit

8

Axle provided access to its entire IT infrastructure to Defendants, including, but not limited to, administrative access to all of its hosting, cloud, and online accounts, along with its networking hardware and computer systems.

### C.    Detroit IT's Failure to Perform

33.    Between July 22, 2020 and December 8, 2020, the parties discussed the provision of various Services and equipment, some of which are referenced in price quotes.

34.    Detroit Axle timely paid invoices (the "Invoices") that Defendants represented were performed, including for equipment (the "Detroit Axle Equipment"). **Exhibit 2**, Paid Invoices.

35.    In total, Detroit Axle paid $173,270.95 to Defendants based upon representations of costs made by Defendants in the Invoices.

36.    Unfortunately, Detroit IT failed to provide the Services that it said it would provide, with the specified quality and professionalism.

37.    Mr. Musheinish, or other Detroit Axle employees, would place multiple calls to Detroit IT in an attempt to resolve computer and IT Infrastructure problems, but often would not receive return calls.

38.    Other times, when Detroit IT would send a representative onsite to fix an equipment or technology problem, Detroit IT failed to fix the problem, or would cause new problems.

39.     Many of the service jobs that Detroit IT was supposed to perform were never completed.

40.     As a result of these numerous problems, Detroit Axle decided to find and hire a new IT services management company.

### D.     Defendants Issue Fraudulent Invoices

41.     After suspecting that Detroit Axle intended to terminate Detroit IT, Defendants began issuing a series of questionable invoices, which were sent by Miller to Detroit Axle.

42.     On October 11, 2020 at 8:51 p.m., Miller sent via electronic mail, to Detroit Axle employee Marcie Pearce, an email stating: "Attached is a copy of the invoices for projects/hardware that I show open." **Exhibit 3**, October 11, 2020 email and invoices.

43.     Among the invoices attached to the October 11, 2020 email was Invoice # 12724, dated 8/02/2020, in the amount of $7,374.23.

44.     However, upon inspection, Detroit Axle discovered that Defendants had backdated and fabricated Invoice # 12724 in order to receive unearned funds from Detroit Axle.  For example, there is a discrepancy in the invoice number when compared to other invoices already paid by Detroit Axle.  For example, Invoice # 12725 (contained in **Exhibit 2**, Paid Invoices) has a higher invoice number than Invoice 12724, and therefore should have been dated later.  However, Invoice 12725

is dated 7/5/2020, which is earlier than the 8/02/2020 date on Invoice 12724.

45.    On November 30, 2020, at 2:16 p.m., Miller sent another email, claiming that: "I've attached a copy of all of the open support invoices that have not been paid … [and] an updated list of all open invoices … that need to be paid ASAP." **Exhibit 4**, November 30, 2020 email and attachments.

46.    However, upon inspection, Detroit Axle discovered that Defendants had backdated and fabricated many of the invoices attached to the November 30, 2020 email from Miller, including the following, set forth below in paragraphs 47-56.

47.    Invoice 12848, dated 11/21/2020, in the amount of $168.39, has a lower invoice number than Invoice 12905, dated 11/17/2020 (Invoice 12905 contained in **Exhibit 2**, Paid Invoices).

48.    Invoice 12700, dated 5/1/2020, in the amount of $9,187.44, has a higher invoice number than Invoice 10539, dated 5/2/2020 (Invoice 10539 contained in **Exhibit 2**, Paid Invoices).

49.    Invoice 12930, dated 11/1/2020, in the amount of $3,368.33, has a higher invoice number than Invoice 12847, dated 11/6/2020 (Invoice 12847 contained in **Exhibit 4**).

50.    Invoice 12929, dated 11/1/2020, in the amount of $3,368.33, has a higher invoice number than Invoice 12905, dated 11/17/2020 (Invoice 12905

11

contained in **Exhibit 2**, Paid Invoices).

51.     Invoice 12698, dated 9/1/2020, in the amount of $4,121.33, has a higher invoice number than Invoices 12587 and 12588, both dated 9/6/2020 (Invoices 12587 and 12588 are contained in **Exhibit 2**, Paid Invoices).

52.     Invoice 12716, dated 10/20/20, in the amount of $1,407.68, has a lower invoice number than Invoice 12726, dated 8/31/2021 (Invoice 12726 contained in **Exhibit 2**, Paid Invoices).

53.     Invoice 12392, dated 8/1/2020, in the amount of 9,322.89, has a lower invoice number than Invoice 12400, dated 7/22/2020 (Invoice 12400 contained in **Exhibit 2**, Paid Invoices).

54.     Invoice 12393, dated 7/1/2020, in the amount of $3,744.83, has a higher invoice number than Invoice 12310, dated 7/30/2020 (Invoice 12310 contained in **Exhibit 2**, Paid Invoices).

55.     Invoice 8940, dated 6/1/2020, in the amount of $4,215.83, has a lower invoice number than Invoices 10539, 10537, and 10840, which were all dated 5/21/2020 (Invoices 10539, 10537 and 10840 are contained in **Exhibit 2**, Paid Invoices).

56.     Invoice 12701, dated 5/1/2020, in the amount of $2,370.98, has a higher invoice number than Invoices 10539, 10537, 10840, dated 5/21/2020, Invoices 12401 and 12400, dated 7/22/2020, Invoices 12536, 12537, and 12538, dated

8/23/2020, Invoice 12310, dated 7/30/2020, Invoice 12395, dated 7/20/2020, and Invoice 12402, dated 7/22/2020.  (Invoices 10539, 10537, 10840, 12401, 12400, 12536, 12537, 12538, 12310, 12395 and 12402 are contained in **Exhibit 2**, Paid Invoices).

57.    Upon further inspection, Detroit Axle discovered that Defendants only delivered and/or installed a fraction of the equipment that Detroit Axle purchased, as had been intentionally misrepresented in the Invoices.

58.    Attached as **Exhibit 5** is an inventory showing equipment that Defendants failed to deliver and/or install, in contrast to representation made in Defendants' Invoices.

### E.    Defendants Hack Into Detroit Axle's System After It Was Terminated

59.    On December 7, 2020, at approximately 10:03 a.m., Detroit Axle notified Defendants that it would begin transitioning to a new IT service provider, and requested that Defendants provide "all administrator and user credentials for Detroit Axle's information/IT infrastructure in [Detroit IT's] possession or control; this should include, but is not limited to, server and domain administrative accounts, network infrastructure and cloud management administrative accounts, application (cloud and on-premise) administrative accounts, and external DNA administrative accounts."  (**Exhibit 6**).

60.    After Detroit Axle informed Defendants that it would be moving on and

that it must return all of its passwords, Detroit Axle gave permission to the new IT services provider to access and secure Detroit Axle's computer/IT network and make any changes necessary to secure its network.

61.    Between 1:30 p.m. and 5:00 p.m. on December 7, 2020, Detroit Axle's new IT services provider removed Defendants' access from Detroit Axle's systems, including, but not limited to, its Google Workspace, Active Directory/Windows domain, and Meraki Firewall, and accounts.

62.    Against the explicit instructions of Detroit Axle, Defendants made repeated attempts to hack back into Detroit Axle's IT Infrastructure.

63.    Defendants were successful in hacking back into Detroit Axle's IT infrastructure by covertly remotely connecting to Detroit Axle employee Russ Rowan's PC, which was connected to the Detroit Axle network.

64.    Once inside Mr. Rowan's PC, Defendants misused Mr. Rowan's "super administrator" access and control within the Google Workspace to reset the password for the Google email account detroitit@detroitaxle.com, an administrative account owned by Detroit Axle that had been deactivated.

65.    Defendants then logged back into the Google Workspace account using detroitit@detroitaxle.com and reset the password for the adminadmin@detroitaxle.com account, which was being used by the new IT provider for administrative purposes.

66.    As a result, Defendants gained control and access to most, if not all, of Detroit Axle's IT infrastructure, with the ability to significantly disrupt Detroit Axle's operations.

67.    Attached as **Exhibit 7** is the Affidavit of Dan Meyer, Chief Technology Officer for Auxiom, Detroit Axle's new IT company.

68.    Attached as **Exhibit 8** is the Audit Log showing Defendants' unauthorized intrusion into Detroit Axle's IT Infrastructure.

## F.    **Extortion and Threats By Defendants Against Detroit Axle**

69.    On the evening of December 7, 2020, Grundlehner contacted Mr. Musheinish, after Defendants had already hacked into Detroit Axle's network and computer systems.

70.    In the call, Grundlehner sounded like he was ready to go to war, and threatened to "shut everything down" and "turn everything off."

71.    Grundlehner threatened to shut down Detroit Axle's operations in Michigan as well as Mexico.

72.    During that call, Grundlehner also insisted that Detroit Axle could not disengage from Detroit IT, or use another IT provider, and promised that he would take care of Detroit Axle if they paid Defendants a large sum of money, but would shut Detroit Axle down if the extortion payment was not made.

73.    Grundlehner language and tone indicated to Mr. Musheinish that

Defendants would carry out their extortive threats.

74.     Grundlehner further demanded an extortion payment of $125,000.00 to Detroit IT from Detroit Axle.

75.     By the morning of December 8, 2020, Defendants had gained access and control over the majority of Detroit Axle's IT Infrastructure, to the extent that Grundlehner could have carried through with his threats to shut down Detroit Axle.

76.     On December 8, 2020, at 8:49 a.m. Mr. Musheinish sent a text message to Grundlehner, stating: "You went thru Russ computer And toke access This needs to stop Eric," in addition to demanding Defendants "give it back," referring to control of Detroit Axle's IT Infrastructure.  **Exhibit 9**.

77.     On the December 8, 2020, in a string of emails to counsel for the new IT provider, Defendants' legal counsel, Jason C. Yert, issued a cease and desist demand, insisting that Detroit Axle's chosen IT provider "immediately cease and desist from these activities, including restoring Detroit IT's rights to the systems and equipment."  **Exhibit 10**.  In subsequent emails, Mr. Yert further threatened that opposing counsel's firm "is going to be sanctioned" for representing the new IT provider. *Id*.

78.     As a result of the threats made by Grundlehener, and the fact that Detroit IT had already gained access and control over the majority of Detroit Axle's IT Infrastructure, Detroit Axle was left with no other option but to accede to

Defendants' extortion demands.

79.     Detroit Axle told its new IT provider to stand down, as Grundlehner demanded on the December 7, 2020 telephone call.

80.     As set forth in Mr. Meyer's affidavit: "Detroit Axle's network and computer systems are under the control of Detroit IT, whom have been dismissed as the provider of Detroit Axle's IT services, and Detroit Axle has lost access to much of the administrative funds of its IT Infrastructure." (**Exhibit 7**, par. 3).

81.     Defendants then removed Detroit Axle's access to other systems that Detroit Axle used with its vendors, including, but not limited to GNT Consulting, which is responsible for supporting Ship Exec server functions, shut down Detroit Axle's ability to utilize administrative functions, and delicensed and/or transferred software.

82.     That loss of access meant that Detroit Axle, among other things, was no longer able to access its database server in Juarez, Mexico.

83.     On December 8, 2020, in partial payment of Defendants' extortion demands, Detroit Axle wired $25.271.20 to Detroit IT.  **Exhibit 11**, wire transfer.

84.     As a result of the problems that Defendants were causing for Detroit Axle's IT Infrastructure, Detroit Axle's website crashed on the evening of December 8, 2020, and interfering with sales with customers across the United States.

85.     Unfortunately, this would be the first in a long string of actions by

Defendants which caused irreparable damage to Detroit Axle's business and reputation, substantial monetary loss, and interference with Detroit Axle's business, in addition to interfering with interstate commerce.

### G.   **Catastrophic Damage Caused to Defendants**

86.    After Defendants, through the above actions, took complete control of Detroit Axle's IT Infrastructure, Defendants demanded an increased extortion amount of $185,000.00 (alleging that Detroit Axle must pay additional amounts for equipment that was never delivered), or Defendants would not return control of Detroit Axle's IT Infrastructure.

87.    Defendants made clear that they would not allow a new IT company to provide any IT service, despite failing and/or refusing to address pressing IT issues.

88.    Defendants refused to provide backup or supporting documentation justifying their claimed extortion amount, or proving the accuracy of the Invoices.

89.    While in complete control of Detroit Axle's IT Infrastructure, Defendants actively interfered with Detroit Axle's ability to utilize its IT Infrastructure, detrimentally impacting Detroit Axle's business and ability to service customers across the United States.

90.    Action taken by Defendants after December 8, 2020, to the detriment of Detroit Axle, also include the following:

91.    Defendants took control of Detroit Axle's Google account, which

prevented Detroit Axle from accessing or creating emails, and unable to access their Google Drive, where the company stored proprietary and confidential information necessary for operations.

92.    Defendants took control of Detroit Axle's Microsoft 365 account, used to facilitate the company's email system, and leaving Detroit Axle unable to access or create emails.

93.    Defendants made Detroit Axle's Warehouse Management System inoperable, by removing Detroit Axle's access to its inventory database and causing half of the network in in the Ferndale, Michigan facility to be rendered inoperable.

94.    Defendants prevented Detroit Axle from onboarding or off boarding employees, including obstructing the removal of former employees from the computer system.

95.    Defendants made Detroit Axle's security system inoperable, including the cameras and motion sensors used to secure and supervise equipment, inventory, and employees.

96.    Defendants made a significant amount of hardware inoperable, including scanners used to identify and ship parts, and printers used for labeling.

97.    Defendants' control over and restrictions over Detroit Axle's network and computer systems caused Detroit Axle a great deal of irreparable harm and injured the company's reputation with distributors and customers across the country.

98.   Detroit Axle suffered significant losses in regards to its relationship with Amazon, as a direct and proximate result of Defendants' misconduct.

99.   A large amount of Detroit Axle's sales originates from Amazon, where it has on average over 10,000 individual automotive parts listed.

100.   Prior to Defendants' hacking of Detroit Axle, Detroit Axle had a prominent placement on Amazon and was part of Amazon's Seller Fulfilled Prime program ("Amazon Prime").

101.   Amazon Prime allowed Detroit Axle to deliver directly to its Amazon customers from its own warehouse and gave Detroit Axle access to Amazon's delivery and logistics services.

102.   Under Amazon Prime, all of Detroit Axle's Amazon listings had a "Prime" logo and badge attached to them.

103.   The "Prime" logo and badge is a major driver of Detroit Axle's sales on Amazon.

104.   In order to be part of Amazon Prime, Detroit Axle was required to fulfill all of its Amazon orders within a two-day delivery window.

105.   Detroit Axle had no difficulty or problems delivering its products under Amazon Prime prior to Defendants' hacking of its network and computer systems, and Defendants' intentional interference with business operations.

106.   After Defendants hacked into Detroit Axle's network and computer

systems, and made large amounts of the IT infrastructure inoperable, Detroit Axle was unable to locate or ship products timely.

107.   For example, only two of Detroit Axle's scanners were operable for its 500,000 square foot Detroit facility. Those two scanners were unable to keep up with Detroit Axle's 5,000 average daily orders, and did not allow Detroit Axle to add new products into its inventory system.

108.   Detroit Axle's employees were forced to manually enter in all of the order and customer information as a temporary alternative, which was much more time consuming and labor intensive, and did not allow Detroit Axle to ship all of its orders timely.

109.   Defendants also only left Detroit Axle with two (2) operable printers to print all of the invoices and shipping labels for its customers across the country, but those printers were unable to handle Detroit Axle's entire shipping volume.

110.   Detroit Axle was unable to add additional scanners or printers because Defendants refused to give Detroit Axle access to its systems, including its shipping server.

111.   Due to Defendants' actions, Detroit Axle and Amazon received a large number of customer complaints, stemming from the inability to control inventory or ship products timely.

112.   In addition to damaging Detroit Axle's reputation, Defendants' actions

caused Detroit Axle's metrics with Amazon to drop, forcing Amazon to remove Detroit Axle from the Amazon Prime program.

113.   Detroit Axle lost well over $100,000 per day from lost sales on Amazon alone, directly attributable to Defendants' misconduct.

114.   Detroit Axle was unable to properly respond to all of the complaints stemming from inventory issues and shipping delays caused by Defendants.

115.   Detroit Axle has lost sales, including large commercial accounts, due to the problems caused by Defendants.

116.   Detroit Axle's retail location in Ferndale, Michigan, and call center were also negatively impaired by Defendants.

117.   Detroit Axle was forced to use only three working computers in the lobby, with only one (1) printer accessible to staff.  Long lines and the inability to access customer data, caused customer complaints and severe backups in customer service.

118.   Detroit Axle was unable to access its other computers because Defendants locked them out and refused to return access.

119.   Defendants also took control over and accessed Detroit Axle's customer information, email system, and firewall.

120.   Defendants' misconduct had a dramatically negative impact on Detroit Axle's business and reputation, in particular, its ability to fulfill orders for its

customers across the United States and its relationships with existing and prospective customers.

121.   Defendants' knew or had reason to know that their actions would impede and interfere with interstate commerce, but persisted in depriving Detroit Axle of control over its IT Infrastructure.

### H.   **Defendants' Scheme to Defraud Similar Customers**

122.   Defendants actively participated in the scheme to obtain funds from Detroit Axle, which Defendants did not earn, through a pattern of racketeering activity that included the manufacture and transfer over electronic mail of fraudulent invoices, on two occasions, hacking into Detroit Axle's computer system, extortion, and interference with commerce.

123.   Defendants have and continue to be engaged in the same or similar scheme, with the same or similar purposes to defraud victims, using the same or similar methods of commission, or which are otherwise interrelated by distinguishing characteristics and are not isolated events.

124.   Detroit IT and/or Grundlehner have been sued by many other similarly situated customers who, after attempting to terminated Detroit IT's services, also experienced instances of hacking, and/or extortion for unearned funds.

125.   These cases include, but are not limited to: (i) *Production Plus Inc. v Detroit IT*, Oakland County Business Court Case No. 2019-178289-CB; (ii) *Paul*

*Chambers v Detroit IT*, Oakland County Business Court Case No. 2015-148388-CB, Judge Michael Warren; (iii) *Custom Home Health Inc. v Detroit IT*, Oakland County Business Court Case No. 2020-181970-CB; (iv) *Search Plus International Inc v Detroit IT,* Oakland County Business Court Case No. 2020-180046-CB; (v) *Broder & Sachse Real Estate*, Oakland County Business Court Case No. 2019-174634-CB; (vi) *SK Dental Labs Inc v Detroit IT*, Oakland County Business Court Case No. 2018-169904-CB; (vii) *GE Dist v Detroit IT*, Oakland County Business Court Case No. 2018-170280-CB; (viii) *Plymouth Technology Inc v Detroit IT*, Oakland County Business Court Case No, 2020-182419-CB.

126.  As one of many example of Defendants' continuous course of misconduct, in *Custom Home Health, Inc*, *supra* an ongoing case, the Honorable Martha D. Anderson found that "it appears that Defendant Detroit IT, LLC may be improperly withholding the requested login access credentials and interfering with Plaintiff's relationships with its patients and new IT service provider." (**Exhibit 12,** Order Granting Plaintiff's Emergency Motion for a Temporary Restraining Order and Requiring Defendant to Show Cause).

127.  In issuing a Temporary Restraining Order against Detroit IT, without notice to Detroit IT, Judge Anderson found that "Plaintiff will suffer irreparable harm if this order is not entered because Plaintiff and its new IT service Provider will be unable to access and use Plaintiff's own computers, network servers, and

devices, compromising Plaintiff's ability to provide service to its patients. . . ." *Id.*

128.    Attached as **Exhibit 13** is Custom Home Health, Inc. Emergency Motion detailing similar conduct committed by Defendants as against Detroit Axle.

129.    Moreover, in *Search Plus International Inc.*, *supra*, now retired Judge James Alexander issuing a Temporary Restraining Order against Detroit IT for similar misconduct, requiring Detroit IT to "provide all passwords, access information and other information to allow Plaintiff to access it's business information contained on Defendant's servers or at Defendant's premises within 48 hours of this Order." **Exhibit 14.**

130.    Defendants continue to pose a threat of similar misconduct and criminal activity against other customers similarly situated to Detroit Axle.

131.    Attached as **Exhibit 15**, and incorporated herein, is the Declaration of Andrew Bartnowak, President of AG Advisors Global, LLC, a risk mitigation and investigative company, who formerly served as Special Agent and Supervisory Special Agent for the Federal Bureau of Investigation.

132.    Based upon Mr. Bartnowak's investigation, Defendants are "engaged in unethical business practices and conduct which likely violate a number of civil and criminal laws."  (*Id.*, par. 5).

133.    In addition, Mr. Bartnowak confirmed that based upon his extensive experience and investigation, "Defendants' conduct is one of the most blatant and

worst examples of behavior which implicates violations of both civil and criminal law that I have experienced in my career." (*Id.*, par. 9).

## I.   Defendants' Counsel's Threat to Trespass at Detroit Axle's Facility

134.   On Thursday, January 21, 2020, Detroit Axle made clear to Defendants that they would not pay the $185,000 extortion amount.

135.   Mr. Yert, acting as counsel for Defendants, then repeatedly threatened to barge into Detroit Axle's facility on Monday, January 25, 2021 at 8:00 a.m., without approval or consent.

136.   As a result, Detroit Axle was left with no other option but to initiate this litigation, seeking to regain control of its IT Infrastructure, in addition to substantial damages.

137.   During a hearing on Detroit Axle's Motion for Injunction, after opening arguments and the testimony of Mr. Musheinish, Defendants finally agreed to turn over to Detroit Axle the passwords to Detroit Axle's IT Infrastructure, which Defendants finally did on February 11, 2021 at 5:09 p.m.

138.   While Detroit Axle in now in control of its IT Infrastructure, it is still entitled to substantial monetary damages stemming from Defendants' actions, which constitute a pattern of racketeering activity, and triggers numerous other meritorious causes of action.

## COUNT I
## RICO §1962(c)
## (Detroit IT, Grundlehner and Miller)

139.   Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

140.   Defendants violated RICO, and Detroit Axle was injured as a result.

141.   Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. §1961(3).

142.   Each Defendant violated 18 U.S.C. §1962(c) by the acts described in the prior paragraphs, and as further described below.

143.   <u>The Enterprise</u>.  Each of the Defendants form an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. §1961(4).   The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  There may be other members of the enterprise who are unknown at this time.

144.   The enterprise has engaged in, and its activities have affected, interstate commerce.

145.   <u>Pattern of Racketeering Activity</u>.   Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the

enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(1), 1961 (5), and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

146.   Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. §1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

147.   The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous, and there is a continued threat of repetition of such conduct.

148.   The association-in-fact enterprise was not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate purpose of providing IT services. Defendants have had and do have, upon information and belief, legitimate business plans outside of the pattern of racketeering activity.

149.   Detroit Axle specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

150.   <u>Predicate Act: Use of Wires to Defraud Detroit Axle in Violation of 18 U.S.C. §1343</u>.  Defendants committed acts constituting indictable offenses under 18 U.S.C. §1343 in that they devised or intended to devise a scheme or artifice to defraud Detroit Axle or to obtain money from Detroit Axle by means of false or fraudulent pretenses, representations or promises.  For the purpose of executing their scheme or artifice, Defendants caused fraudulent invoices to be sent to Detroit Axle, via electronic mail, on October 11, 2020, and then on November 30, 2020.  The acts of Defendants were done intentionally, and knowingly, with specific intent to advance Defendants' scheme or artifice.

151.   Defendants' objective was to divert funds belonging to Detroit Axle to their own benefit.

152.   <u>Predicate Act: Interference with Commerce by Threats or Violation - Extortion</u>.  Defendants also committed indictable offenses under 18 U.S.C. §1951 by extorting Detroit Axle on December 7, 2020 to shut down the business if Detroit Axle did not tell its new IT provider to stand down, and pay Defendants a substantial extortion payment.  As a result of Defendants' extortion, Detroit Axle wired an extortion payment in the amount of $25,271.20 to Defendants.  Defendants, through

their extortion, also interfered with Detroit Axle's ability to access and control its IT Infrastructure, resulting in substantial interference with commerce, in particular, numerous sales transactions with Detroit Axle's customers.  The acts of Defendants were done willfully and with knowledge that the money was not willingly provided, and were done intentionally, and knowingly, with specific intent to advance Defendants' scheme or artifice.

153.   Defendants' objective was to divert funds belonging to Detroit Axle to their own benefit, and Defendants caused substantial harm to Detroit Axle.

154.   <u>Continuity of Conduct</u>.  Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Detroit Axle, constituted a continuous course of conduct, which both preceded Defendants' interactions with Detroit Axle – as evidenced by the other pending lawsuits against Detroit IT and Grundlehner – and continues to this day, which was intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means.  Therefore, said violations were a part of a pattern of racketeering activity under 28 U.S.C. §1961(1) and (5).

155. Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 28 U.S.C. §1962(c).

156.   The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Detroit Axle in its business.

157.   Detroit Axle seeks an award of damages in compensation for, among other things, the money taken by Defendants, and the substantial financial losses stemming from Defendants' misconduct.

Wherefore, Detroit Axle respectfully requests a judgment in its favor against Defendants, three times the amount of financial damages sustained, and the recovery of attorneys' fees and costs, as well as any other relief as authorized by statute, and such other and further relief as this Court deems just and proper under the circumstances.

## COUNT II
### RICO §1962(d)
### (Detroit IT, Grundlehner and Miller)

158.   Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

159.   In violation of 18 U.S.C. §1962(d), Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged above.

160.   The conspiracy against Detroit Axle began in April 2020, when Detroit IT was hired, but Defendants scheme to defraud clients stretches back at least to 2018 (first customer lawsuit against Detroit IT cited above), although Detroit Axle has evidence that Defendants have been engaged in similar racketeering behavior against clients well before that time.

161.   The conspiracy's purpose was to divert money from clients, including Detroit Axle, to Defendants' own benefit, and facilitate payments to enrich Defendants.

162.   Each Defendant committed at least one overt act in furtherance of such conspiracy.  These acts in furtherance of the conspiracy included, but are not limited to, manufacturing and sending fraudulent invoices to Detroit Axle, engaging in hacking and extortion, and interfering with commerce.

163.   Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

164.   Defendants' misconduct interfered with Detroit Axle's business, and correspondingly, interstate commerce.

165.   Even if some of the Defendants did not agree to harm Detroit Axle specifically, the purpose of the acts they engaged in was to advance the overall object

of the conspiracy, and the harm to Detroit Axle was a reasonably foreseeable consequence of Defendants' actions.

166.   Detroit Axle has been injured and continues to be injured in its business and property by Defendants' conspiracy in violation of 18 U.S.C. §1962(d).  The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business or property.

Wherefore, Detroit Axle respectfully requests a judgment in its favor against Defendants, three times the amount of financial damages sustained, and the recovery of attorneys' fees and costs, as well as any other relief as authorized by statute, and such other and further relief as this Court deems just and proper under the circumstances.

## COUNT III
### Michigan RICO Statute
### (Detroit IT, Grundlehner and Miller)

167.   Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

168.   Under Michigan law, "a person employed by, or associated with, an enterprise shall not knowingly conduct or participate in the affairs of the enterprise directly or indirectly through a pattern of racketeering activity."  MCL750.159(f)

33

169.   Racketeering is defined as including: "An offense committed within this state or another state that constitutes racketeering activity as defined in 18 USC 1961(1)." MCL 750.159(g)(pp).

170.   In addition, under Michigan law, a predicate act for racketeering includes "extortion." MCL 750.159(g)(v), as further defined by MCL 750.213 (malicious threats to extort money).

171.   Moreover, "identity theft," including utilizing another person's "account password" constitutes a predicate act for racketeering.   MCL 750.159(g)(oo), as further defined by MCL 445.63.

172.   Defendants committed predicate acts set forth above, including, but not limited to: sending fraudulent invoices via electronic mail on at least two (2) occasions, hacking into Detroit Axle's IT Infrastructure using a Detroit Axle employee's computer (i.e. identity theft), and engaging in extortion to obtain ill-gotten gains from Detroit Axle.

173.   Each Defendant committed at least one overt act constituting racketeering under Michigan law.

174.   These acts in furtherance of the conspiracy include, but are not limited to, manufacturing and sending fraudulent invoices to Detroit Axle, engaging in hacking and extortion, and interfering with commerce.

175.   Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

176.   Defendants' misconduct interfered with Detroit Axle's business, and correspondingly, commerce.

177.   Even if some of the Defendants did not agree to harm Detroit Axle specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Detroit Axle was a reasonably foreseeable consequence of Defendants' actions.

178.   Detroit Axle has been injured and continues to be injured in its business and property by Defendants' conspiracy in violation of 18 U.S.C. §1962(d).  The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business or property.

Wherefore, Detroit Axle respectfully requests a judgment in its favor against Defendants, three times the amount of financial damages sustained, and the recovery of attorneys' fees and costs, and such other and further relief as this Court deems just and proper under the circumstances.

# COUNT IV
**Breach of Contract**
**(Detroit IT)**

179.   Detroit Axles reasserts and incorporates all the prior paragraphs as though fully stated.

180.   In or about April 2020, Detroit Axle began utilizing Detroit IT for the Services.

181.   The Parties' handshake agreement that Detroit IT would provide the Services in exchange for payment, upon receipt of Invoices, is an enforceable contract.

182.   Detroit IT was required to provide the Services in a professional and competent manner.

183.   In addition, Detroit IT was expected to actually perform the Services reflected on its Invoices.

184.   Instead, Detroit IT failed to perform the Services in a professional and competent manner, including, but not limited to, not responding to communications and/or requests from Detroit Axle in a timely manner and failing to install the network and/or computer equipment necessary for Detroit Axle's operations.

185.   In addition, since July 22, 2020, Detroit Axle paid Detroit IT $173,270.95 for the purchase and installation of equipment from Detroit IT, pursuant to the Invoices.

36

186.    The Invoices constituted part of the binding and enforceable agreement between the Parties.

187.    Pursuant to the Invoices, Detroit IT was obligated to procure and install the equipment that Detroit Axle purchased at Detroit Axle's Michigan and Mexico offices.

188.    Instead of fulfilling its obligations under the Invoices, Detroit IT failed to procure and/or install numerous pieces of equipment that were purchased by Detroit Axle.

189.    In addition, Detroit IT failed to perform other Services, despite demanding payment for them.

190.    Pursuant to the Parties' agreement, Detroit IT was also required to, upon Detroit Axle's request, provide assistance to Detroit Axle to transition to a new IT service provider.

191.    On December 7, 2020, Detroit Axle requested that Defendants help its transition to a new IT service provider, due to Detroit IT's poor service.

192.    Instead of helping Detroit Axle to transition to a new IT service provider, Defendants instead hacked into Detroit Axle's system, and held Detroit Axle's passwords and accounts hostage while detrimentally impacting Detroit Axle's ability to operate its business.

193.    By its actions, as described above, Detroit IT has breached its

contractual obligations.

194.   Detroit Axle has been damaged in an amount to be determined at trial, but in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees, by Detroit IT's breach of its agreements.

WHEREFORE, Detroit Axle respectfully requests a judgment in its favor and against Detroit IT in an amount in excess of $75,000.00 plus interest and its costs and attorneys' fees incurred in exercising its rights and remedies, and such other and further relief as this Court deems just and proper under the circumstances.

**COUNT V**
**Fraud and/or Misrepresentation**
**(Detroit IT, Grundlehner and Miller)**

195.   Detroit Axles reasserts and incorporates all the prior paragraphs as though fully stated.

196.   Defendants made a material representation that Detroit IT installed the Detroit Axle Equipment that Detroit Axle fully paid for at Detroit Axle's facilities.

197.   Defendants further represented that Detroit IT installed additional equipment at Detroit Axle's locations.

198.   However, instead of installing all of the equipment as Defendants claimed, they only installed a fraction of said equipment.

199.   Defendants have demanded additional monies for equipment that they have represented that they have installed, but have failed to.

200.   Defendants knew that they would not, or did not, install the Detroit Axle Equipment and additional equipment that they represented they would install and/or was installed when they demanded payment for the equipment.

201.   Moreover, Defendants have knowingly issued fabricated and fraudulent Invoices to Detroit Axle, which contain entries for work that was never performed.

202.   Defendants made said misrepresentations with the intention that Detroit Axle would act upon the and pay for equipment that was never installed and/or received, and/or for other entries identified on the Invoices that were never performed.

203.   Detroit Axle relied upon Defendants' representations and paid for the Detroit Axle Equipment and along with numerous Invoices.

204.   Detroit Axle has been damaged in an amount to be determined at trial, but in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees, by Defendants' fraud and/or misrepresentation.

WHEREFORE, Detroit Axle respectfully requests a judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $75,000.00 plus interest and its costs and attorneys' fees incurred in exercising its rights and remedies, and such other and further relief as this Court deems just and proper under the circumstances.

## COUNT VI
## Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030
### (Detroit IT, Grundlehner and Miller)

205.   Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

206.   In addition to its criminal penalties, the CFAA gives a private cause of action for the damage and losses caused by the intentional, unauthorized, access of a protected computer.

207.   During the relevant period, Defendants were not authorized to and/or exceeded their authorization to access Detroit Axle's computers, the computer servers Detroit Axle's services were hosted on, and/or Detroit Axle's computer network.

208.   Upon information and belief, Defendants also intentionally and without consent, permission, or authorization gained access to confidential and sensitive information through Detroit Axle's computer and network systems.

209.   Defendants continued their conduct after Detroit Axle outright revoked Defendants' access to Detroit Axle's computer and network systems.

210.   In fact, after they were told that Detroit Axle would no longer be utilizing their services, Defendants accessed Detroit Axle's computer and network systems and revoked licenses and changed Detroit Axle's passwords.

211.    Defendants took said actions with the intent to extort Detroit Axle and demanded payment to restore Detroit Axle's access to its own computer and network systems.

212.    Detroit Axle's computer and network systems are protected computers which at all relevant times operated and affected interstate commerce.

213.    Defendants' intentional access of the protected computers caused loss and damages to Detroit Axle, including, but not limited to, costs incurred in Detroit Axle's attempts to regain ownership of its computer systems and accounts, costs incurred in securing its computer systems, and costs of investigation as to which computer systems have been affected by Defendants' conduct.

214.    Detroit Axle's damages from Defendants' unauthorized access exceed $5,000.00.

215.    Defendants took all such actions knowingly and intentionally and without Detroit Axle's consent or permission and in violation of the Computer Fraud and Abuse Act.

216.    As a direct and proximate result of Defendants' unlawful and improper actions, Detroit Axle has suffered losses in an amount to be proven at trial.

217.    Punitive and exemplary damages are appropriate because Defendants' actions were willful and intentional.

WHEREFORE, Detroit Axle respectfully requests a judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $75,000.00 plus interest and its costs and attorneys' fees incurred in exercising its rights and remedies, along with punitive damages, and such other and further relief as this Court deems just and proper under the circumstances.

### COUNT VII
**Violation of the Stored Communications Act, 18 U.S.C. § 2701 *et seq.***
**(Detroit IT, Grundlehner and Miller)**

218.   Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

219.   The SCA prohibits the intentional access of a facility through which an electronic communication service is provided without authorization, or intentionally exceeding authorization to access that facility, and the obtaining, altering, or prevention of authorized access to an electronic communication while it is in electronic storage in such system.

220.   In addition to its criminal penalties, the SCA provides a civil cause of action for any person aggrieved by any violation of the SCA.

221.   Defendants intentionally and without authorization gained access to confidential and sensitive information stored on a facility through which an electronic communications service is provided by accessing Detroit Axle's computer and network systems and cloud-based accounts, which contained communications

between Detroit Axle and its customers and confidential information about Detroit Axle's business.

222.   Defendants also prevented Detroit Axle from accessing its electronic communications by, among other things, changing the passwords to the Accounts.

223.   Under the SCA, Detroit Axle's computer and network systems and the servers its cloud-based accounts can be accessed through are a facility through which an electronic communication service is provided.

224.   Without authorization, Defendants obtained confidential, proprietary, and sensitive business records and electronic communications of Detroit Axle while they were stored on said computers, networks, and servers.

225.   Defendants' unauthorized access or access in excess of authorization caused actual harm to Detroit Axle, including but not limited to, investigation costs, attorneys' fees, the improper disclosure of confidential and sensitive information, and the costs of securing said computer systems, networks, and/or servers.

226.   Defendants took all such actions knowingly and intentionally and in violation of the SCA.

227.   Punitive and exemplary damages are appropriate because Defendants' actions were willful and intentional.

228.   This Court should award Detroit Axle its attorneys' fees under 18 U.S.C. § 2707(c).

WHEREFORE, Detroit Axle respectfully requests that this Court enter a judgment in its favor and against Defendants, jointly and severally, grant Detroit Axle damages against Defendants in an amount in excess of $75,000.00, including, but not limited to, actual damages, punitive damages, and statutory damages, plus its costs and attorneys' fees, and any such other and further relief as the Court deems just and proper.

## COUNT VIII
### Request for Declaratory Relief
### (Detroit IT)

229.   Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

230.   An actual, existing, and bona fide controversy exists between Detroit Axle and Detroit IT with respect to their obligations pursuant to the Services and the ownership of the Detroit Axle Equipment, which can only be determined by an adjudication of a declaratory judgment as provided by law.

231.   Detroit Axle is entitled to a Declaratory Judgment that it is the rightful owner of the Detroit Axle Equipment, and that Detroit IT has no possessory interest and/or rights to the Detroit Axle Equipment.

232.   If Detroit Axle's rights are not adjudicated by way of declaratory action, there will be adverse consequences to Detroit Axle, including, but not limited to, Detroit IT's wrongful removal of the Detroit Axle Equipment which would

further negatively impact its business.

WHEREFORE, Detroit Axle respectfully requests that this Court enter a declaratory judgment in its favor and against Detroit IT, ruling that Detroit Axle is the rightful owner of the Detroit Axle Equipment, and that Detroit IT has no possessory interest and/or rights to the Detroit Axle Equipment, in addition to awarding Detroit Axle an amount in excess of $75,000.00, plus interest and its costs and attorneys' fees incurred in exercising its rights and remedies, and such other and further relief as this Court deems just and proper under the circumstances.

### COUNT IX
**Unjust Enrichment**
**(Detroit IT, Grundlehner and Miller)**

233. Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

234. Defendants have received over $173,270 in monies from Detroit Axle for the Detroit Axle Equipment.

235. Detroit IT has no legal or equitable title to the Detroit Axle Equipment.

236. Furthermore, despite Detroit Axle paying for the Detroit Axle Equipment, Detroit IT failed to provide and/or install some of the equipment.

237. Moreover, Detroit Axle paid for Services not actually provided by Detroit IT, despite paying for them.

238.   Detroit IT, and the individual Defendants, were improperly enriched at the expense of Detroit Axle.

239.   Defendants would be unjustly enriched if they were allowed to retain the monies that was paid for the Detroit Axle Equipment and/or the equipment itself and/or for services Detroit IT failed to perform.

WHEREFORE, Detroit Axle respectfully requests a judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $75,000.00 plus interest and its costs and attorneys' fees incurred in exercising its rights and remedies, and such other and further relief as this Court deems just and proper under the circumstances.

## COUNT X
## Common Law and Statutory Conversion
## (Detroit IT, Grundlehner and Miller)

240.   Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

241.   Detroit Axle maintained ownership of its network and computer systems, along with the Accounts at all relevant times to this action.

242.   Defendants unlawfully engaged in a distinct act of dominion over Detroit Axle's property, its network and computer systems and the Accounts, by, among other things, changing the passwords to the Accounts to lock Detroit Axle

out of the administrative functions of the Accounts and to prevent Detroit Axle from switching IT services providers without paying a ransom to Defendants.

243.   Detroit Axle was unable to access much of the functionality of the Accounts, and was locked out of many of its network and computer systems due to Defendants' actions until after this litigation commenced.

244.   Defendants used their unlawful dominion over the Accounts for their own benefit to, among other things, extort Detroit Axle into paying a ransom for the return of its access to the Accounts and as a method of revenge against Detroit Axle.

245.   By doing so, Defendants have committed common law and statutory conversion, pursuant to MCL 600.2919a, which entitles Detroit Axle to treble damages and attorneys' fees against Defendants.

WHEREFORE, Detroit Axle respectfully requests a judgment in its favor and against Defendants in an amount in excess of $75,000.00 plus interest, treble damages, along with its costs and attorneys' fees incurred in exercising its rights and remedies, and such other and further relief as this Court deems just and proper under the circumstances.

## COUNT XI
### Tortious Interference with Business Relationship or Expectancy
### (Detroit IT, Grundlehner and Miller)

246.   Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

247.   Defendants interfered with Detroit Axle's business relationships with third parties by actions including, but not limited to: (i) hacking into and taking over Detroit Axle's IT Infrastructure; (ii) disrupting Detroit Axle's ability to provide products and customer support to Detroit Axle's customers; and (iii) preventing Detroit Axle from addressing IT problems while the system was under Defendants' control.

248.   Defendants did so with the purpose of intentionally interfering with Detroit Axle's businesses relationships and expectancy with third parties.

249.   Defendants knew of Detroit Axle's business relationship or expectancy with these third parties.

250.   As a result of Defendants' misconduct, they interfered with Detroit Axle's business relationships with customers and prospective customers, as evidenced by loss of sales and customer accounts, complaints, poor customer ratings and damage to Detroit Axle's reputation.

251.   Defendants' misconduct has and will continue to disrupt Detroit Axle's business and cause substantial damage to Detroit Axle.

WHEREFORE, Detroit Axle requests a judgment against Defendants, in an amount exceeding $75,000.00, plus interest and its costs and attorneys' fees incurred in exercising its rights and remedies, and such other and further relief as this Court deems just and proper under the circumstances.

## COUNT XII
### Civil Conspiracy
### (Detroit IT, Grundlehner and Miller)

252.   Detroit Axle reasserts and incorporates all prior paragraphs as though fully stated.

253.   Defendants, directly and/or through their agents, entered into an agreement to harm Detroit Axle, or acted in concert in a manner that was detrimental to Detroit Axle.

254.   In addition, Defendants contacted former employees of Detroit Axle in an attempt to coopt others into the civil conspiracy to harm Detroit Axle.

255.   Grundlehner and Miller acted outside the scope of their job responsibilities, and individually engaged in tortious conduct against Detroit Axle.

256.   Defendants, illegally, maliciously, and wrongfully conspired with one another with the intent to, and for the illegal purpose of engaging in the impermissible acts described previously in this Complaint.

257.   Defendants' actions, in combination, were tortious and/or unlawful, or in the alternative, were designed to accomplish an unlawful purpose, or accomplish a lawful purpose through unlawful means.

258.   As a result of the conspiracy and Defendants' illegal, wrongful, and tortious acts, Detroit Axle sustained significant damages.

WHEREFORE, Detroit Axle respectfully requests a judgment in its favor and against Defendants in an amount in excess of $75,000.00 plus interest and its costs and attorneys' fees incurred in exercising its rights and remedies, and such other and further relief as this Court deems just and proper under the circumstances.

## JURY DEMAND

Detroit Axle demands a jury on all claims so triable.

> Respectfully submitted,
> JAFFE, RAITT, HEUER & WEISS P.C.
>
> /s/ Jonathan H. Schwartz
> Jonathan H. Schwartz (P70819)
> Mark Kowalsky (P35573)
> Benjamin M. Low (P82834)
> Jaffe Raitt Heuer & Weiss, PC
> *Attorneys for Detroit Axle*
> 27777 Franklin Road, Suite 2500
> Southfield, MI 48034
> 248.351.3000
> jschwartz@jaffelaw.com
> mkowalky@jaffelaw.com

Dated: March 12, 2021 benlow@jaffelaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 12, 2021, a copy of the foregoing was filed and served on counsel of record through the Court's E-filing system.

> /s/Jonathan H. Schwartz
> Jonathan H. Schwartz (P70819)
> jschwartz@jaffelaw.com