# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

**AXLE OF DEARBORN, INC., D.B.A.**
**DETROIT AXLE**, a Michigan corporation;
**DETROIT AXLE, INC**., a Michigan
corporation; and **DETROIT AXLE QSSS,**
**INC.,** a Michigan corporation,

        Plaintiffs,

v.

**DETROIT IT, LLC**, a Michigan limited
liability company; **ERIC**
**GRUNDLEHNER**, an individual; and
**STEPHANIE MILLER**, an individual,

        Defendants,

and

**DETROIT IT, LLC**, a Michigan limited
liability company,

        Counterclaim Plaintiff,

v.

**AXLE OF DEARBORN, INC., D.B.A**.
**DETROIT AXLE**, a Michigan corporation;
**DETROIT AXLE, INC**., a Michigan
corporation; **DETROIT AXLE QSSS,**
**INC**., a Michigan corporation, and
**MOUHAMED MUSHEINESH**, an individual.

        Counterclaim Defendants.

Case No. 21-cv-10163

Hon. Stephanie Dawkins Davis

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANTS' PARTIAL MOTION TO DISMISS

5207534

Plaintiffs Axle of Dearborn, Inc., d.b.a. Detroit Axle, Detroit Axle, Inc., and Detroit Axle QSSS, Inc. (collectively, "Detroit Axle" or "Plaintiffs"), through their attorneys, Jaffe Raitt Heuer & Weiss, P.C., respectfully submit this Response in Opposition to Defendants Detroit IT, LLC ("Detroit IT"), Eric Grundlehner's ("Grundlehner"), and Stephanie Miller's ("Miller") (collectively, the "Defendants") Partial Motion to Dismiss (the "Motion"). For the reasons stated in the attached brief in support, the Motion should be denied.

Respectfully submitted,
JAFFE, RAITT, HEUER, & WEISS, P.C.

By: /s/ Jonathan H. Schwartz
Jonathan H. Schwartz (P70819)
Mark L. Kowalsky (P35573)
Benjamin M. Low (P82834)
Jaffe Raitt Heuer & Weiss, PC
*Attorneys for Detroit Axle*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
jschwartz@jaffelaw.com
mkowalsky@jaffelaw.com
benlow@jaffelaw.com

Dated: April 15, 2021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**AXLE OF DEARBORN, INC., D.B.A**.
**DETROIT AXLE**, a Michigan corporation;
**DETROIT AXLE, INC**., a Michigan
corporation; and **DETROIT AXLE QSSS,
INC.,** a Michigan corporation,

        Plaintiffs,

v.

**DETROIT IT, LLC**, a Michigan limited
liability company; **ERIC
GRUNDLEHNER**, an individual; and
**STEPHANIE MILLER**, an individual,

        Defendants,

and

**DETROIT IT, LLC**, a Michigan limited
liability company,

        Counterclaim Plaintiff,

v.

**AXLE OF DEARBORN, INC., D.B.A**.
**DETROIT AXLE**, a Michigan corporation;
**DETROIT AXLE, INC**., a Michigan
corporation; **DETROIT AXLE QSSS,
INC**., a Michigan corporation, and
**MOUHAMED MUSHEINESH**, an individual.

        Counterclaim Defendants.

Case No. 21-cv-10163

Hon. Stephanie Dawkins Davis

---

## BRIEF IN OPPOSITION TO
## DEFENDANTS' PARTIAL MOTION TO DISMISS

5207534

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. iii

ISSUES PRESENTED ................................................................. iii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................... v

INDEX OF AUTHORITIES .......................................................... vi

INTRODUCTION ........................................................................ 1

STATEMENT OF FACTS ............................................................... 2

STANDARD OF REVIEW .............................................................. 4

ARGUMENT ............................................................................. 6

   I.    Detroit Axle Properly Alleged Its RICO Claim ........................... 6

      A.   Detroit Axle Alleged That Defendants Formed A RICO Enterprise ........ 7

      B.   Detroit Axle Alleged That Defendants Committed Wire Fraud Under RICO ................................................................................ 11

      C.   Detroit Axle Alleged That Defendants Are Engaged In A Pattern Of Racketeering Activity ......................................................... 14

   II.   Detroit Axle Sufficiently Alleged That Defendants' Intrusion Onto Detroit Axle's Network And Computers Was Unauthorized ......................... 18

   III.  Detroit Axle Properly Pleaded That Defendants Committed Fraud .......... 20

   IV.  The Bar Against Intra-Corporate Conspiracy Is Not Applicable When Defendants Acted Outside The Scope Of Their Employment .................. 22

   V.   Detroit Axle Sufficiently Alleged That Defendants Converted It's Property 23

CONCLUSION ......................................................................... 25

## ISSUES PRESENTED

1.  Did Detroit Axle properly allege that Defendants violated RICO by conspiring to form an association-in-fact to commit wire fraud and extortion against Detroit Axle?

    Plaintiff answers: Yes.

    Defendants answer: No.

2.  Did Detroit Axle properly allege that Defendants were engaged in a pattern of racketeering activity when their predicate acts indicated that their harm to Detroit Axle would be ongoing and they have a long history of similar behavior directed towards other former customers?

    Plaintiff answers: Yes.

    Defendants answer: No.

3.  Did Detroit Axle sufficiently allege that Defendants are liable for CFAA and SCA violations because their intrusion onto Detroit Axle's network and computers was unauthorized?

    Plaintiff answers: Yes.

    Defendants answer: No.

4.  Did Detroit Axle properly plead that Defendants committed fraud by presenting Detroit Axle with fraudulent invoices for past work they claimed was performed?

    Plaintiff answers: Yes.

    Defendants answer: No.

5.  Is the bar against intra-corporate conspiracy applicable when there is a civil conspiracy by individuals acting outside of the scope of their regular employment duties?

    Plaintiff answers: No

iii

5207534

Defendants answer: Yes.

6.  Did Detroit Axle sufficiently allege that Defendants converted Detroit Axle's network, computer hardware and computer accounts when they exerted control over its network, hardware and accounts and locked Detroit Axle out?

    Plaintiff answers: Yes.

    Defendants answer: No.

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

Fed. R. Civ. P. 12(b)(6)

18 USC § 1962(c)

18 USC § 1962(d)

# INDEX OF AUTHORITIES

## Cases

*American Furukawa, Inc. v. Hossain*, 103 F.Supp.3d 864, 886 (E.D. Mich. 2015) ...................................................................................................................24

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ..........................................5

*Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) .................5

*Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000).........6, 9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...............................5

*Boyle v. United States*, 556 U.S. 938, 946 (2009) ...............................7, 8

*Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639, 648, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) ................................................................ 12, 14

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) ............. 10, 11

*Conley v. Gibson*, 355 U.S. 41 (1957) ......................................................5

*DiLuzio v. Vill. Of Yorklive, Ohio*, 796 F.3d 604, 615 (6th Cir. 2015) ..................22

*DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).....................................5

*H.J. Inc. v. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989) ................................... 14, 16

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) ...................................................................................................12

*Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) ................................................................................... 12, 14, 16, 17

*Hi-Way Motor Co. v. Int'l Harvester Co.*, 59 Mich.App. 366, 371-372 (1975) .....20

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) ............................12

*In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 490 (6th Cir. 2013) ..............7, 9

*International Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir.) .........20

*Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F.Supp.3d 760 (E.D. Mich. 2014) 23

*McNally v. Smith*, 2005 WL 3236779, at *1 (Mich. Ct. App. Dec. 1, 2005) .........23

*Montgomery Ward & Co. v. Williams*, 330 Mich. 275, 284 (1951) .......................21

*Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006).................6, 15

*Nieves v. Bell Industries*, 204 Mich. App. 459, 464, 517 N.W.2d 235 (1994)........21

*Pulte Homes, Inc. v. Laborers' Int'l Union of N.A.*, 648 F.3d 295, 304 (6th Cir. 2011) ...................................................................................................18

*Sarver v. Detroit Edison Co.*, 225 Mich.App. 580, 586 (1997) ....................... 23, 24

*Sedima, SPRL v. Imrex Co.*, 473 U.S. 479, 496 (1985)..............................................6

*State Farm Mut. Auto. Ins. Co. v. Radden,* 2017 WL 1315758, at *2 (E.D. Mich. Apr. 10, 2017) ................................................................ 11, 12, 13

*Titan Ins. Co. v. Hyten*, 491 Mich. 547, 555, n. 4, 817 N.W.2d 562, 568 (2012) . 21, 22

*United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991).................................15

*United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985) ...................................7

*United States v. Turkette*, 452 U.S. 576 (1981) ......................................................7

*Uselmann v. Pop*, --- F.Supp.3d ---, 2020 WL 6075553, at *6 (E.D. Mich. Oct. 15, 2020) .........................................................................................................7

*Vemco, Inc. v. Camardella*, 23 F.3d 129 (6th Cir. 1994) ...................................16

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus. Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ............................................................................................5

## Statutes

18 USC § 1030(e)(6)...............................................................................................18

18 USC § 1951 ........................................................................................................25

18 USC § 1962(c) ......................................................................................................6

Fed. R. Civ. P. 12(b)(6)........................................................................................4, 5

Fed. R. Civ. P. 9(b) ...........................................................................................12, 13

vii

## **INTRODUCTION**

After Defendants Detroit IT, LLC ("Detroit IT"), Eric Grundlehner ("Grundlehner"), and Stephanie Miller ("Miller") (collectively, the "Defendants") began to suspect that Plaintiffs Axle of Dearborn, Inc., d.b.a. Detroit Axle, Detroit Axle, Inc., and Detroit Axle QSSS, Inc. (collectively "Detroit Axle") would terminate Detroit IT's services as its IT manager, Defendants began implementing their scheme to defraud and extort Detroit Axle by, in part, sending fraudulent invoices to Detroit Axle. Defendants then turned up the heat on Detroit Axle after Detroit Axle notified them that it was moving to a new IT services provider by hacking onto Detroit Axle's network and computer systems after Defendants' access was removed and wresting control of Detroit Axle's IT infrastructure from Detroit Axle and its new IT services provider. Defendants then demanded extortion payments in return for unfulfilled promises to restore Detroit Axle's access to its own network and computers.

Defendants' predicate acts and extortion are highly illegal, and Defendants are liable for their actions – through a variety of Federal and State law claims. However, instead of being willing to face the consequences of their actions, Defendants are now seeking dismissal of Detroit Axle's meritorious claims, arguing that Detroit Axle is not entitled to the relief it seeks because Defendants could not have committed RICO violations, could not have committed fraud, could not have

committed conversion, were authorized to hack Detroit Axle's network and computers, and cannot be responsible for any of their actions. As discussed below, Defendants' assertions are incorrect for a variety of reasons, and much of the law they rely upon is either contradicted by the authority they themselves cite, or by the rulings of the Supreme Court. Because both the facts and the law support Detroit Axle's claims, Defendants' Partial Motion to Dismiss (the "Motion") should be denied, and Detroit Axle's meritorious claims should be allowed to proceed.

## STATEMENT OF FACTS

Detroit Axle is a Michigan corporation that has been in business since 1990 and which is in Ferndale, Michigan. *See* First Amended Complaint (the "Complaint"), ECF No. 33, PageID.1481-82 at ¶ 14. Detroit Axle distributes new and reconditioned automotive parts locally through a physical retail sales location and on a nationwide basis through its website and other online retail channels. *Id* at PageID.1482, ¶ 15. A significant amount of Detroit Axle's sales is generated through its e-commerce efforts. *Id*. at ¶ 17. In order to facilitate its business and online presence, Detroit Axle depends on its network and computer systems. *Id*. at ¶ 20.

Detroit Axle hired Detroit IT because Grundlehner expressly represented that Detroit IT could service a company Detroit Axle's size and provide its services in a professional manner. *Id*. at PageID.1483, ¶ 22. After Detroit Axle realized that Detroit IT's representations were false and that it could not properly provide its

2

services, Detroit Axle decided to find and hire a new IT services management company. *Id*. at PageID.1486, ¶ 40. Defendants, suspecting that Detroit Axle was planning to terminate Detroit IT, then began issuing numerous fraudulent invoices. *Id*. at ¶ 41.

On October 11, 2020 and November 30, 2020, Miller sent, via electronic mail, numerous "invoices for projects/hardware that I show open" – most of which were for fraudulent charges originating from Detroit IT for equipment that was never installed or for services that were never provided. *Id*. at ¶¶ 42-58. Detroit Axle paid many of the fraudulent invoices that it was sent. *Id*.

On December 7, 2020, Detroit Axle "notified Defendants that it would begin transitioning to a new IT services provider." *Id*. at PageID.1489, ¶ 59. Shortly thereafter, between 1:30 pm and 5:00 pm, Detroit Axle's new IT services provided "removed Defendants' access from Detroit Axle's systems." *Id*. at PageID.1490, ¶ 61. In response, "Defendants made repeated attempts to hack back into Detroit Axle's IT infrastructure." *Id*. at ¶ 62. Defendants were ultimately successful in their hacking attempts. *Id*. at ¶¶ 63-68.

After Defendants illegally took control over Detroit Axle's IT infrastructure, Grundlehener called Detroit Axle's president and "threatened to 'shut everything down' and 'turn everything off.'" *Id*. at PageID.1491, ¶ 70. Grundlehener then demanded "a large sum of money" to not turn Detroit Axle off and promised that he

3

would "shut Detroit Axle down if the extortion was not made." *Id*. at ¶ 72. In total, Grundlehener demanded $125,000.00. *Id*. at PageID.1492, ¶ 74. Because Defendants had full control over Detroit Axle's IT infrastructure, and because of Grundlehener's threats, "Detroit Axle was left with no other option but to acede to Defendants' extortion demands." *Id*. ate PageID.1492-1493, ¶ 78. Defendants then continued to remove Detroit Axle's access to and control over its own computer systems. *Id*. at PageID.1493, ¶ 81. On December 8, 2020, Detroit Axle paid part of Defendants' extortion demands and remitted $25,271.20 to Detroit IT. *Id*. at ¶ 83. However, Defendants refused to return control of Detroit Axle's IT infrastructure, and, after Detroit Axle refused their increased demands for $185,000.00, Defendants' counsel threatened to barge into Detroit Axle's facility. *Id*. at PageID.1502, ¶¶ 134-135.

Defendants' actions have caused Detroit Axle significant damages. Among other things, Defendants crashed Detroit Axle's website, *Id*. at PageID.1493, ¶ 84; removed its ability to communicate with its vendors and other locations, *Id*. at ¶¶ 81-83; and caused Detroit Axle to lose well over $100,000 per day in sales. *Id*. at PageID.1498, ¶ 113.

## **STANDARD OF REVIEW**

In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court must accept a plaintiff's well pled allegations as true and

5207534

construe the complaint in the light most favorable to the plaintiff. *Conley v. Gibson*, 355 U.S. 41 (1957); *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). To survive a motion to dismiss, the "[f]actual allegations contained in [the] complaint must 'raise a right to relief above the speculative level.'" *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). This "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its fact.'" *Id.* (quoting *Twombly*, 127 S.Ct. 1974).

At the motion to dismiss stage, the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the fact of the pleading that recovery is very remote and unlikely, but that is not the test. *See, e.g. Watson Carpet & Floor Covering, Inc. v. Mohawk Indus. Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("*Twombly* insists that pleadings be plausible, not probable"); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[T]he plausibility standard is not akin to a probability requirement."); *Twombly*, 550 U.S. 556 (plaintiffs can "proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely").

Accordingly, the Court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at trial, but merely determine whether the

5

complaint itself is legally sufficient. When examining the Complaint in the light most favorable to Detroit Axle, this Court should conclude that its claims against Defendants have been properly and more than sufficiently pled in its 50 page Complaint, and that this case should now be allowed to proceed on the merits.

## **ARGUMENT**

### I.   **Detroit Axle Properly Alleged Its RICO Claim[1]**

Under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), "[i]t shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 USC § 1962(c).[2] To plead a RICO violation, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, SPRL v. Imrex Co.*, 473 U.S. 479, 496 (1985). "Generally, RICO pleadings are to be liberally

---

[1] Detroit Axle voluntarily withdraws its Count III for violations of the Michigan RICO Statute. Defendants failed to indicate their sole basis for dismissal of Count III when seeking concurrence in their Motion. To the extent the Court finds that Detroit Axle's other claims should be dismissed, Detroit Axle requests that it be given the opportunity to amend its First Amended Complaint.

[2] It is also "unlawful for any person to conspire to violate any of the provisions" of 18 USC § 1962. 18 USC § 1962(d). Detroit Axle alleges that Defendants violated both 18 USC § 1962(c) and that they conspired to violate the RICO statute under 18 USC § 1962(d). ECF No. 33, PageID.1503-1509.

5207534

construed. *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000) (citing *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985))." *Uselmann v. Pop*, --- F.Supp.3d ---, 2020 WL 6075553, at \*6 (E.D. Mich. Oct. 15, 2020). Furthermore, because Detroit Axle properly alleged its RICO claim under 18 USC § 1962(c), as discussed below, and Defendants "unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged above," ECF No. 33, PageID.1507 at ¶ 159, Plaintiffs have sufficiently plead a claim that Defendants have liability for their conspiracy under 18 USC § 1962(d).

### A.   Detroit Axle Alleged That Defendants Formed A RICO Enterprise

"RICO applies both to legitimate enterprises conducted through racketeering operations as well as illegitimate enterprises." *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985) (citing *United States v. Turkette*, 452 U.S. 576 (1981)). "The enterprise itself is not liable for RICO violations; rather, the 'persons' who conducted the affairs of the enterprise through a pattern of racketeering activity are liable." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 490 (6th Cir. 2013). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). This structure does not have to be hierarchical, can make

decisions on an ad hoc basis, and does not require the members to have fixed roles. *Id*. at 948. All a plaintiff must show is "simply a continuing unit that functions with a common purpose." *Id*. The association-in-fact enterprise may be "form[e]d solely for the purpose of carrying out a pattern of racketeering acts" and "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *Id*. at 941 n. 1. Therefore, "a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact.'" *Id*. at 951.

Defendants challenge Detroit Axle's pleading of RICO's "enterprise" requirement. ECF No. 37, PageID.1701-1703. Defendants' sole argument is that they could not have formed a RICO enterprise because "an 'association-in-fact' necessarily requires more than one person"[3] and that RICO prohibits "an enterprise that consists only of [a company's] own members and employees." *Id*. at 1702-1703.[4] Defendants are incorrect, and their counsel has lost this exact argument when

---

[3] The association-in-fact here has three "people" – Detroit IT, Grundlehner, and Miller. Contrary to Defendants' assertion, Detroit IT, Grundlehener, and Miller are responsible for their individual actions, such as wire fraud, hacking, and the extortion demands that they themselves made. Each of the Defendants' actions are discussed in this brief and at length in the Complaint. As such, no piercing the corporate veil is required, as each Defendant acted in their own individual capacity.
[4] As part of Defendants' challenge of the enterprise requirement, Defendants make a blanket statement that "Plaintiff did not allege any facts to support their conclusion that Detroit IT, Grundlehner, and Miller formed an 'association-in-fact' enterprise." *Id*. at PageID.1702. However, that is not the case. Detroit Axle alleged numerous facts that show that Defendants formed a "continuing unit that functions with a

8

they tried to advance it before this District.

Defendants' reliance upon *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776 (6th Cir. 2000), for their broad assertion that *Begala* provides a blanket prohibition against RICO claims when the RICO enterprise "consists only of [a company's] own members and employees," is misplaced. ECF No. 37, PageID.1703. The RICO claim in *Begala* was actually dismissed because the plaintiff's complaint did not "contain facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit'" – not because of a "distinctness" rule. 214 F.3d 782. Likewise, while the Sixth Circuit stated that "[i]f RICO imposed liability on a corporation for the ordinary conduct of its agents and employees, every claim of corporate fraud would automatically become a violation of RICO"[5] in *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 490 (6th

---

common purpose," *Boyle*, 556 US 948, for example, that Defendants illegally "attempt[ed] to obtain payment from Detroit Axle based upon fraudulent invoices, which included fabricated and/or backdated charges, sent by Miller via electronic communication to Detroit Axle on at least (2) separate occasions," ECF No. 33, PageID.1478 at ¶ 1(i); attempted to extort "Detroit Axle through Grundlehner's threats to shut down the business . . . which led to Detroit Axle wiring $25,271.20 to Defendants on December 8, 2020," *Id.* at PageID.1479, ¶ 1(iii); and "have engaged in the same pattern and practice of racketeering activity against many other customers, evidenced, in part, by multiple prior and ongoing lawsuits, and scathing judicial injunctions against Detroit IT," *Id.* at PageID.1480, ¶ 3. These are just a few examples of the numerous allegations that Defendants formed an association-in-fact enterprise in the first three paragraphs of Detroit Axle's two hundred fifty-eight paragraph Complaint.

[5] Nothing in Defendants' conduct is ordinary, as they are illegal activities of fraud, hacking, and extortion.

9

Cir. 2013), the Sixth Circuit went on to further <u>hold</u> that "1) individual defendants are **always** distinct from corporate enterprises because they are legally distinct entities, even when those individuals own the corporations or act only on their behalf; and 2) corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity." *Id*. at 492 (emphasis added). Therefore, Detroit Axle properly alleged an enterprise consisting of different entities.

Furthermore, the Supreme Court has expressly rejected Defendants' argument that no association-in-fact exists when it "held that RICO both protects a legitimate enterprise from those who would use unlawful acts to victimize it, and also protects the public from those who would unlawfully use an enterprise (whether legitimate or illegitimate) as a vehicle through which 'unlawful . . . activity is committed." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) (internal citations omitted). "A corporate employee who conducts the corporation's affairs through an unlawful RICO pattern of activity uses that corporation as a vehicle whether he is, or is not, its sole owner." *Id*. at 164-165. Therefore, liability exists for corporate employees who conduct the affairs of the corporation in a RICO forbidden manner, as RICO "requires no more than the formal legal distinction between 'person' and 'enterprise' (namely, incorporation) that is present here." *Id*. at 165.

The Supreme Court further held that "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the [RICO] statute that requires more 'separateness' than that," *Id*. at 161.

Following the Supreme Court's guidance in *Cedric Kushner*, courts in the Eastern District of Michigan have rejected Defendants' exact argument – which was made in a different case by Defendants' attorneys in this matter. *See State Farm Mut. Auto. Ins. Co. v. Radden,* 2017 WL 1315758, at \*2 (E.D. Mich. Apr. 10, 2017), attached as **Exhibit A**.[6]

Here, Detroit IT, Grundlehner, and Miller are all separate entities. They each, individually and collectively, undertook actions to send fraudulent invoices via wire, hack Detroit Axle's IT infrastructure, and extort Detroit Axle. *See* ECF No. 33. Because Defendants are "legally distinct entit[ies] with different rights and responsibilities due to [their] different legal status," they are separate entities that can form a RICO enterprise, as Detroit Axle has alleged, the claim is properly stated and Defendants' Motion should be dismissed. *Cedric Kushner*, 533 U.S. 161.

### B. Detroit Axle Alleged That Defendants Committed Wire Fraud Under RICO

---

[6] In *State Farm*, Defendants' attorneys argued that "a RICO violation requires that a plaintiff prove the existence of a person and an enterprise that is not simply the same person referred to by a different name" and because the defendant was "the sole shareholder of" the co-defendant entity there could be no RICO violation. 2017 WL 1315758, at \*1-2.

"When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Heinrich v. Waiting Angels Adoption Servs., Inc*., 668 F.3d 393, 404 (6th Cir. 2012) (internal quotations omitted). "A RICO plaintiff is not required to plead or prove first-party reliance on an allegedly false statement." *Id*. at 404-405 (citing *Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639, 648 (2008)." Therefore, "[a] plaintiff must show 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id*. (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). Furthermore, courts should refrain from dismissing Complaints under Rule 9(b) "if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

In *State Farm Mut. Auto. Ins. Co. v. Radden*, the court held that "fraudulent bills and records" submitted by Plaintiff was "sufficient evidence to create genuine issues of material fact regarding Defendants' alleged scheme to defraud under common law fraud" to defeat summary judgment for its common law fraud and

12

RICO claims. 2017 WL 1315758, at *1-2. Defendants in that case – using the same counsel as the Defendants in this matter - argued that Plaintiff was "unable to show 'how or which services' were fraudulent."[7] *Id*. at *1. However, the Court found that because bills and other records were presented by Plaintiff, they constituted "sufficient evidence to create genuine issues of material fact regarding Defendants' alleged scheme to defraud under common law fraud" and under RICO. *Id*. at *1-2.

Here, Detroit Axle has not only stated what statements were fraudulent, identified Miller and Detroit IT as the speaker of the statements, showed how and when the statements were made, and explained why the statements were fraudulent, ECF No. 33, PageID.1486-1489 at ¶¶ 41-58, but it also provided the statements themselves – both the emails from Miller and the fraudulent invoices created by Defendants. *See* ECF. No. 34-3, PageID.1542-1574, ECF No. 34-4, PageID.1576-1596, ECF No. 34-5, PageID.1598-1622. Like in *State Farm*, the invoices are not only sufficient to defeat summary judgment, but they are sufficient to satisfy the pleading requirements of Rule 9(b) and show that Defendants committed wire fraud under RICO, and Defendants' Motion should be dismissed.[8]

---

[7] The defendants' attorneys in *State Farm* were David W. Warren, Peter W. Joelson, and Emily R. Warren.

[8] Defendants' argument that "Plaintiffs cannot claim to have relied on representations made in any invoice they did not pay in full, nor can Plaintiffs claim that an unpaid invoice, fraudulent or not, is the proximate cause of any injury to Plaintiffs' business or property" is incorrect, ECF No. 37, PageID.1707, as Detroit Axle paid numerous fraudulent invoices, ECF No 33, PageID.1515 at ¶ 203; the

13

### C.    Detroit Axle Alleged That Defendants Are Engaged In A Pattern Of Racketeering Activity

In order to show a "pattern" of racketeering activity, a plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Heinrich*, 668 F.3d 409 (quoting *H.J. Inc. v. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989)). This requirement is known as the "relationship plus continuity" test. *Id*. The "continuity prong of the test can be satisfied by showing either a 'close-ended' pattern (a series of related predicate acts extending over a substantial period of time) or an 'open-ended' pattern (a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed)." *Id*. at 409-410 (quoting *H.J. Inc.*, 492 U.S. 241-42).[9]

In *Heinrich*, the Sixth Circuit held that Plaintiffs established "open-ended continuity" even though "the predicate acts of racketeering activity spanned less than

_____

Supreme Court has rejected any requirement for "first-party reliance" in "a civil RICO claim predicated on [ ] fraud," *Bridge*, 553 U.S. 648; and Detroit Axle has been significantly harmed by Defendants claiming that the fraudulent invoices are valid. Defendants used their fraud as justification for their hacking onto Detroit Axle's network and computers and disruption of Detroit Axle's business – a disruption which caused in excess of $100,000.00 a day in damages to Detroit Axle – and for their extortion. *See* ECF No. 33, PageID.1494-1499 at ¶¶ 86-121. Because Defendants' fraud unpins their actions, "defendants' fraud was directly related to and was the proximate cause of the injuries required by 18 U.S.C. § 1964(c)." *Brown v. Cassens Transport Co.*, 546 F.3d 347, 357 (6th Cir. 2008).
[9] Defendants do not argue that the "relationship prong" of the "relationship plus continuity test" is not satisfied. ECF No. 37, PageID.1703-1706.

two months . . . and thus do not meet the requirements for close-ended continuity." *Id*. at 410. Plaintiffs alleged that Defendants committed "four predicate acts of mail or wire fraud" about the availability of children to adopt and for the "fraudulent inducement of the payment of foster care expenses." *Id*. at 408-409. Defendants argued that because they "were shut down as part of the criminal prosecution of the individual defendants, the enterprise currently poses no threat of facilitating continued criminal activity, and the plaintiffs, therefore, cannot establish open-ended continuity." *Id*. at 410. The Sixth Circuit rejected Defendants' argument because "in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred." *Id*. (quoting *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991)); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 729 (6th Cir., 2006) (Moore, J., concurring) (stating that the court should not consider events that transpired after the alleged racketeering acts ended when determining whether a threat of long-term racketeering activity has been properly alleged). The Sixth Circuit held that "the four predicate acts alleged here" had "no indication that their pattern of behavior would not continue indefinitely into the future" because the "complaint does not allege an inherently terminable scheme – a pattern of racketeering activity with a built-in ending point"

such as "a single scheme to defraud one plaintiff the cost of one paint system"[10] or on that was "an inherently short-term affair," and therefore Plaintiffs adequately alleged open ended continuity. *Id.* at 410-411. Importantly the Sixth Circuit also found that Plaintiffs further established open-ended continuity because they alleged that Defendants' predicate acts were their "'regular way of conducting [their] on-going business activities.'" (quoting *H.J. Inc.*, 492 U.S. 243).

Here, like in *Heinrich*, Detroit Axle adequately pled open ended continuity. Defendants' predicate acts of wire fraud on numerous occasions, extortion, and hacking were not limited to a single product and was not "an inherently short-term affair." Defendants' scheme was not inherently terminable as there is no inherent limit to what alleged services Defendants could fraudulently bill Detroit Axle for, what amounts Defendants could force Detroit Axle to pay under the fear of economic harm, and what further damage Defendants could have caused to Detroit Axle's computers and business. At the time Detroit Axle filed its lawsuit against Defendants, Defendants' actions showed that there was a "threat of continuing criminal activity," *Id.* at 410 – Detroit Axle had already paid numerous fraudulent invoices, ECF No. 33, PageID.1486-1489 at ¶¶ 41-58, and had paid Defendants

---

[10] The Sixth Circuit specifically addressed *Vemco, Inc. v. Camardella*, 23 F.3d 129 (6th Cir. 1994), which Defendants rely upon, determining that it found that there was "no open-ended continuity" because only one plaintiff and one paint system was pled, not because it took "place within a fifteen-month period" as Defendants argue. *Heinrich*, 688 F.3d 410-11, ECF No. 37, PageID.1703-1704.

16

$25,271.20 in funds that they demanded, *Id.* at PageID.1493, ¶ 83. In response, Defendants demanded "increased extortion" amounts, *Id.* at PageID.1494, ¶ 86; actively interfered with Detroit Axle's computer systems, *Id.* at ¶¶ 89-120; and "threatened to barge into Detroit Axle's facility." *Id.* at PageID.1502, ¶¶ 134-135. In fact, Detroit Axle filed this lawsuit, and sought a temporary restraining order and injunction against Defendants, because "Detroit Axle is faced with the possibility that Defendants will engage in further retaliatory against it." ECF No. 8, PageID.388. Therefore, because RICO "liability depends on whether the *threat* of continuity is demonstrated" through looking at the "totality of the circumstances surrounding the commission of [Defendants'] acts," and Defendants' actions show open ended continuity, Plaintiffs have plead a valid claim and Defendants' Motion should be dismissed.[11] *Heinrich*, supra.

Furthermore, Detroit Axle has adequately pled close-ended continuity, as Defendants' predicate acts go back years. Defendants "have and continue to be engaged in the same or similar scheme, with the same or similar purposes to defraud victims, using the same or similar methods of commission" against numerous other customers. ECF No. 33, PageID.1499, ¶¶ 122-133. Defendants' actions are hardly the "garden-variety state law crimes, torts, and contract breaches" that they claim,

---

[11] Detroit Axle has also alleged that Defendants' RICO violations are their "regular way of conducting" business activities, which also establish open ended continuity. ECF No. 33, PageID.1499, ¶¶ 122-133.

17

but a long running and pervasive criminal scheme which RICO was designed to combat against that is the "most blatant and worst examples of behavior which implicates violations of both civil and criminal law that I [Andrew Bartnowak] have experienced in my career." ECF No. 37, PageID.1706, ECF No. 34-16, PageID.1676 at ¶ 9.

## II. Detroit Axle Sufficiently Alleged That Defendants' Intrusion Onto Detroit Axle's Network And Computers Was Unauthorized

The Sixth Circuit interprets the "without authorization" element of the CFAA and SCA to mean accessing a computer "without sanction or permission." *Pulte Homes, Inc. v. Laborers' Int'l Union of N.A.*, 648 F.3d 295, 304 (6th Cir. 2011). Under the CFAA, "exceeds authorized access" is "access[ing] a computer with authorization and . . . us[ing] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 USC § 1030(e)(6). "Under this definition, 'an individual who is authorized to use a computer for certain purposes *but goes beyond those limitations* . . . has 'exceed[ed] authorized access.'" *Pulte Homes*, 948 F.3d 304 (emphasis in original). "In contrast, 'a person who uses a computer 'without authorization' *has no rights, limited or otherwise*, to access the computer in question.'" *Id*. (emphasis in original).

Here, Defendants argue that the CFAA and SCA do not apply because "Detroit IT's access to Detroit Axle's computers" was "authorized" and "Plaintiffs provided Defendants with authorization to access its networks, computers, and

18

systems." ECF No. 37, PageID.1712. Defendants completely ignore and hide the fact that Detroit Axle revoked Defendants' access onto its network and removed its credentials from the network, ECF No. 33, PageID.1489 at ¶¶ 59-60; "[a]gainst the explicit instructions of Detroit Axle, Defendants made repeated attempts to hack back into Detroit Axle's IT infrastructure," *Id*. at PageID.1490 at ¶ 62; that Defendants "covertly remotely connect[ed] to Detroit Axle employee Russ Rowan's PC, which was connected to the Detroit Axle network," *Id*. at ¶ 63; Defendants reset numerous passwords and accounts, *Id*. at ¶¶ 64-65; and that Detroit Axle's CEO Mouhamed Musheinish made it clear that Defendants did not have permission to control Detroit Axle's systems and that he wanted Defendants to "give it back," *Id*. at PageID.1492, ¶ 76, ECF 34-10, PageID.1637.

Furthermore, even if Detroit IT was authorized to restore its access to Detroit Axle's network and computers, which it was not, Detroit IT unquestionably exceeded its authorization to be on Detroit Axle's computers when it removed Detroit Axle's access to its own network and computers and <u>refused to return control to Detroit Axle</u>. ECF No. 33, PageID.1492 at ¶¶ 76, 80-82, 86-96, 242-244. Defendants' actions are exactly what is prohibited by the CFAA and the SCA, which were enacted to restrict bad actors from using "such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter," and therefore Plaintiffs have plead a valid claim and Defendants' Motion should be

5207534

dismissed. *International Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir.) (Finding that "Congress was concerned" with "attacks from disgruntled programmers who decide to trash the employer's data system on the way out (or threaten to do so in order to extort payments)" in enacting the CFAA.).

### III.    Detroit Axle Properly Pleaded That Defendants Committed Fraud

While "[s]tatements promissory in their character that one will do a particular thing in the future are not misrepresentations, but are contractual in their nature and do not constitute fraud," ECF No. 37, PageID.1710 (quoting *Hi-Way Motor Co. v. Int'l Harvester Co.*, 59 Mich.App. 366, 371-372 (1975)), Defendants intentionally obfuscate the issue – that they intentionally presented fraudulent invoices to Detroit Axle for services they claim were fully performed and for equipment they claimed was installed. ECF No.33, PageID.38-39.

Detroit Axle, in its Count V for Fraud and/or Misrepresentation, does not allege that Defendants failed to perform a future contractual promise, but that "Defendants made a material representation that Detroit IT installed the Detroit Axle Equipment," that "Defendants further represented that Detroit IT installed additional equipment at Detroit Axle's locations," and that "Defendants have knowingly issued fabricated and fraudulent Invoices to Detroit Axle, which contain entries for work that was never performed." *Id.* at ¶¶ 106, 107, 201, *see also* Paid Invoices, ECF No. 34-3, PageID.1542-1574; October 11, 2010 email and invoices, ECF No. 34-4,

PageID.1576-1596; November 30, 2020 email and invoices, ECF No. 34-5, PageID.1598-1622. Defendants' representations, through their communications and invoices, were not for future work, but for <u>work that was allegedly completed</u>. ECF No. 33, PageID.1515 at ¶ 202. In reliance upon Defendants' representations and presentation of numerous invoices that they claimed was for completed work and installed equipment, Detroit Axle "paid for the Detroit Axle Equipment and along with numerous Invoices." *Id.* at ¶ 203.

Defendants' secondary argument to avoid the ramifications of their fraud, that "Plaintiffs would be able to see which equipment was installed in their facilities and easily verify whether the items listed in the invoice were installed" is also inapposite. ECF No. 37, PageID.1711. While "fraud is not perpetrated upon one who has full knowledge to the contrary of a representation," *Montgomery Ward & Co. v. Williams*, 330 Mich. 275, 284 (1951), "there is no common-law duty to attempt to acquire such knowledge." *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 555, n. 4 (2012). Defendants, here, attempt to argue what the Michigan Supreme Court has expressly rejected - that Detroit Axle had "an independent duty to investigate and corroborate representations." *Id.*[12] However, because no such duty exists, and because

---

[12] The Michigan Supreme Court also addressed the case that Defendants rely upon, *Nieves v. Bell Industries*, 204 Mich. App. 459, 464 (1994), and held that *Nieves's* statement that "[t]here can be no fraud where a person has the means to determine that a representation is not true" should not be "read in isolation" and only applies

Defendants were the only parties with sufficient specialized knowledge about the equipment and software that was installed at Detroit Axle's facilities, Plaintiffs have plead a valid claim and Defendants' Motion should be denied.

## IV. The Bar Against Intra-Corporate Conspiracy Is Not Applicable When Defendants Acted Outside The Scope Of Their Employment

Defendants argue that "[t]here can be no conspiracy between a corporation and its directors if the directors are acting on behalf of the corporation." ECF No. 37, PageID.1715. Defendants ignore the fact that the bar against an intra-corporate conspiracy is only applicable when the "alleged acts were within the scope of [the actor's] employment." *DiLuzio v. Vill. Of Yorkville, Ohio*, 796 F.3d 604, 615 (6th Cir. 2015). Defendants argue that Miller just "emailed invoices – an act that is clearly within the scope of her employment" and hide the fact that what Miller actually did was conspire with Grundlehener to commit wire fraud by preparing fraudulent invoices with Grundlehener. Miller sent those fraudulent invoices to Detroit Axle, using Detroit IT as a cover to claim the services were performed, which is an illegal act that is outside the scope of her, and Grundlehener's, employment. ECF No. 37, PageID.1716.[13] Because Defendants do not admit that Miller and Grundlehener's

---

when "the allegedly defrauded party was given direct information refuting the misrepresentations." *Titan Ins. Co.*, 491 Mich. 555, n. 4.

[13] Furthermore, beyond directing the hacking of Detroit Axle, Grundlehner also committed extortion by threatening to shut down Detroit Axle unless Defendants were paid an extortion fee. ECF No. 33, PageID.1491 at ¶¶ 69-75.

wire fraud and fraud against Detroit Axle was within the scope of their employment, the bar against intra-corporate conspiracy cannot apply.

## V.     Detroit Axle Sufficiently Alleged That Defendants Converted It's Property

In Michigan, conversion arises from "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F.Supp.3d 760 (E.D. Mich. 2014). Notwithstanding the fact that Defendants converted Detroit Axle's tangible and physical personal property, which they did by depriving Detroit Axle the use of its networking and computer hardware, "Michigan appellate courts have held that certain intangible property can be the subject of a conversion action." *Sarver v. Detroit Edison Co.*, 225 Mich.App. 580, 586 (1997). Michigan courts do so when "the plaintiff's ownership interest in intangible property was represented by or connected with something tangible." *Id*. On that basis, both State and Federal Courts in Michigan recognize that computer and electronic data – such as the Accounts – can be converted.

In *McNally v. Smith*, 2005 WL 3236779, at *1 (Mich. Ct. App. Dec. 1, 2005), attached as **Exhibit B**, the Michigan Court of Appeals affirmed the trial court's "judgment in favor of plaintiff for the conversion of the computer software with an award of costs and attorney fees." Plaintiff provided funds for Defendant "to obtain a computer software program." *Id*. Defendant provided a "copy of the program" but

23

did not provide "all of the components necessary to make the program function." *Id.* at *2. Therefore, because Plaintiff "did not receive a functioning software program" the Court of Appeals held that "the trial court did not err in its award of damages to plaintiff for the computer software program." *Id.*

Likewise, in *American Furukawa, Inc. v. Hossain*, 103 F.Supp.3d 864, 886 (E.D. Mich. 2015), a court in this district held that Plaintiff "has set forth a proper claim for conversion since [Defendant] took 1,785 files and two-and-half years of emails from Furukawa's exchange server." In reaching its decision, the court found that "Michigan appellate courts have held that certain intangible property can be the subject of a conversion action." *Id.* (quoting *Sarver*, 225 Mich.App. 586). The court determined that because the "emails on the server" were "stored inside [Plaintiff's] tangible property," Plaintiff properly plead conversion. *Id.*

Here, Defendants improperly exerted dominion over Detroit Axle's property – its networking and computer hardware and its software and Accounts by "changing the passwords to the Accounts." ECF No. 33, PageID.1523-1524 at ¶ 242. Defendants' actions caused Detroit Axle to be unable to "access much of the functionality of the Accounts" and Defendants "locked [Detroit Axle] out of many of its network and computer systems." *Id.* at ¶ 243. As in *McNally* and *American Furukawa*, as pled Defendants are liable for not only their conversion of Detroit Axle's hardware, but their conversion of software and the Accounts, and therefore

24

Defendants' Motion should be denied.[14]

## CONCLUSION

For the reasons stated above, Detroit Axle respectfully requests that the Court deny Defendants' Motion, grant its costs and fees, together with such other and further relief as the Court deems just and appropriate under the circumstances.

Respectfully submitted,

By: /s/ Jonathan H. Schwartz
Jonathan H. Schwartz (P70819)
Jaffe Raitt Heuer & Weiss, PC
*Attorneys for Detroit Axle*
27777 Franklin Road, Suite 2500
Southfield, MI 48034

Dated: April 15, 2021                248.351.3000

---

[14] Defendants have not identified what alleged "contractual duties" apply to this situation that would bar Detroit Axle's conversion claims, ECF No.37, PageID.1714-1715, especially as "[t]he parties did not enter into any written contract, but rather, agreed that Detroit IT would bill Detroit Axle for services authorized by Detroit Axle, with payment to be made after receipt of invoices." ECF No. 33, PageID.1483 at ¶ 25. However, even if there was a contract between the Parties on the relevant issues, Defendants' hacking onto Detroit Axle's network and computers after they were terminated and Detroit Axle had Defendants' access removed, does not justify their hacking through "covertly remotely connecting to Detroit Axle employee Russ Rowan's PC, which was connected to the Detroit Axle network" and refusal to return control of Detroit Axle's network and computers back to Detroit Axle, even after Detroit Axle paid Defendants $25,271.20, are breaches of duties completely separate and distinct from any alleged contract. *Id.* at PageID.1489-1491, 1493 at ¶¶ 59-68, 83. Simply put, Defendants had no right to hack Detroit Axle's IT infrastructure and threaten to shut down Detroit Axle's business. Defendants had no right to wrest control of Detroit Axle's IT infrastructure from Detroit Axle – even if they allegedly had "the right to suspend services for any customer who fails to timely pay an invoice." ECF No. 37, PageID.1708. Defendants' actions are not only conversion, but a violation of the Hobbs Act, 18 USC § 1951.

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**AXLE OF DEARBORN, INC., D.B.A.**
**DETROIT AXLE**, a Michigan corporation;
**DETROIT AXLE, INC**., a Michigan
corporation; and **DETROIT AXLE QSSS,**
**INC.,** a Michigan corporation,

       Plaintiffs,              Case No. 21-cv-10163

v.                            Hon. Stephanie Dawkins Davis

**DETROIT IT, LLC**, a Michigan limited
liability company; **ERIC**
**GRUNDLEHNER**, an individual; and
**STEPHANIE MILLER**, an individual,

       Defendants,

and

**DETROIT IT, LLC**, a Michigan limited
liability company,

       Counterclaim Plaintiff,

v.

**AXLE OF DEARBORN, INC., D.B.O**.
**DETROIT AXLE**, a Michigan corporation;
**DETROIT AXLE, INC**., a Michigan
corporation; **DETROIT AXLE QSSS,**
**INC**., a Michigan corporation, and
**MOUHAMED MUSHEINESH**, an individual.

       Counterclaim Defendants.

---

## <u>CERTIFICATE OF SERVICE</u>

1

The undersigned hereby certifies that on April 15, 2021 she filed the foregoing

***Plaintiffs' Response in Opposition to Defendants' Partial Motion to Dismiss*** via

the Court's ECF system which will serve all counsel of record.

/s/ Pamela R. Mathews
pmathews@jaffelaw.com