UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AXLE OF DEARBORN, INC., d/b/a/
DETROIT AXLE, DETROIT AXLE, INC.,
and DETROIT AXLE QSSS, INC.,

                Plaintiffs,

v.

DETROIT IT, LLC, ERIC
GRUNDLEHNER, and STEPHANIE
MILLER,

                Defendants.

and

DETROIT IT, LLC,

                Counterclaim Plaintiff,

v.

AXLE OF DEARBORN, INC., d/b/a/
DETROIT AXLE, DETROIT AXLE, INC.,
DETROIT AXLE QSSS, INC,
and MOUHAMED MUSHEINSH,

                Counterclaim Defendants,

_____/

Case No. 21-cv-10163

Gershwin A. Drain
United States District Judge

**ORDER AND OPINION GRANTING IN PART AND DENYING IN
PART DEFENDANTS' PARTIAL MOTION TO DISMISS [ECF No. 37]
AND GRANTING IN PART AND DENYING IN PART COUNTER-
DEFENDANTS' PARTIAL MOTION TO DISMISS AND STRIKE [ECF No.
42]**

1

## I.   Introduction

This case arises from a contract between a distribution company and its information technology ("IT") service provider. The distribution company and its associated entities include Axle of Dearborn, Inc., d.b.a. Detroit Axle, Detroit Axle, Inc., and Detroit Axle QSSS, Inc. (collectively, "Axle" or "Axle Plaintiffs") along with Counterclaim Defendant Mouhamed Musheinesh, Axle's CEO (collectively, "Axle Counter-Defendants"). On the other side of the dispute are defendants/counter-plaintiffs Detroit IT, LLC ("Detroit IT"), Detroit IT founder/president/chief technology officer Eric Grundlehner, and Detroit IT Operations Coordinator Stephanie Miller (together "Detroit IT Defendants" or "Defendants").

Before the court are two motions: Detroit IT Defendants' Partial Motion to Dismiss Axle Plaintiffs' First Amended Complaint (ECF No. 37); and Axle Counter-Defendants' Partial Motion to Dismiss and Strike Parts of Detroit IT Counter-Plaintiff's Amended Counterclaim (ECF No 42).

For the reasons set forth below, the court will **GRANT** in part and **DENY** in part Detroit IT Defendants' Motion (ECF No. 37) and will **GRANT** in part and **DENY** in part Axle Counter-Defendants' Motion (ECF No 42).

## II.    Factual Background

Axle is a Michigan corporation that distributes automotive parts locally and nationwide.  (ECF No. 33, PageID.1481-82, ¶¶ 14-15). Detroit IT is a business that provides IT management and consulting services.  (ECF No. 39, PageID.1789, ¶ 11). Axle contracted with Detroit IT in April 2020 for IT services, including buying networking and computer equipment for Axle, and providing IT management services, among other things. The Parties agreed that Detroit IT would bill Axle for authorized services, with payment to be made after receipt of an invoice.  (ECF No. 33, PageID1483, ¶ 25).

On the first invoice that Axle authorized, Price Quote 21372, Detroit IT indicated that Axle agreed to be bound by the Terms and Conditions on Detroit IT's website, including obligations to make timely payments within 30 days of receipt of the invoice.  Section 5(c) of the Terms and Conditions permits Detroit IT to suspend services until paid in full.  (ECF No. 39, PageID.1790, ¶¶ 14-20); Section 12(a) includes the instructions for terminating the agreement upon material breach; and Section 12(b) provides that Axle must pay an early termination fee should it terminate the agreement. (ECF No. 39, PageID.1791, ¶¶ 21-2).

Axle authorized additional services and paid corresponding Price Quotes on May 19, June 11, July 7, July 9, July 15, July 28, July 30, July 31, August 12,

3

September 8, November 16, and December 17, 2020.  (ECF No. 39, PageID.1791-3, ¶¶ 23-34).

Starting in late 2020, however, Axle determined that it was no longer satisfied with Detroit IT's services. Axle suspected that Detroit IT was issuing invoices for projects and hardware that it never provided or installed.  (ECF No. 33, PageID.1486, ¶¶ 41-58).  So, on or about December 7, 2020, Axle notified Detroit IT that it would be transitioning to a new service provider.  (ECF No. 33, PageID.1486, ¶ 40, PageID.1489, ¶ 59). In its correspondence on the same day, Axle stated that "they look[ed] forward to [Detroit IT's] anticipated cooperation during the transition," (ECF No. 34-7, PageID.1629), because Detroit IT had previously agreed that it would "assist [] Axle if [it] chose to change to a new IT services provider in the future." (ECF No. 33, PageID.1483, ¶ 26).  On the same day Axle notified Detroit IT about the transition, Axle's new IT provider terminated Detroit IT's access to Axle's systems.  (ECF No. 33, PageID.1490, ¶ 61).

According to Axle, Detroit IT did not cooperate with the transition and instead changed some of Axle's passwords, de-licensed some of Axle's software, and regained access to Axle's IT infrastructure without permission.  (ECF No. 33, PageID.1490, ¶¶ 61-68). Further, Axle alleges that Detroit IT's Grundlehener called Axle's CEO Musheinish on the evening of December 7, 2020   and

4

threatened to "shut everything down" and "turn everything off" unless Axle paid Detroit IT $125,000.00. (ECF No. 33, PageID.1491-92, ¶¶ 70-4).

Detroit IT asserts that its actions were permissive and related to fulfilling its obligations to facilitate the transition to a new IT service provider. Detroit IT also says that it provided over $169,564.07 in services and equipment to Axle for which it had not yet been paid. (ECF No. 39, PageID.1794, ¶ 45).

On December 8, 2020, Axle Plaintiffs paid part of Detroit IT's request, $25,271.20. (ECF No. 33, PageID.1493, ¶¶ 81-3). Axle claims that Detroit IT's actions caused significant damages, including crashing Axle's website, removing its ability to communicate with vendors and other locations, (ECF No. 33, PageID.1493, ¶¶ 81-4), and, among other things, caused Axle to lose over $100,000.00 per day in sales, (ECF No. 33, PageID.1498, ¶ 113).

## III. Procedural Posture

Axle originally filed this action in the Oakland County Circuit Court. (ECF No. 1, PageID.8–32). Detroit IT removed the case to this court on January 25, 2021. (ECF No. 1). On March 12, 2021, Axle Plaintiffs filed its First Amended Complaint. (ECF No. 33). It brings claims of violations of: Racketeer Influenced and Corrupt Organization Act ("RICO") 18 U.S.C. § 1962(c) (Count I); RICO 18 U.S.C. § 1962(d) (Count II); Michigan RICO Statute MCL 750.159(f) (Count III); Breach of Contract (Count IV); Fraud and/or Misrepresentation (Count V);

Computer Fraud and Abuse Act 8 U.S.C. §1030 (Count VI); Stored Communications Act 18 U.S.C. § 2701 *et seq.* (Count VII); a Request for Declaratory Relief (Count VIII); Unjust Enrichment (Count IX); Common Law and Statutory Conversion (Count X); Tortious Interference with Business Relationship or Expectancy (Count XI); and for Civil Conspiracy (Count XII). The court issued text-only orders terminating as moot previous motions to dismiss the original Complaint and original Counterclaim.

Detroit IT filed a Counterclaim (ECF No. 28), which it later amended (ECF No. 39). In the Amended Counterclaim, Detroit IT claims: Breach of Contract (Counts I-II); Statutory and Common Law Conversion (Count III); Unjust Enrichment/Promissory Estoppel (Count IV); and Fraudulent Inducement (Count V).

Before the court are two motions, which are fully briefed. In Detroit IT's Partial Motion to Dismiss Axle's First Amended Complaint (ECF No. 37), Detroit IT argues that the court should dismiss Axle's claims as to Count I-III,[1] V-VII, X, XII, and all claims alleged against individuals Miller and Grundlehner. (ECF No. 37, PageID.1682). In Axle's Partial Motion to Dismiss and Strike Parts of Detroit IT Counter-Plaintiff's Amended Counterclaim (ECF No 42), Axle Counter-Defendants argue that the court should dismiss Detroit IT's counterclaims as to

---

[1] After the motion was filed Axle voluntarily withdrew its Count III for violations of the Michigan RICO statute. (ECF No. 41, PageID.1980, n. 1).

Counts III-IV, dismiss all claims alleged against individual Musheinesh, and that the court should strike paragraphs 82, 83, 84, 120-122, 126, 127, Exhibit 15, and Exhibit 16 of the Amended Counterclaim. The court held a hearing as to these two motions and took each under advisement.

## IV.   Standards of Review

### A.   Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must first comply with Rule 8(a)(2), which requires "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A plaintiff is also obliged "to provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting Twombly, 550 U.S. at 555 (citations and internal quotation marks omitted)).

In *Iqbal*, the Supreme Court explained that a civil complaint only survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662,

677 (2009).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Iqbal*, 556 U.S. at 678.   And, while a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."   *Id*. (quoting *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted)); see also *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (the factual allegations in a complaint need not be detailed but they "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief.").

The plaintiffs must also meet the more rigorous pleading standards of Rule 9(b) with respect to any claims based on fraud.   Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."   Fed.R.Civ.P. 9(b).   In order to allege fraud with particularity, the plaintiffs, at a minimum, must "'allege the time, place, and content of the alleged misrepresentation on which [they] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"   *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc*., 342 F.3d 634, 643

(6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)).

### B.   Motion to Strike

Federal Rule 12(f) provides that, on a motion of a party, the court may "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A court has liberal discretion to strike such filings as it deems appropriate, or to let the filings stand. *Van Loo v. Cajun Operating Co.*, 64 F.Supp.3d 1007, 1012 (E.D. Mich. 2014) *(internal citation omitted).* However, the Sixth Circuit has held that such motions are a "drastic remedy" that are to be used sparingly and are only to be granted when the pleadings to be stricken have no possible relation to the controversy. *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir.1953).

## V.   Discussion

The court will first address Detroit IT's motion (ECF No. 37), then address Axle's motion (ECF No 42).

### A.   Detroit IT Defendant's Motion (No. 37)

Detroit IT argues that Counts I-II, V-VII, X, XII and all claims against individuals listed in Axle Plaintiffs' First Amended Complaint should be dismissed.

#### i.   RICO (Counts I-II)

Counts I and II alleged violations of 18 U.S.C. §§ 1962(c) and (d). First, to survive a motion to dismiss a RICO claim under § 1962(c), a plaintiff must allege: (1) a defendant's conduct, (2) an enterprise, and (3) a pattern of racketeering activity. 18 U.S.C. § 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (*citing* 18 U.S.C. § 1962(c)). Second, to allege a plausible violation of RICO conspiracy under § 1962(d), a plaintiff must state facts sufficient to demonstrate all the elements of a RICO violation and plead the "existence of an illicit agreement to violate the substantive RICO provision." *Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Georgia*, 768 F. App'x 446, 459 (6th Cir. 2019) (*citing* 18 U.S.C. § 1962(d)). The Court will discuss § 1962(c) first.

### 1.  RICO § 1962(c) - Conduct

"Racketeering activity consists of acts which are indictable under a number of federal statutes listed in 18 U.S.C. 1961(1)." *Heinrich v. Waiting Angels Adoption Servs., Inc*, 668 F.3d 393, 404 (6th Cir. 2012).  Axle sufficiently alleges RICO conduct under § 1962(c) by Detroit IT and Miller through wire fraud, which is an enumerated offense under 18 U.S.C. § 1961(1).

The federal wire fraud statute makes it a crime to effect (with use of the wires) "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (citing 18 U.S.C. § 1343). "A 'scheme

to defraud,' as required to establish wire fraud, includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Heinrich*, 668 F.3d at 404 (citing *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir.2005). A plaintiff must also demonstrate scienter to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to misleading information. *Id*. (citing *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir.1998)).

A fraud claim meets Rule 9(b)'s heightened pleading requirements if it alleges: "(1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Wall v. Mich. Rental,* 852 F.3d 492, 496 (6th Cir. 2017). Rule 9(b) requires not only specifying the false statements and by whom they were made but also identifying the basis for inferring scienter." *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 787–88 (E.D. Mich. 2015) (citing *Heinrich*, 668 F.3d at 406). Lastly, to allege a valid RICO claim, a plaintiff must show not only that the predicate act was a "but for" cause of plaintiff's injuries, but also that it was a proximate cause. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

11

Axle's fraud allegations against Miller fail under Rules 9 and 12(b)(6). They state only that she sent emails containing fraudulent invoices and demanding payment. This is not enough to form a basis for inferring intent, that she drafted the invoices, or knew they were fraudulent and fabricated.

As to Grundlehner and Detroit IT, Axle's allegations satisfy Rule 9's heightened pleading requirements and they raise right of relief above the level of speculation under Rule 12(b)(6). In its Complaint, Axle alleged that Defendants "devised or intended to devise a scheme or artifice to defraud [Axle] or to obtain money from [Axle] by means of false or fraudulent pretenses, representations or promises." (ECF No. 33, PageID.1505, ¶ 150). These allegations, in addition to those described below, provide the basis for inferring scienter Grundlehner and Detroit IT. Axle alleges the use of a wire to commit this fraud and obtain Axle's funds. According to Axle, "Defendants caused fraudulent invoices to be sent to [Axle], via electronic mail, on October 11, 2020, and then on November 30, 2020" and the "acts of Defendants were done intentionally, and knowingly, with specific intent to advance Defendants' scheme or artifice." *Id.* Miller sent the October 11, 2020 email with allegedly fraudulent invoice #12724 attached. Axle avers that Detroit IT "backdated and Fabricated Invoice #12724 to receive unearned funds [in the amount of $7,374.23] from [Axle]. (ECF No. 33, PageID.1483, 1486, ¶¶ 41-44).

Axle also avers that Detroit IT, under the direction of Grundlehner, "backdated and fabricated many of the invoices attached to Miller's November 30, 2020 email." (Id. at PageID.1486). These invoice numbers include: 12848, 12700, 12930, 12929, 12968, 12716, 12392, 12393, 8940, and 12701. (ECF No. 33, PageID.1487-1489, ¶¶ 47-56). Axle claims to have paid some of these fraudulent invoices included in Miller's November 30, 2020 email, which are also attached in Axle's exhibit entitled "paid invoices". (Id). This alleged fraud amounted to a total of more than $32,000 in paid invoices. (Id). Axle believes these invoices are fraudulent because of certain discrepancies. For example, Axle alleges that 12724 is fabricated because it is dated later that invoice 12725; if 12724 occurred before 12725, so the argument goes, it should be dated as occurring before 12725, but Defendants dated 12724 as occurring after 12725. Axle also allegedly discovered that Detroit IT only delivered or installed "a fraction of the equipment that Axle purchased, as had been intentionally misrepresented in the invoices." (ECF No. 33, PageID.1489, ¶ 57). Axle attaches to its Complaint an inventory showing equipment that Detroit IT allegedly failed to deliver and/or install, in contrast to representations made in the invoices, including a variety of technology equipment. (ECF No. 33, PageID.1489, ¶ 58; ECF No. 34-6, PageID.1624-1625).

Axle's allegations satisfy the threshold test under Rule 9. "When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to

reintroduce formalities to pleading but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 788 (E.D. Mich. 2015). The threshold is whether "the complaint places the defendant on sufficient notice of the misrepresentation allowing the defendants to answer, addressing in an informed way plaintiff[']s claim of fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir.1993) (quotation marks omitted). With respect to Axle's allegations of fraud, the Amended Complaint pleads sufficient detail to raise a plausible entitlement to relief and to place Grundlehner and Detroit IT on notice of the particulars of the misrepresentations associated with the fraud claims asserted against them.

In *Liberty Mut. Fire Ins. Co. v. Maple Manor Neuro Ctr. Inc.*, 2022 WL 107584, at *5 (E.D. Mich. Jan. 10, 2022), the court ruled that the plaintiff adequately pled facts to establish at least two predicate acts of mail fraud under §1962(c) with the requisite Rule 9(b) particularity. *Id*. Plaintiff alleged that defendants submitted fraudulent medical records, bills, and invoices through interstate wires, which sought payment for treatment and services from an unlicensed healthcare provider. *Id*. And Plaintiff stated when, how, and by whom the fraudulent medical records and invoices were faxed or mailed to them). *Maple Manor* is persuasive and analogous to the fraud allegedly perpetuated by Miller

and Detroit IT. Similar to *Maple Manor*, Axle describes the fraud, the purpose behind it, the time and place of its occurrence, and the parties who perpetuated it. Axle's allegations sufficiently allege predicate acts involving a wire fraud scheme perpetuated by Detroit IT and Grundlehner to defraud Axle out of money.

Defendants say their alleged conduct described above are not predicate acts under 18 U.S.C. § 1961 but, if accepted as true, could only potentially give rise to contract claims. They rely on *Sunlight Elec. Contracting Co. v. Turchi*, 918 F. Supp. 2d 392, 404–05 (E.D. Pa. 2013), to distinguish Axle's claims from civil RICO claims. In that case, a subcontractor's claim against a developer for failure to pay money owed upon completion of electrical project was found to be a garden variety breach of contract claim under Pennsylvania law, rather than one supporting violation of RICO. *Id*. at 405. The court observed that the developer's actions did not involve the deceit crucial to a civil RICO claim. *Id*. Although the subcontractor alleged that the developer had used the mail and wire to communicate with other entities to advance a deceptive scheme to avoid payment to the subcontractor, it was clear that the developer was the controlling principal of all of the entities and, given the parties' past contracts, it was not reasonable for the subcontractor to believe that the entities were separate and funded and controlled by sources other than the developer. *Id*.

15

In contrast to *Sunlight Elec.*, Axle's allegations, Axle accuses Miller of fabricating invoices to elicit unjustified payments from Axle via email and they accuse Detroit IT of intentionally misrepresenting the amount of equipment it delivered and for which Axle had paid. The allegations also accuse Detroit IT and Miller of issuing invoices for equipment that it either had not delivered or had no intention to deliver in the future.[2]

Defendants also aver that "Plaintiffs' other theory that the invoices are fraudulent because they are not number coded consecutively according to date is ridiculous and not evidence of fraud." [ECF No. 37, PageID.1708]. Axle's burden on a motion to dismiss is to allege detailed facts to support a plausible inference and raise a reasonable expectation that discovery will reveal evidence of fraud. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Axle's fraud allegations satisfy this burden.

---

[2] Defendants say that Axle did not reasonably rely on the alleged fraudulent invoices and there can be no fraud where Axle could have easily inspected their facilities to determine whether the items listed in equipment invoices were installed. They rely on *Nieves v. Bell Industries*, 204 Mich. App. 459, 464 (1994). But *Nieves* involved state law fraud claims related to false assurances made about a just-cause employment contract that was really an at-will employment contract. In the RICO context involving wire fraud under 18 U.S.C §1343 and mail fraud under §1343, the Sixth Circuit and U.S. Supreme Court have held that RICO plaintiff is not required to plead or prove first-party reliance on an allegedly false statement. See *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008); and *Heinrich*, 668 F.3d at 404–05. Thus, Defendant's argument is without merit.

Finally, Axle appears to accuse Grundlehner of extorting it under the Hobbs Act 18 U.S.C § 1951. A plaintiff claiming a Hobbs Act violation based on extortion as a predicate act in a civil RICO claim must show the defendant "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by...extortion or attempt[ed] or conspir[ed] to do so. 18 U.S.C. § 1951(a); *Heinrich*, 668 F.3d at 406-07. This includes parties who have "committ[ed] or threaten[ed] physical violence to any person or property in furtherance of a plan or purpose to do [so]." *Id*. Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Extortion can occur either through (1) the threat of force, violence, or fear; or (2) "the color of official right." *United States v. Watson*, 778 Fed. Appx. 340, 345 (6th Cir. 2019).

Axle alleges that it terminated its relationship with Detroit IT and directed its new IT provider to remove Detroit IT's access. Thereafter Detroit IT allegedly hacked into Axle's systems, regained control, Grundlehner called Axle's president, threatened to shut the business down, and demanded an "increasing amount of money (first $100,000 and then $185,000)." (ECF No. 33, PageID.1492). Defendants deny that Grundlehner threatened to shut down Axle's business. They argue, however, that any such threats would not have been extortion because

Detroit IT had the right under the parties' contract to suspend services for any customer who fails to timely pay an invoice. To credit this argument, the Court would need to assume that the invoices were not fabricated, that Detroit IT was entitled to payment of the invoices, and that Detroit IT either: (1) was authorized by contract to shut down Axle's systems in the event of nonpayment, or (2) was permitted to gain unauthorized access to Axle's systems and hold them hostage until payment was made under the contract. Such factual allegations have not been made by either party. Further, this finding would contradict the Axle's allegations and draw an inference against it. Drawing a factual inference against the nonmovant violates established practice under Fed. R. Civ. P. 12(b)(6) and the rule that RICO pleadings are to be liberally construed. *Begala*, 214 F.3d at 781.

Grundlehner's alleged actions constitute a threat to shut down Axle's business in order to obtain a large sum of money the company, i.e., extortion. This resulted in Axle wiring $25,271.20 to Detroit IT thereafter. (ECF No. 33, PageID.1479). The facts as alleged support the plausible inference that Grundlehner was not merely engaged in an effort to suspend the services of a party who was delinquent on its payments under a contract.

The court finds that Axle has sufficiently alleged RICO conduct as to Detroit IT and Grundlehner. Axle's has not sufficiently alleged a fraud claim as to Miller; count I, as asserted against Miller, is **DISMISSED**.

18

## 2.  RICO § 1962(c) - Enterprise

Axle has sufficiently alleged a RICO enterprise as required under § 1962(c). An enterprise is defined by statute as "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

To establish an enterprise, a plaintiff must allege: (1) an ongoing organization with some sort of framework or structure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties and; (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged.  *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 793 (6th Cir. 2012).  At minimum, an enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

In interpreting RICO, courts have applied a "distinctness" requirement, which requires the "person" charged with violating RICO be a separate entity from the "enterprise." See *Begala v. PNC Bank, Ohio*, 214 F.3d 776, 781 (6th Cir.2000). In *Begala*, the Sixth Circuit held that, under this requirement, "a corporation may not be liable under [RICO] for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members." *Id*. at 781.  Thus, "[a]n

organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself." *Id*.; See also *Shields v. UnumProvident Corp.,* 415 F. App'x 686, 691 (6th Cir. 2011); *In re ClassicStar Mare Lease Litig.,* 727 F.3d 473, 490 (6th Cir. 2013) ("If RICO imposed liability on a corporation for the ordinary conduct of its agents and employees, every claim of corporate fraud would automatically become a violation of RICO.").

Axle alleges that Detroit IT, Grundlehner, and Miller form an association-in-fact for the common and continuing purpose of racketeering activity. (ECF No. 33, PageID.1504). The allegations plead in the First Amended Complaint assert that Grundlehner and Miller were employed at a RICO enterprise (Detroit IT), conducted its affairs, and engaged in racketeering activity on its behalf, in addition to regular corporate activity. (Id).

Axle hired Detroit IT around April 2020. Between July 22, 2020, and December 8, 2020, Detroit IT and Axle allegedly discussed price quotes for various services and equipment. (*Id*. at PageID.1485). Axle purports to have timely paid invoices totaling $173,270.95 for services that Defendants said were performed and equipment. Allegedly, Detroit IT: failed to provide the services with the promised quality and professionalism, failed to perform some of the service jobs promised, furnished only a fraction of the equipment paid for, and failed to fix

problems that were reported or sometimes created new ones. (*Id*). Axle's First Amended Complaint alleges activities of Detroit IT's regular business affairs.

The allegations of extortion and fraud begin, however, when Detroit IT allegedly suspected that Axle intended to terminate the relationship and Miller began issuing a series of "questionable" invoices. Axle says Miller sent it an invoice for $7,374.23 on October 11, 2020; the invoice was allegedly fabricated and backdated to August 2, 2020. (Id. at PageID.1486). Miller sent another email on November 30, 2020 with several fabricated invoices and demanding payment. (Id).

Axle had Detroit IT removed from its systems. However, on December 7, 2020 a phone call with Axle President, Grundlehner allegedly told him that Axle's systems had been hacked and threatened to shut down Axle's operations in Michigan and Mexico if Axle disengaged from Detroit IT or did not pay a sum of $125,000. [ECF No. 33, PageID.1491]. By the next day, Detroit IT allegedly regained access over the majority of Axle's control system, reset the passwords, and deactivated certain accounts it had with vendors. (*Id*. at PageID.1492). Axle made a partial payment ($25,271.20) of Grundlehner's extortion demand, and its website crashed. Axle alleges that Grundlehner and Miller directed Detroit IT's business affairs and racketeering activity. (Id. at PageID.1480).

Defendants rely on *Begala,* arguing that Grundlehner and Miller are not sufficiently distinct from Detroit IT such that they constitute an association in fact. *Begala* is a Sixth Circuit case dealing with the issue of whether subsidiaries of a corporation can be distinct from the corporation itself such that, together, they constitute a RICO enterprise. In *Begala*, the district court found that plaintiff failed to adequately allege an "enterprise" under RICO because the other corporate RICO defendants were not separate from the corporation listed as a RICO defendant. The Sixth Circuit agreed with this conclusion but rejected the district court's rationale. *Begala*, 214 F.3d at 781, finding that it was *not* clear whether the corporations named as RICO defendants were subdivisions, agents, or members of the corporation. *Id*. Instead, the Sixth Circuit found that no enterprise was alleged because the complaint was "entirely devoid" of factual allegations suggesting that the behavior of the listed entities was coordinated in such a way that they functioned as a "continuing unit." *Id*. at 782. Axle correctly asserts that the distinctness principle was not the reason for the Sixth Circuit's affirmance of the dismissal in *Begala*. And *Begala* does not discuss the distinctness principle in relation to individual corporate employees and a corporation. Thus, the Court finds *Begala* it unpersuasive.

Axle also says that *In re ClassicStar Mare Lease Litig*., 727 F.3d 473, 490 (6th Cir. 2013) supports its argument that a RICO enterprise amongst a corporation

and its employees may satisfy the distinctness principle. In that case, the Sixth Circuit held that a parent company was distinct from a RICO enterprise where the parent company and each of its subsidiaries helped facilitate a fraud scheme and the enterprise included other entities that were neither owned nor acting as agents for parent corporation. *In re ClassicStar Mare Lease Litig.,* 727 F.3d 473, 493 (6th Cir. 2013). The Court reasoned that the distinctness requirement may be satisfied when the parent corporation uses the separately incorporated nature of its subsidiaries to perpetrate a fraudulent scheme. *Id*. The distinctness requirement was satisfied there because the subsidiaries used their separate legal incorporation to facilitate racketeering activity by allowing other RICO defendant corporations to use its reputation, experience, and legitimacy, and one of the subsidiaries served as a mechanism for concealing the fraud. *Id*. at 493.

This case is distinct from *In re ClassicStar*. Miller and Grundlehner were not legally distinct corporations who used their separate legal incorporation to facilitate racketeering activity on Detroit IT's behalf. Neither *Begala* nor *In re ClassicStar* support Axle's argument for the existence of a RICO enterprise between Detroit IT, Grundlehner, and Miller. The holdings in *Begala* and *In re ClassicStar* apply the distinctness principle with respect to an enterprise consisting of parent corporations and its subsidiaries. Those cases do not resolve the question at hand: whether a corporation and its individual employees who engage in illicit

activity on behalf of the corporation may join to form a RICO enterprise. To the

contrary, the *In re ClassicStar* panel stated that: "individual defendants are always

distinct from corporate enterprises because they are legally distinct entities, even

when those individuals own the corporations or act only on their behalf." *In re*

*ClassicStar*, 727 F.3d at 492.

The only authority cited by the parties that directly addresses a similar issue

regarding individual corporate employees is *Cedric Kushner Promotions, Ltd. v.*

*King*. In *King*, the alleged "enterprise" consisted of a corporation and its sole

owner. Applying the distinctness principle, the Supreme Court held that:

> The corporate owner/employee, a natural person, is distinct from the
> corporation itself, a legally different entity with different rights and
> responsibilities due to its different legal status. The Court can find
> nothing in RICO that requires more 'separateness' than that.
> Linguistically speaking, an employee who conducts his corporation's
> affairs through illegal acts comes within § 1962(c)'s terms forbidding
> any 'person' unlawfully to conduct an "enterprise," particularly when
> RICO explicitly defines 'person' to include 'any individual ... capable
> of holding a legal or beneficial interest in property,' and defines
> 'enterprise' to include a 'corporation,' §§ 1961(3), (4). And,
> linguistically speaking, the employee and the corporation are different
> 'persons,' even where the employee is the corporation's sole owner.

*King*, 533 U.S. at 158–59. Under *King*, a corporate owner or employee is

distinct from the corporation itself and courts in the Sixth Circuit have adopted this

interpretation of *King*. *Id*. "When a corporate employee conducts the affairs of the

corporation in a RICO-forbidden manner, he or she can be liable under the RICO

statute separate from the corporation itself." *Allstate Ins. Co. v. Inscribed PLLC*,

No. 19-CV-13721, 2020 WL 5801186, at *5 (E.D. Mich. Sept. 29, 2020) (citing *King*, 533 U.S. at 163) (holding that defendant owner and manager of defendant pharmacy was distinct from pharmacy and constituted an enterprise ran through the pharmacy's affairs). See also *Liberty Mut. Fire Ins. Co. v. Maple Manor Neuro Ctr. Inc.*, No. CV 20-13170, 2022 WL 107584, at *6 (E.D. Mich. Jan. 10, 2022) (holding that defendant corporation was the enterprise and its employees who managed the corporation were sufficiently distinct from it). See also *United States v. Hills*, 27 F.4th 1155, 1173 (6th Cir. 2022), cert. denied *sub nom*. *Alqsous v. United States*, 214 L. Ed. 2d 134, 143 S. Ct. 305 (2022), and cert. denied *sub nom*. *Al-Madani v. United States*, 214 L. Ed. 2d 357, 143 S. Ct. 606 (2023) (holding that employees of county hospital were sufficiently distinct from the county hospital to form a RICO enterprise with the county hospital as the enterprise).

Detroit IT was a business entity separate and distinct from the alleged racketeering activity undertaken by Miller and Grundlehner, who allegedly directed the corporation's affairs, engaged in wire fraud, and extorted Axle. Corporate employees Miller and Grundlehner are distinct from Detroit IT and Axle sufficiently alleges a RICO enterprise.

The court will complete its analysis of Axle's RICO claims below.

### 3.  RICO § 1962(c) - Pattern of Racketeering Activity

Axle does not sufficiently allege a pattern of racketeering activity. A pattern of racketeering activity requires, at a minimum, two acts of racketeering activity within ten years of each other. *Ouwinga v. Benistar*, 694 F.3d 783, 795 (6th Cir. 2012); 18 U.S.C. § 1961(5). The Supreme Court has held, however, that the minimum two acts are not necessarily sufficient; a plaintiff must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co*., 492 U.S. 229, 237–39, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). This requirement is known as the "relationship plus continuity" test. See *Brown v. Cassens Transp. Co*., 546 F.3d 347, 355 (6th Cir.2008).

### (A) The Relationship Prong

The relationship prong is satisfied by showing the predicate acts have "similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Ouwinga*, 694 F.3d at 795. A particular defendant's predicate acts are not required to be interrelated with each other; instead, the predicate acts must be connected to the affairs and operations of the criminal enterprise. *Id*.

This case is distinguishable from *Vild v. Visconsi*, where the Sixth Circuit held that plaintiff did not establish the relationship prong of the  relationship plus continuity because a "civil plaintiff may not use one type of conduct (acts directed at him) to satisfy the relationship test, and then invoke a second type of conduct (unrelated acts directed at others) to fulfill the continuity test absent similar types of conduct and victims who are essentially in the same position." *Vild v. Visconsi*, 956 F.2d 560, 570 (6th Cir. 1992).

In contrast to *Vild*, Axle satisfies the relationship prong of the test. Grundlehner's alleged knowledge of the falsity of the invoices Miller sent and his alleged extortion both had the purpose of obtaining money from Axle on Detroit IT's behalf. According to Axle's First Amended Complaint, both acts achieved their purpose, at least in part, as Axle paid many of the fraudulent invoices and wired Detroit IT an extortion payment.[3]

**(B)** **The Continuity Prong**

The continuity prong of the test is satisfied by demonstrating either "a 'close-ended' pattern (a series of related predicate acts extending over a substantial period of time) or an 'open-ended' pattern (a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the

---

[3] Because the racketeering claim against Miller has been dismissed, the Court will not discuss whether Axle sufficiently alleges a pattern of RICO activity as to her.

predicate acts were performed).” *Heinrich*, 668 F.3d at 409–10) (citing *H.J. Inc.*, 492 U.S. at 241–42).

Axle cannot sufficiently allege closed-period continuity. The Sixth Circuit has found that racketeering activity that spanned seventeen months did not constitute a substantial period of time for closed pattern continuity. See *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir.1994) (finding that allegations of four predicate acts, affecting one victim and spanning seventeen months, were insufficient to meet the continuity requirement); and *Heinrich*, 668 F.3d at 410 (the predicate acts of racketeering activity that spanned less than two months do not meet the requirements for closed-ended continuity).

However, the short duration of the alleged scheme alone does not defeat open continuity. “Often a RICO action will be brought before continuity can be established [by showing predicate acts spanning a substantial period of time]. In such cases, liability depends on whether the threat of continuity is demonstrated.” *H.J. Inc.*, 492 U.S. at 242.   In *H.J.*, the Supreme Court held that open-ended continuity could be pleaded through facts showing “a distinct threat of long-term racketeering activity,” or by showing “that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.” *Moon v. Harrison Piping Supply*, 465 F. 3d 719, 726-27 (6th Cir. 2006) (citing *H.J., Inc.*, 492 U.S. at 242). Determining whether a pattern of predicate racketeering acts has open-ended

continuity requires a court to examine the specific facts of the case, but the threat of continuing racketeering activity need not be established exclusively by reference to the predicate acts alone; rather, a court should consider the totality of the circumstances surrounding the commission of those acts. *Heinrich,* 668 F.3d at 410.

Detroit IT and Grundlehner assert that their actions—in sending fraudulent invoices and shutting down Axle's systems until payment was made for over $185,000—were designed to recoup funds "for unpaid services and equipment, not including contractual fees." [ECF No. 37, PageID.1695]. However, accepting the plausible allegations of Axle's First Amended Complaint as true and viewing them in the light most favorable to Axle, they assert that Miller sent fraudulent invoices, Grundlehner directed this conduct, Axle had paid some or all of the invoices, and that Grundlehner's demand for an increasing amount in extortion payments (from $100,000 to ultimately $185,000) were for services never performed and equipment never furnished. [ECF No. 33, PageID.1478]. Further, Axle alleges that "Grundlehner also insisted that Detroit Axle could not disengage from Detroit IT, or use another IT provider, and promised that he would take care of Detroit Axle if they paid Defendants a large sum of money but would shut Detroit Axle down if the extortion payment was not made." [Id. at PageID.1492].

29

These facts allege multiple predicate acts designed to obtain funds from Axle and keep its business engaged with Detroit IT. It does not allege the same type of "inherently terminable scheme", ie., a "pattern of racketeering activity with a built-in ending point" that has prevented the Sixth Circuit from finding open-ended continuity in the past. *Heinrich*, 668 F.3d at 410. Defendants' scheme is distinguishable from other cases in the Sixth Circuit finding that no open-ended continuity exists. See *Vemco*, 23 F.3d at 134 (finding no open-ended continuity where only a single scheme to defraud one plaintiff of the cost of one paint system was pled); *Vild v. Visconsi*, 956 F.2d 560, 569 (6th Cir.1992) (finding the plaintiff had failed to plead open-ended continuity when "the acts alleged amount[ed] at best to a breach of contract with a single customer"); *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir.1991) (finding that there was no open-ended continuity because the defendant's fraudulent scheme to sell nineteen lots of land was "an inherently short-term affair" that would end once the lots were sold).

In *Moon*, the court held that the plaintiff did not establish an open-ended continuity where the predicate acts, which occurred over a 2.5-year period, were based on a single scheme of depriving an employee of his benefits and nothing suggested it would continue afterwards. *Moon*, 465 F. 3d at 725; *see also Kalitta Air, LLC v. GSBD & Assocs., LLC*, 2013 WL 3270871, at *5 (E.D. Mich. June 27,

2013) (dismissing a RICO claim because no open-ended continuity was found where the alleged scheme was a "one shot deal").

In contrast, under the allegations of Axle's First Amended Complaint, it is unclear whether the predicate acts constitute a single scheme aimed at diverting the funds associated solely with the fraudulent invoices and unpaid services and equipment. Miller sent multiple emails with numerous allegedly fraudulent invoices (some of which were paid by Axle), the amount of the alleged extortion payment increased gradually from $100,000-$185,000, and Grundlehner warned Axle not to disengage from Detroit IT. It is not obvious that the alleged racketeering activity would terminate upon payment of the invoices and allegedly unpaid services or that the scheme was keyed to the single objective of obtaining a certain amount of money on a one-time basis. The allegations also point to distinct injuries associated with the fraudulent invoices and the alleged extortion. Even if the Court were inclined to accept Defendants' argument that recovery is very remote and unlikely, at minimum, Axle is entitled to offer evidence to support its claims. See, e.g. *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus. Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Twombly insists that pleadings be plausible, not probable"); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[T]he plausibility standard is not akin to a probability requirement."); *Twombly*, 550 U.S. 556

31

(plaintiffs can "proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely")

Axle alleges sufficient facts to support its contention that the acts of alleged racketeering were "not isolated, but…the acts of racketeering by Defendants have been continuous, and there is a continued threat of repetition of such conduct. (ECF No. 33, PageID.1504, ¶ 147). Therefore, the court finds that Axle has sufficiently pled an opened-ended pattern of racketing activity as to Detroit IT and Grundlehner.

Defendants' Motion to Dismiss with respect to Count I is **DENIED** as to Grundlehner and Detroit IT and **GRANTED** with respect to Miller.

### 4. RICO § 1962(d)

Axle does not sufficiently alleged a RICO conspiracy under § 1962(d). To allege a RICO conspiracy, a plaintiff must successfully plead all the elements of a RICO violation and plead the "existence of an illicit agreement to violate the substantive RICO provision." *Heinrich,* 668 F.3d at 411 (*citing United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir.1983)); *see also Aces High Coal Sales, Inc. v. Cmty. Bank of Tr. Of W. Georgiai,* 768 F. App'x 446, 459 (6th Cir. 2019) (dismissing for same).  An agreement can be shown if "the defendant ... objectively manifested an agreement to participate directly or indirectly in the affairs of an

enterprise through the commission of two or more predicate crimes." *Sinito*, 723 F.2d at 1261.

As described above, Axle alleges predicate acts but does not successfully plead all the elements of a RICO violation as to Miller. For that reason, Axle's RICO conspiracy claim against her will be dismissed. Further, the complaint does not name another person with whom Grundlehner could have conspired with to engage in racketeering activity on Detroit IT's behalf. For this reason, the RICO conspiracy claim against Grundlehner must be dismissed as well.

Therefore, the court finds that Axle Plaintiffs fail to meet their burden of pleading a RICO violation under § 1962(d) (Count II). Defendant's motion to Dismiss is GRANTED with respect to count II.

### ii.      Fraud and/or Misrepresentation (Count V)

In their First Amended Complaint, Axle Plaintiffs allege common law fraud and/or misrepresentation about the following: Detroit IT made a material misrepresentation that it installed all the equipment that Axle fully paid for; and Detroit IT issued fabricated invoices for work that was never performed. (ECF No. 33, PageID.1514, ¶¶ 195-204). Detroit IT Defendants move for the claim to be dismissed, arguing that Axle does not meet Rule 9(b)'s particularity standard, that the claim is based on future conduct (statements promissory), that the claim is

33

further barred by the economic loss doctrine, and because Axle cannot raise a fraud claim where it had notice of the alleged fraud.

The court first finds that Axle does meet Rule 9(b)'s particularity requirements. As previously discussed in Section IV(A), a plaintiff pleading fraud must meet Rule 9(b)'s particularity requirements, and as discussed in Section V(A)(ii)(1), this court has found that Axle Plaintiffs meet this burden. At issue is: 1) whether Axle's claim is based on statements promissory; 2) barred by the economic loss doctrine; or 3) barred because Axle was on notice of the alleged fraud.

### 1. Statements Promissory

Axle's allegations of fraud are not promissory statements. Under Michigan law, statements that are promissory about future acts are contractual in nature and do not constitute fraud." *Hi-Way Motor Co. v. Int'l Harvester Co.*, 59 Mich. App. 366, 371-72 (1975); *see also Cook v. Little Caesar Enterprises, Inc.*, 972 F. Supp 400 (E.D. Mich. 1997) ("[T]o establish fraud the statements alleged to be false must relate to past or existing facts, and not to a future promise or expectation." (Internal citation omitted)). In *Hi-Way Motor Co.*, the court held that a promise made during a franchise negotiation not to grant other franchises in the area was not fraud, as it was a future promise and thus contractual. Detroit IT argues that Axle's fraud claim is based on unfulfilled promises to install certain equipment and

thus cannot constitute fraud.  (ECF No. 37, PageID.1710).  However, and unlike in *Hi-Way,* Axle Plaintiffs do not allege fraud about future promises.  Instead, Axle alleges misrepresentations in invoices about work allegedly already completed and equipment allegedly already installed.  (ECF No. 33, PageID.1514, ¶¶ 195-204). Therefore, the court finds these allegations to be based on past or existing facts, and thus not promissory statements.

### 2.  Economic Loss Doctrine

Detroit IT also argues that the economic loss doctrine bars Axle's fraud claim.  (ECF No. 37, PageID.1687).  Under Michigan law, the economic loss doctrine bars tort recovery where a claim for damages arises out of the commercial sale of goods and losses incurred are purely economic.  *Frankenmuth Mut. Ins. Co. v. Ace Hardware Corp*., 899 F.Supp. 348, 350 (W.D. Mich. 1995) (citing *Neibarger v. Universal Cooperatives, Inc*., 439 Mich. 512, 515 (1992)).

Other than a general assertion in its Statement of Issues Presented that this doctrine bars Axle's claim, however, Detroit IT offers no rationale as to why this doctrine should apply. As a result, the court finds the argument is waived. ("[I]ssues adverted to in perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.

1991) (per curiam) (stating that a "skeletal argument" does not preserve a claim and explaining that "[j]udges are not like pigs, hunting for truffles buried in briefs").

### 3. Notice

Detroit IT argues that Axle cannot raise a fraud claim where it was on notice of the alleged fraud. It asserts that Axle could independently verify that any equipment was not received and also review for whether given services were rendered. Consequently, it was on notice of what it now alleges as fraud. However, the court is not persuaded by this argument. Generally, under Michigan law fraud cannot be perpetrated against someone who has full knowledge that the representation is fraudulent. *Montgomery Ward & Co. v. Williams*, 330 Mich. 275, 284 (Mich. Sup. Ct. 1951). However, there is no common law duty to conduct an independent investigation to acquire such knowledge of a fraudulent misrepresentation. *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 555, n. 4 (2012) ("Stated differently, these doctrines do not require the party asserting fraud to have performed an investigation of all assertions and representations made by its contracting partner as a prerequisite to establishing fraud."). *Id.* at 557. Detroit IT cites *Nieves v. Bell Industries*, 204 Mich. App. 459, 464 (1994) for the general proposition that such a duty exists, and cites *Alfieri v. Bertorelli*, 295 Mich. App. 189, 195, (2012) to describe that this duty exists when a plaintiff is "either

presented with the information and chose to ignore it or had some other indication that further inquiry was necessary." Detroit IT's argument, however, is based on outdated caselaw. The Michigan Supreme Court has since explicated *Nieves*, noting that the plaintiff there possessed direct information, in the form of an employment contract, refuting misrepresentations that his hiring manager made. *Titan Ins. Co.*, 491 Mich. 555, n. 4. And, the latter proposition, that a duty exists when a plaintiff had an indication that further inquiry was necessary, was specifically overruled in *Titans*. *See Titan Ins. Co.*, 491 Mich. 555, n. 4 ("To the extent that the latter part of this statement can be read to support the proposition that a party has an independent duty to investigate and corroborate representations, we overrule *Mable Cleary Trust*"). Unlike in *Nieves*, Axle has alleged that it was not on notice that Detroit IT had failed to provide certain goods and services for which it had billed Axle. And Axle did not have a duty to independently acquire such knowledge. Therefore, Detroit IT's claim of notice is insufficient to defeat Axle's claim for fraud and/or Misrepresentation (Count V).

### iii.   Computer Fraud and Abuse Act and the Stored Communications Act (Counts VI-VII)

In Counts VI and VII, Axle claims that Detroit IT violated the Computer Fraud and Abuse Act (18 U.S.C. §1030) and the Stored Communications Act (18 U.S.C. § 2701 *et seq*.). Detroit IT seeks dismissal of these claims, arguing that

Detroit IT did not access Axle's computers without authorization or by exceeding the scope of authorization.

## A. Computer Fraud and Abuse Act

Axle sufficiently alleges a violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by pleading that Detroit IT acted without authorization and exceeded its authority in accessing Axle's computers. (ECF No. 33, PageID.1516-1518, ¶¶ 205-217).

The CFAA authorizes a private right of action for computer fraud and related activities. 18 U.S. Code § 1030(g). Specifically, it is a violation to "knowingly access[] a computer without authorization or exceeding authorized access…" 18 U.S.C. § 1030(a)(1). The Sixth Circuit has interpreted "without authorization" to mean to access a computer "without sanction or permission." *Pulte Homes, Inc. v. Laborers' Int'l Union of N.A*., 648 F.3d 295, 304 (6th Cir. 2011). The Sixth Circuit interpreted "exceeds authorized access" to mean when "an individual who is authorized to use a computer for certain purposes but goes beyond those limitations…" *id.*; *see also* 18 USC § 1030(e)(6) (defining "exceeds authorized access" to include "access[ing] a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter.").

Axle cites a case, *Pulte Homes, Inc.*, to distinguish between acts that are

done without authorization, and those that are permissible. *Id.*   In *Pulte Homes, Inc.*, a plaintiff claimed that a defendant's "onslaught" of emails caused a violation of the CFAA as it overloaded the plaintiff's computer system and caused damage to business operations. *Pulte Homes, Inc.,* 648 F.3d at 295.  The Sixth Circuit held that the defendant did not violate the CFAA under the "without authorization" prong since the plaintiff's email system was open to the public and did not require any private passwords. *Id.* at 304.  The court also reasoned that the defendant did not violate the CFAA under the "exceeds authorized access" prong where the defendant was not alleged to have exceeded any specific authority. *Id.* at 304.

Axle asserts that Detroit IT violated the CFAA by acting without authorization, or alternatively, exceeded its authorization.  Notably, unlike in *Pulte Homes, Inc,* Axle's computers were not public systems but rather private computers.  According to Axle, Detroit IT violated the CFAA when, after Axle specifically revoked its access and removed its credentials from the network on December 7, 2020 (ECF No. 33, PageID.1489 at ¶¶ 59-60), Detroit IT then "intentionally and without consent, permission or authorization gained access to confidential and sensitive information through Detroit Axle's computers and network systems." (ECF No. 33, PageID.1516, ¶ 208).  Furthermore, Axle alleges that Detroit IT then changed various passwords and revoked various software licenses, thus preventing Axle from accessing its own systems.  (ECF No. 33,

PageID.1516, ¶ 210).  Accepting these allegations as true and viewing them in the light most favorable to Axle, it has adequately alleged that Detroit IT both acted without authorization and exceeded any authorization it might have had.  In response, Detroit IT alleges that it had some authorization to access Axle's systems during this transition window.  (ECF No. 37, PageID.1711-12).  But factual disputes are not resolved at the motion to dismiss stage, and even if true, Axle has also alleged that Detroit IT exceeded its authorization in then preventing Axle from accessing its own systems.  Therefore, Axle has sufficiently pled this claim and Defendants' motion is **DENIED** with respect to Axle's CFAA claim.

## B. Stored Communications Act

Axle also sufficiently alleges a violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, *et seq*., in pleading that Detroit IT accessed Axle's computers without authorization and by exceeding its authorization, and also by preventing Axle from accessing its own stored communications.  (ECF No. 33, PageID.1518-1520, ¶¶ 218-228).  The SCA authorizes a private right of action for unlawful access to stored communications.  18 U.S.C. § 2701.  Under the SCA, it is a violation to access "without authorization" a facility through which an electronic communication service is offered, or "exceed authorization" to access that facility and obtain, alter, or prevent authorized access to a wire or electronic communication.  18 U.S.C. § 2701(a).  An "electronic communication service" is

40

defined to include computers and "computer facilities or related electronic equipment for the electronic storage of such communications." 18 U.S.C.A. § 2510(14).

As described in the above discussion of the CFAA, Axle has sufficiently alleged that Detroit IT acted both without authorization and also by exceeding its authorization in accessing Axle's computers. Axle has also sufficiently alleged that Detroit IT did so to obtain, alter, or prevent authorized access to a wire or electronic communication. In its First Amended Complaint, Axle states that Detroit IT gained access to Axle computers, network systems, and cloud-based accounts which contained communications between Axle and its customers. (ECF No. 33, PageID.1518-1519, ¶ 221). Axle alleges that its computers, network systems, and cloud-based accounts are a facility where electronic communications services are provided. (ECF No. 33, PageID.1519, ¶ 223). Further, Axle alleges that Detroit IT then prevented Axle from accessing its electronic communications by, among other things, changing the passwords to its accounts. (ECF No. 33, PageID.1519, ¶ 222). Thus, Axle has sufficiently pleaded this claim and it survives the motion to dismiss.

Therefore, the court finds that Axle Plaintiffs have sufficiently pleaded claims for violations of both acts (Counts VI-VII). Defendants motion is **DENIED** with respect to these counts.

### iv.   Conversion (Count X)

Axle also claims common law and statutory conversion of Axle's "property, its network and computer systems and the Accounts, by, among other things, changing the passwords to the Accounts to lock Detroit Axle out of the administrative functions of the Accounts and to prevent Detroit Axle from switching IT services providers without paying a ransom to Defendants."  (ECF No. 33, PageID.1522-3).   Detroit IT seeks dismissal of the conversion claim, arguing that it could not have converted the property alleged by Axle because it is intangible property, and because the claim is not actionable where it is not alleged to be separate and distinct from breach of contract claims.

Under Michigan law, conversion arises from "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Llewellyn-Jones v. Metro Prop. Grp.*, *LLC*, 22 F. Supp. 3d 760 (E.D. Mich. 2014) (internal citations omitted).  Statutory conversion includes instances where [a]nother person[] steal[s] or embezzl[es] property or convert[s] property to the other person's own use."   Mich. Comp. Laws § 600.2919a.  Michigan courts have defined "property" to include tangible property, as well as certain intangible property where a plaintiff's ownership interest is represented by, or connected to, something tangible. *Am. Furukawa, Inc. v. Hossain*, 103 F. Supp. 3d 864, 884 (E.D. Mich. 2015) (citing *Sarver v. Detroit Edison Co*., 225

Mich.App. 580, 586 (1997)). Michigan specifically includes software in its definition of intangible property. Mich. Comp. Laws § 440.9102(pp). Further, a conversion claim cannot be brought where the property right alleged to have been converted arises entirely from a plaintiff's contractual rights. *Llewellyn-Jones,* 22 F.Supp.3d at 788-789 (internal citation omitted).

The Court finds that Axle has not sufficiently alleged conversion of tangible property, or of intangible property with an ownership interest connected to something tangible. Axle cites *McNally v. Smith*, 2005 WL 3236779, at *1 (Mich. Ct. App. Dec. 1, 2005) and *American Furukawa, Inc. v. Hossain*, 103 F.Supp.3d 864, 886 (E.D. Mich. 2015) for the proposition that computers and electronic data can be converted. However, these cases are distinguishable from the present case. In *McNally*, the court affirmed a judgment for conversion of computer software where a plaintiff received software and an associated CD-rom. *McNally,* 2005 WL 3236779, at *2. Here, Axle does not allege the conversion of tangible property, or of intangible property connected to tangible property like the software and CD-rom in *McNally*. Instead, Axle alleges the conversion of its network and computer systems and accounts. (ECF No. 33, PageID.1522-3). And in *American Furukawa, Inc.*, the court held a claim for conversion was sufficiently pleaded where the plaintiff's ownership interest in intangible property (files and emails) was alleged to be connected to tangible property (a physical server and an external hard drive).

*American Furukawa, Inc.*, 103 F. Supp. 3d at 886.  The same cannot be said here. Axle has not made a connection between the allegedly converted intangible property (network, computer systems, and accounts), and any tangible property.

Therefore, the court finds that Axle Plaintiffs have not sufficiently pleaded their conversion claim and as a result, Detroit IT's motion to dismiss is GRANTED with respect to Axle's conversion claim.[4]

### v.   Civil Conspiracy (Count XII)

Finally, Axle alleges civil conspiracy against Detroit IT, Grundlehner, and Miller for entering "into an agreement to harm Detroit Axle or acted in concert in a manner that was detrimental to Detroit Axle."  (ECF No. 33, PageID.1525, ¶ 253). Detroit IT seeks to dismiss the civil conspiracy claim, arguing that the intracorporate conspiracy doctrine bars this claim.

Under Michigan law, conspiracy is a concerted action by a combination of two or more persons to accomplish an unlawful purpose, or a lawful purpose by unlawful means.  *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 313 (1992).  However, a corporation ordinarily cannot conspire with its agents or employees.  *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir.1991).  The Sixth Circuit has adopted the intracorporate

---

[4] Since the Court will dismiss this claim based on the lack of connection between the intangible property and tangible property, and the Court need not address Defendants' argument that Axle's claim is not actionable where it is not alleged to be separate and distinct from breach of contract claims.

conspiracy doctrine, under which "members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment." *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 615 (6th Cir. 2015). This exception "draws 'a distinction between collaborative acts done in pursuit of an employer's business and private acts done by persons who happen to work at the same place.'" *Adcock v. City of Memphis*, No. 06-2109, 2007 WL 784344, at *12 (W.D. Tenn. Mar. 13, 2007) (quoting *Johnson v. Hills & Dales General Hosp.*, 40 F.3d 837, 839 (6th Cir.1994). "[C]orporate actors might be beyond the scope of their employment where the aim of the conspiracy exceeds the reach of legitimate corporate activity." *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 840 (6th Cir. 1994)

In *DiLuzio*, municipal defendants were alleged to have conspired to wrongfully divest a plaintiff of his property, which the court noted fell outside of the scope of their municipal employment responsibilities. Therefore, the court held that the plaintiff sufficiently alleged that the defendants conspired together. *DiLuzio*, 796 F.3d at 616. In the present case, Axle alleges in its First Amended Complaint that "Grundlehner and Miller acted outside the scope of their job responsibilities, and individually engaged in tortious conduct against Detroit Axle." (ECF No. 33, PageID.1525, ¶ 225).

As discussed above, Miller cannot be liable for civil conspiracy because there are no allegations to show that she knew the invoices were fabricated or false and merely sending emails to a client does not fall outside the scope of employment. Secondly, Grundlehner allegedly directed Detroit IT's affairs and agreed to engage in fraud and extortion on its behalf in order to divert funds from Axle. As in *DiLuzio*, Axle has sufficiently alleged wrongful of illegal conduct by Grundlehner that falls outside the scope of his employment. Axle plausibly alleges an entitlement to relief on its civil conspiracy claim.

Therefore, Grundlehner and Detroit IT's motion to dismiss is **DENIED** with respect to the civil conspiracy claim. Miller's motion to dismiss the civil conspiracy claim is GRANTED.

### vi.    Claims against Individuals

Detroit IT contends that the claims against Miller and Grundlehner should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), because Axle has not alleged any individual liability as to Miller, and further that Axle has not alleged sufficient facts to justify piercing the corporate veil to attach liability to Grundlehner.

First, the court finds that Axle has not sufficiently alleged liability as to Miller under the *Twombly* and *Iqbal* pleading standards, as discussed above, nor under the Federal Rule 9(b) pleading heightened standard for fraud claims. As an initial matter, regarding Miller, Detroit IT's Operations Coordinator, Axle's only

allegations are that she sent fraudulent invoices to Detroit IT on two occasions. (ECF No. 33, PageID.1478, ¶ 1). Axle offers no further information about whether Miller drafted the emails, whether she exercised any discretion in sending the emails, whether sending the emails was outside the scope for her position, or Miller's role, if any, in other alleged acts including RICO violations, federal computer crimes, fraud, conversion, tortious interference, unjust enrichment, and conspiracy. As described in each section below, the court is not persuaded that Axle has met its pleading burden as to permit the court to draw a reasonable inference that Miller is individually liable for the misconduct alleged based on the facts provided. As a result, the court will dismiss Defendant Miller from the present action as well as all the claims against her.

Second, the court finds that Axle has sufficiently alleged liability as to Grundlehner. Detroit IT argues that Axle has not alleged sufficient facts to justify piercing the corporate veil to attach liability to Grundlehner. Axle concedes this point in its Response, instead arguing that "no piercing the corporate veil is required, as [Grundlehner] acted in [his] own individual capacity." (ECF No. 41, PageID.1982, n. 3). The court is persuaded that Axle has met its pleading burden as to Grundlehner's individual liability. The court describes Grundlehner's individual actions that give rise to individual liability in each relevant section above. Therefore, the court will not dismiss him from the present action.

### B. Axle Counter-Defendants' Motion (ECF No. 42)

The court next turns to Axle Counter-Defendant's Motion.  (ECF No. 42).  In its motion, Axle argues that Counts III-V of Detroit IT's Amended Counterclaim should be dismissed, along with claims against Counter-Defendant Mouhamed Musheinesh. Further Axle Counter-Defendants argue that allegations and exhibits relating to alleged settlement negotiations should be stricken from the Amended Counterclaim.

### i.   Claims Against Individuals

Axle argues that Detroit IT has not alleged sufficient facts to justify piercing the Axle entities' corporate veil to attach liability to corporate shareholder Musheinesh.  Detroit IT argues that it meets its burden, and the court agrees.

Under Michigan law, there is a general presumption that the corporate form will be respected.  *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007) (internal citation omitted).  However, the corporate veil may be pierced where "an otherwise separate corporate existence has been used to subvert justice or cause a result that [is] contrary to some overriding public policy."  *Id.*   To sufficiently plead a claim against an individual by piercing a corporate veil, a plaintiff must establish that: (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss.  *Id.*   Courts

may consider factors including undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham. *Laborers' Pension Tr. Fund v. Sidney Weinberger Homes, Inc*., 872 F.2d 702, 704–705 (6th Cir. 1988).

In *Laborers' Pension Tr. Fund*, a defendant similarly argued against individual liability and in favor of respecting the corporate form. 872 F.2d at 704–705. Instead, the court found that there was clear evidence that the defendant disregarded the corporate form and that fraud was properly alleged when the individual withdrew corporate funds before paying corporate creditors. *Id.* Therefore, the court affirmed a district court's ruling that the corporate veil should be pierced to attach individual liability. *Id.* However, in a case cited by both parties, *PSP Stores, LLC v. Ford,* 2018 WL 4164423, at *4 (Mich. Ct. App. Aug. 30, 2018), the court found that a plaintiff failed to allege sufficient facts to pierce a corporate veil. In *PSP Stores, LLC*, the court noted that the individual was alleged to be sole owner and also sent two checks on the company's behalf. *Id.* The court reasoned that these facts, alone, were insufficient to show that the company was a mere instrumentality of that individual. *Id.*

Unlike in *PSP Stores, LLC*, Detroit IT has alleged sufficient facts to justify piercing Axle's corporate veil to attach individual liability as to Musheinesh.

Detroit IT has alleged that the Axle entities are undercapitalized, under the common control and used interchangeably by Musheinesh, and that he failed to timely pay invoices. (ECF No. 39, PageID.1796, ¶ 56-57, 59; ECF No.39, PageID.1797, ¶ 65). Detroit IT says discovery is "likely to show that the Detroit Axle entities comingled funds, contracted in the entities' names interchangeably, own or use common property, and other indicia that the entities are shams and the instrumentality of Musheinesh." [ECF No. 45, PageID.2133]. At minimum, Axle pleads sufficient facts to assert a plausible entitlement to relief and raise a reasonable expectation that discovery will reveal evidence that warrants piercing the corporate veil.

As in *Laborers' Pension Tr. Fund*, *LLC*, Detroit IT has sufficiently alleged that Musheinesh used the Axle entities to commit fraud. Therefore, the court will not dismiss Musheinesh from the present action.

### ii.   Conversion (Count III)

Counter-Plaintiff Detroit IT also alleges statutory and common law conversion of "equipment and other personal property" it provided to Axle and valued at approximately $37,976.66. (ECF No. 39, PageID.1801, ¶ 91; ECF No.

39-21, PageID.1960). Axle seeks dismissal of the conversion claim, arguing that it is improper because it arises out of an express contractual agreement.[5]

A conversion claim does not lie where the property right alleged to have been converted arises entirely from a plaintiff's contractual rights. *Llewellyn-Jones v. Metro Property Group, LLC,* 22 F.Supp.3d 760, 788-789 (E.D. Mich. 2014) (internal citation omitted). "[I]t is possible for a party's conduct to result in both a breach of contract and a tort for common law conversion[,] so long as the defendant's conduct constituted a breach of duty separate and distinct from the breach of contract." *Devon Indus. Grp., LLC v. Demrex Indus. Servs., Inc*., 11–10313, 2012 WL 4839013 (E.D.Mich. Oct. 11, 2012). In its Amended Counterclaim, Detroit IT alleges that the Axle Counter-Defendants, including Musheinesh, continue to possess and control Detroit IT equipment and personal property listed in Exhibits 20 and 21. (ECF No. 39, PageID.1801-02, ¶ 91-100;

---

[5] Detroit IT alleges that it is entitled to plead alternate theories of recovery, conversion and unjust enrichment, where Axle denies the existence of a contract. Under Fed. R. Civ. P. 8(d)(2), a party "may set out 2 or more statements of a claim or defense alternatively or hypothetically," and "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." In *Devon Indus. Grp., LLC v. Demrex Indus. Servs., Inc.*, 2012 WL 4839013, at *5 (E.D. Mich. Oct. 11, 2012), the court allowed both conversion and contract claims to proceed where there was a dispute over the existence of a contract, and the conversion claims stemmed from a breach of duty separate and distinct from the breach of contract claim. In the present motion (ECF No. 42), neither Detroit IT nor Axle dispute that the Price Quotes govern these claims. Therefore, the court finds that it has not sufficiently pleaded these claims in the alternative.

ECF No. 39-21, PageID.1960; ECF No. 39-22, PageID.1963). Detroit IT's claim for conversion stems from a contractual duty to provide equipment as identified on various cited invoices.  Detroit IT does not identify a duty relating to the identified equipment and personal property that is separate and distinct from its breach of contract claims.   In fact, the Amended Counterclaim specifically alleges that "Detroit IT provided certain equipment and other personal property to Counterclaim Defendants *in order to perform IT services*." (ECF No. 39, PageID.1800, ¶ 90) (emphasis added).   As far as has been asserted by any party, the only services Detroit IT was bound to perform were those subject to the contract(s) between the parties.

Therefore, the court finds that Counter-Plaintiff Detroit IT has not sufficiently pleaded its conversion claim and as a result, the claim does not survive Axle Counter-Defendants' motion to dismiss. Counter Defendant Axle's motion to dismiss is **GRANTED** with respect to Counter Plaintiffs' counter claim III.

### iii.   Unjust Enrichment/Promissory Estoppel) Count IV

Detroit IT also brings claims for unjust enrichment and promissory estoppel where Axle received the benefit of equipment and services provided by Detroit IT as stated in various price quotes without payment. (ECF No. 39, PageID.1802-03, ¶¶ 101-109; ECF No. 39, PageID.1802-3).  Axle moves for the unjust enrichment

claim to be dismissed, arguing that unjust enrichment claims are not viable where express agreements govern a claim.

To sufficiently allege a claim for unjust enrichment under Michigan law, a plaintiff must establish the receipt of a benefit by defendant and an "inequity resulting to plaintiff because of the retention of the benefit by defendant." *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 478 (Mich. Ct. App. 2003).  When both elements are met, a contract will be implied at law to prevent unjust enrichment "only if there is no express contract governing the same subject matter." *Id.*

In *Belle Isle Grill Corp.*, the court affirmed that a plaintiff could not sufficiently allege unjust enrichment where a lease agreement governed the disputed benefit involving rent payments and capital improvements. *Id.* at 479.  In the present case, Detroit IT similarly alleges unjust enrichment while simultaneously alleging express agreements, in the form of signed price quotes (ECF Nos. 39-2, 39-3, 39-4, 39-5, 39-6, 39-7, 39-8, 39-9, 39-10, 39-11, 39-12, 39-13, 39-14) governed the disputed benefit.  In its Amended Counterclaim, Detroit IT alleged that Axle "received the benefit of the equipment and services provided by Detroit IT as stated in the Price Quotes," (ECF No. 39, PageID.1802, ¶ 102) and that the price quotes, which itemize each piece of disputed equipment "comprise the written agreements from April 28, 2020, to December 17, 2020 between

Detroit IT and Counterclaim Defendants."   (ECF No. 39, PageID.1793, ¶ 35). Further, Detroit IT alleges that these price quotes obligated the parties to various requirements of various provisions, including timely payments, the Terms and Conditions on Detroit IT's website, and procedures to dispute specific chargers. (ECF No. 39, PageID.1789-1793, ¶¶ 12-35).  As in *Belle Isle Grill Corp.,* Detroit IT does not sufficiently allege unjust enrichment where it simultaneously alleges that express agreements govern the disputed benefits.

Therefore, the court finds that Counter-Plaintiff Detroit IT has not set forth a plausibly claim for recovery for unjust enrichment and promissory estoppel.  As a result, the claim does not survive. Counter Plaintiffs' motion to dismiss is **GRANTED** with respect to count IV.

### iv.    Fraudulent Inducement (Count V)

Detroit IT alleges two bases for fraudulent inducement: first that Axle, through Musheinesh, sought to "fraudulently obtain goods and services from Detroit IT, while at all relevant times intending to repudiate the Price Quotes" by claiming Axle employees were not authorized to sign off on the price quotes (ECF No. 39, PageID.1804, ¶ 115); and second, that Axle, through Musheinesh, promised to pay outstanding invoices to induce Detroit IT to provide additional

equipment and services.  (ECF No. 39, PageID.1805-06, ¶¶ 120-127).[6]  Axle seeks

dismissal of the fraudulent inducement claim, arguing that fraudulent inducement

is not available when the alleged misrepresentations are contract terms of the

agreement that are subsequently breached.   At issue is whether the alleged

misrepresentations amount to breached contract terms or terms that fall outside a

contract's scope.

In Michigan, a plaintiff may bring a fraudulent inducement claim where he

is induced to enter an agreement based on false representations.  *Rood v. Midwest*

*Matrix Mart, Inc*., 350 Mich. 559, (1957).   To sufficiently allege fraudulent

inducement under Michigan law, a plaintiff must establish that: the defendant

made a material representation; the representation was false; when the defendant

made the representation, the defendant knew that it was false, or made it

recklessly, without knowledge of its truth and as a positive assertion; the defendant

made the representation with the intention that the plaintiff would act upon it; the

plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.  *Custom*

*Data Solutions, Inc. v. Preferred Capital, Inc*., 274 Mich.App. 239 (2006).

Further, and as described in Section IV(A), a plaintiff alleging fraud in the

---

[6] Axle argues that references to this second alleged basis for fraudulent
inducement should be "struck from Detroit IT's Amended Counterclaim as they
are confidential settlement communications under Fed. R. Evid. 408." (ECF No.
42, PageID.2032, n. 4).  For the reasons set forth in section V(B)(v), the court
declines to strike this material.

inducement must meet Rule 9(b)'s more rigorous pleading standards, alleging at a minimum the time, place and content of the alleged fraud, as well as information about the scheme, intent, and resulting injury. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc*., 342 F.3d at 643.[7]   However, the Sixth Circuit has held that fraud in the inducement is not available for a breach of contract where a party simply failed to uphold its side of the bargain, "lest fraud in the inducement claims swallow all breach of- contract claims." *Uhl v. Komatsu Forklift Co., Ltd*., 512 F.3d 294, 304 (6th Cir. 2008).

In *Uhl*, a defendant alleged fraudulent inducement and sought to set aside a final arbitration agreement because of an alleged defect in the agreement to

---

[7] The court notes that Detroit IT meets its Rule 9(b) pleading standards for both of its alleged bases for fraudulent inducement.  The first basis is that Axle induced Detroit IT into signing Price Quotes that it intended to repudiate.  Detroit IT has identified the speaker (Detroit IT entities), the time, place and content of the alleged fraud (signed and dated Price Quotes), as well as information about the scheme and intent (that Musheinesh either directed unauthorized employees to sign the Price Quotes or recklessly permitted unauthorized employees to sign the Price Quotes to fraudulently obtain goods and services from Detroit IT and then repudiate the contracts) and information about the resulting damage to Detroit IT.  (ECF No. 39, PageID.1803-1806, ¶ 110-127).  The second basis of the alleged fraud is that Axle promised to pay outstanding invoices to induce Detroit IT to provide additional equipment and services.  Detroit IT has identified the speaker (Musheinesh), the time, place and content of the alleged fraud (a December 9, 2020 agreement to pay Detroit IT $100,000.00 at $10,000 per month intervals), information about the scheme and intent (to get Detroit IT to rely on Musheinesh's representation to enter into a new agreement on December 9, 2020 wherein Detroit IT would provide additional services to Axle on a "COD basis"), and information about the resulting damage to Detroit IT.  (ECF No. 39, PageID.1803-1806, ¶ 110-127).

arbitrate. *Id.* at 304-305. The defendant argued that the arbitration agreement required plaintiff's arbitrator to make certain disclosures, and because the disclosures were never made, defendant was fraudulently induced. *Id.* The court disagreed, reasoning that it was instead a contractual dispute where one party did not perform its side of the bargain. *Id.* The court dismissed the claim because it concluded that it "cannot hold that this constitutes fraud in the inducement without turning every breach-of-contract claim into a claim for fraud in the inducement, because every party enters into an agreement with the expectation that all parties will abide by the agreement's terms." *Id.*

Here, Detroit IT has sufficiently alleged fraudulent inducement for only one of the two alleged basis explained herein. As in *Uhl*, where a defendant could not establish fraudulent inducement where a plaintiff breached its duties under a contract, Detroit IT's first alleged basis is whether Axle has breached its duties under the Price Quotes by not paying for equipment and services it received. (ECF No. 39, PageID.1804, ¶ 118). And as in *Uhl*, fraudulent inducement is not available to Detroit IT's first alleged basis because its complaint in this regard is essentially the equivalent of saying Axle has "simply failed to uphold its side of the bargain." 512 F.3d at 304. However, unlike in *Uhl¸* Detroit IT's second alleged basis sufficiently establishes fraudulent inducement since it is not related to the terms of the allegedly induced contract and instead governs a separate

statement that remains in dispute. Specifically, Detroit IT alleges that in order to induce it to enter into a December 9, 2020 agreement to provide continued equipment and services on a "COD basis," Musheinesh promised to pay Detroit IT $100,000.00 that it owed at intervals of $10,000 per month. (ECF No. 39, PageID.1805, ¶ 121). Detroit IT alleges that Axle then "failed and refused" to pay for the additional services and "den[ied] that they owe Detroit IT any amount for previously provided equipment and services." (ECF No. 39, PageID.1805, ¶ ¶ 123-125). Thus, Detroit IT alleges fraudulent inducement based on representations by Musheinesh that fall outside of the scope of the December 9, 2020's contract's terms. Therefore, the court finds that Counter-Plaintiff Detroit IT has sufficiently plead its fraudulent inducement claim.

Counter Defendants' motion to dismiss is **DENIED** with respect to count V.

### v.   Motion to Strike

Axle moves to strike references to alleged settlement negotiations in Detroit IT's Amended Counterclaim, arguing that such references are "impertinent and immaterial" in violation of Federal Rule of Evidence 408.   Axle specifically requests the court strike Amended Counterclaim paragraphs 82, 83, 120-122, 126, and Exhibits 15 and 16.   Detroit IT argues that there is no basis to strike the referenced material, and even if there were, Axle waived the right to do so when it referenced the material in its First Amended Complaint.

The Sixth Circuit has held that a motion to strike is a "drastic remedy" that should only be granted when a pleading has no possible relation to the controversy and when its inclusion will prejudice the defendant.   *Brown & Williamson Tobacco Corp v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).   Under Federal Rule 12, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."   Fed. R. Civ. P. 12(f).   This district has defined "impertinent" and "immaterial" to include allegations that are "not relevant to the issues involved in the action."   *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F.Supp.3d 772, 801 (E.D. Mich. 2015).   Further, evidence about settlement negotiations is not admissible "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity   or   amount,   or   to   impeach   through   a   prior   inconsistent   statement   or

contradiction." Fed. R. Evid. 408. Where a party puts a settlement negotiation in issue, however, it waives the associated privilege. *See Traverse Bay Area Intermediate Sch. Dist. v. Michigan Dep't of Educ*., 2007 WL 2986469, at *3 (W.D. Mich. Oct. 10, 2007); *see also In Nurse Notes, Inc. v. All State Ins. Co.*, 2011 WL 3862402, at *4 (E.D. Mich. Aug. 31, 2011) (finding not clearly erroneous a Magistrate Judge's decision to strike settlement material that was not labeled as "confidential" or settlement communications" by defendant).

In *Traverse Bay Area Intermediate Sch. Dist.*, the court denied a motion to strike alleged settlement material because the defendant failed to meet its burden under Rule 12(f) of establishing the material was redundant, immaterial, impertinent, or scandalous. *Id.* at *2-3. Instead, the court reasoned that the terms of the settlement agreement were "substantively relevant" to determine the scope and intent of the agreement, and that the defendant waived its settlement privilege by placing the settlement agreement in issue. *Id.* ("If the acceptance of the compromise results in an enforceable contract, which is subsequently repudiated, the aggrieved party can obviously, in a suit on the contract, prove the offer of compromise, its acceptance, and the surrounding circumstances.").

In the present case, Detroit IT argues the alleged material, which was not labeled as confidential or settlement communications, is material to its claims for breach of contract and for fraudulent inducement. Further, Detroit IT argues that,

like in *Traverse Bay Area Intermediate Sch. Dist.*, Axle waived its privilege by placing the alleged settlement negotiations in issue. The court agrees, Axle waived its privilege by first placing the alleged negotiation at issue, as Axle described terms of the alleged negotiation on the third page of its own First Amended Complaint. (ECF No. 33, PageID.1479, ¶ iii).

Axle cites a Texas case, *Washington v. Pacific Summit Energy LLC*, 2021 WL 229653, at *4 (S.D. Tex. Jan. 21, 2021), for the proposition that the court should strike the requested material. However, that case is distinguishable. In *Washington*, the court struck sections of a plaintiff's complaint which revealed settlement discussions because the defendant established that the statements were immaterial and were prejudicial. *Id.* at 3. However, unlike in *Washington*, Detroit IT has established that the alleged communications with Axle are material to some of its claims, as in *Traverse Bay Area Intermediate Sch. Dist. Id.* Further, and unlike in *Washington*, there is no prejudice to Axle where Axle has first cited the material.

Therefore, the court finds that Axle Counter-Defendants do not meet its obligations under Rule 12 and that its motion to strike certain material fails. Counter Defendants' motion to strike is **DENIED**.

## C. Conclusion

For the reasons set forth above, regarding Defendants' Motion to Dismiss [ECF No. 37] the court:

1. **GRANTS** it as to Miller and **DENIES** it as Grundlehner and Detroit IT on Counts I and II (RICO).

2. **DENIES** it as to Count V (Fraud),

3. **DENIES** it as to Counts VI and VII (Federal Computer Fraud and Abuse Act and Stored Communication Act Claims),

4. **GRANTS** it as to Count X (Conversion),

5. **DENIES** it as to Grundlehner and Detroit IT (civil conspiracy), **GRANTS** it as to Miller on Count XII

6. **DENIES** Defendants motion to dismiss Grundlehener based on the corporate veil.

Furthermore, regarding Counter Defendant Axle's Motion to Dismiss [ECF No. 42], the court:

1. **GRANTS** it on Count III (conversion);
2. **GRANTS** it as to Count IV (unjust enrichment);
3. **DENIES** it as to Count V (fraudulent inducement);
4. **DENIES** it as to the individual claims against Musheinesh based on the corporate veil;
5. **DENIES** it the Motion to Strike.

**IT IS SO ORDERED.**

Dated:     May 12, 2023

/s/ Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 12, 2023, by electronic and/or ordinary mail.

<u>/s/ Teresa McGovern</u>
Case Manager